Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
Elijah T. Gaglio, Esq., SBN 324799
egaglio@amslawyers.com
AGUIRRE & SEVERSON, LLP
501 West Broadway, Suite 1050
San Diego, CA 92101
Telephone:  (619) 876-5364

Francis J Flynn , Jr., Esq., SBN 304712
francisflynn@gmail.com
LAW OFFICE OF FRANCIS J. FLYNN, JR.
422 South Curson Avenue
Los Angeles, CA 90036
Telephone:  314-662-2836

**Co-Lead Counsel for Plaintiffs**

*Additional Counsel listed on signature page*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In Re:  Southwest Airlines Co. Flight Disruption Litigation*<br><br>This Document Relates to: All Actions | Lead Case No. 3:23-cv-00306-AJB-SBC<br>Consolidated with:<br>Case No. 3:23-cv-00313-AJB-SBC<br>Case No. 3:23-cv-00633-AJB-SBC<br>Case No. 3:23-CV-0306-AJB-SBC<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs MARY SMITH, MATT GROVE, PAULA HILL, EVA PIÑA, AND ERIC F. CAPDEVILLE, ("Plaintiffs"), individually and on behalf of all others similarly situated as set forth herein, by and through Plaintiffs' undersigned counsel, bring this class action lawsuit against SOUTHWEST AIRLINES CO. ("Defendant" or "Southwest") and alleges, based upon information and belief and the investigation of Plaintiffs' counsel as follows:

1

## I.      INTRODUCTION

1.      In 2003, Southwest Airlines Company ("Southwest") became the largest, domestic air carrier in the United States. Now in its 49th year of service, Southwest, which services over 130 million passengers annually, is one of three of the top ranked airlines.

2.      In its peak travel seasons, Southwest operates more than 4,000 weekday departures among a network of 102 destinations in the United States and 10 additional countries.

3.      Southwest does not sell airline tickets on any third-party global distribution platform, requiring all customers to purchase directly from Southwest whether it be through its website or by calling a Southwest booking line to make a reservation.

4.      On December 22, 2022, Southwest Airlines began canceling flights nationwide blaming the failure on a weather-driven issue. Subsequently, Southwest continued to cancel flights blaming weather through Wednesday, December 28, 2022, resulting in more than 14,500 flights cancelled since the prior Friday. On Wednesday, December 28, 2022 alone, Southwest cancelled 2,500 flights. Southwest CEO Bob Jordan confirmed the airline needed to upgrade its legacy systems. The Department of Transportation also confirmed that the cancellations came about as a result of Southwest's decision and actions.

5.      Southwest's response to the internally created crisis was to suggest customers could submit receipts for flight cancellations from December 24, 2022 through January 2, 2023 for consideration of reimbursement.

6.      Southwest's Contract of Carriage mandates refunds in this situation as well as full compensation for incurred costs and resultant cancellations for the failure of the carriage contract.

7.      Southwest's failure to provide prompt refunds for cancelled flights violates not only its own Contract of Carriage, but also federal law.

## II.    JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because (a) the aggregated claims of putative class members exceed $5 million, exclusive of interest and costs; (b) there are at least hundreds of putative class members; and (c) at least one of the members of the putative class is a citizen of a different state than Defendants.

9.      This Court has personal jurisdiction over Defendant because Defendant, directly or through its agents, conducts business in the State of California and within this District. Specifically, Defendant markets in this District and operates flights to and from this District. Through its business operations in this District, Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

10.    Through its business operations in this District, Defendant intentionally availed itself of the markets within this District and has sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court just and proper.

11.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Court sits in a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## III.   CONSOLIDATED ACTION

12.    On September 1, 2023, by Order of the United States District Court for the Southern District of California, Document 21, the Court consolidated the actions *Smith v. Southwest Airlines, Co.*, Case No. 3:23-cv-00313-AJB-SBC, *Hill and Pina v. Southwest Airlines Co.*, Case No. 3:23-cv-00633-AJB-SBC, *Grove v. Southwest Airlines Co.,* 3:23-CV-0306-AJB-SBC, and referenced additional plaintiff Eric Capdeville.

13.    Plaintiffs in this action bring this consolidated amended complaint in this District because a large portion of the Class resides in this District and a substantial

amount of substantial part of the events or omissions giving rise to the Class Members' claims occurred in this Division.

## IV.    PARTIES

### A.    PLAINTIFFS

**<u>Mary Smith</u>**

14.    Plaintiff MARY SMITH, over seventy years old, is a citizen of the state of California residing in Milpitas, California.

15.    Plaintiff Smith purchased from Southwest a ticket for a flight on December 29, 2022 from San Jose, California (stop in Las Vegas) to Indianapolis, Indiana:    Confirmation# 3GQRVZ, 12/29/22: SJC(6:50AM) -LAS(10:20AM) - IND(Arrival @ 4:45PM)

16.    December 29, 2022, while Plaintiff Smith, who is over seventy years old, was at the airport waiting for the delayed flight until Southwest cancelled Plaintiff's flight.  She waited for over 10 hours before Defendant canceled the flight, and she was without her luggage for twelve hours.

17.    Southwest was unable to rebook her on a same day flight, but instead booked a flight for December 30, 2022.

18.    On December 30, 2022, Southwest canceled that booked flight.

19.    In fact, the next available flight on Southwest from San Jose, California to Indianapolis, Indiana was not until after January 3, 2022 (assuming that the next available flight would even take off.)

20.    As a result, Plaintiff Smith was forced to purchase a replacement flight through Delta Airlines.

21.    Given the holiday season and the increased supply and demand created as a result of the Southwest debacle, the cost of the Delta Airlines ticket was $720.00 for one way flight.

22.    Defendant did not issue Plaintiff Smith a refund of the price of Plaintiff's ticket.

4

23.     Defendant did not reimburse Plaintiff Smith for her out of pocket expenses caused a result of cancelling her ticket within hours of the flight during the holiday season.

24.     To make matters worse, Plaintiff Smith was without her luggage for nearly twelve weeks, which included (among other important belongings) her medication.

**Matt Grove**

25.     Plaintiff Matt Grove is a citizen of the state of California residing in San Diego, California.

26.     Plaintiff Grove purchased from Southwest a ticket for a flight on December 23, 2022 from Oakland, California to San Diego, Califonria, Confirmation # 52621915818.

27.     On December 23, 2022, Plaintiff Grove was at the airport waiting for the delayed flight until Southwest canceled Plaintiff Grove's flight. He waited for over 1.5 hours before Southwest canceled the flight.

28.     Southwest was unable to rebook him on a same day flight.  Plaintiff Grove was forced to rent a car and then drive from Oakland to San Diego in a rental car at a cost of approximately $200.00.

29.     Defendant did not issue Plaintiff Grove a refund of the price of Plaintiff's ticket. Instead, Southwest issued a flight credit.

30.     Defendant did not reimburse Plaintiff Grove for his out-of-pocket expenses caused by Southwest's canceling his ticket within hours of the flight during the holiday season.

**Paula Hill**

31.     Plaintiff Paula Hill is a resident of the County of San Diego who purchased Southwest Airline tickets for roundtrip travel between San Diego, California and Kansas City from December 25, 2022 through January 2, 2023, but said flights were canceled by Southwest Airlines and travel was delayed.

5

32.    Because of Southwest Airlines' wrongful conduct as alleged herein, Plaintiff was not able to spend Christmas and New Years with family as intended upon her purchase of the tickets.

33.    Defendant did not issue Plaintiff Hill a refund.

**Eva Piña**

34.    Plaintiff Eva Piña is a resident of the County of San Diego who purchased Southwest Airline tickets for roundtrip travel between San Diego and Sacramento, California from December 21, 2022 through December 26, 2022, but said flights were canceled by Southwest Airlines and travel was delayed.

35.    Because of the Southwest Airlines wrongful conduct as alleged herein, Plaintiff Piña was forced to find an alternative means of travel to get back to San Diego by booking a car through a rental service for an 8-hour drive from Sacramento to San Diego.

36.    Defendant did not issue Plaintiff Piña a refund of the price of Plaintiff's ticket.

37.    Defendant did not reimburse Plaintiff Piña for her out of pocket expenses caused a result of cancelling her ticket within hours of the flight during the holiday season.

**Eric F. Capdeville**

38.    ERIC F. CAPDEVILLE is a Louisiana citizen who resides in Marrero, Louisiana, Parish of Jefferson.

39.    On or about October 10, 2022, Plaintiff Capdeville purchased two tickets for travel Tuesday, December 27, 2022 from New Orleans, Louisiana (MSY) to Portland, Oregan (PDX) for himself and his daughter, which included a connecting flight to Pheonix, Arizona (PHX) (the "Trip") through Southwest Airlines.

40.    Prior to departing, Plaintiff Capdeville saw the news that thousands of flights had been cancelled by Southwest Airlines. Upon checking, Plaintiff Capdeville

confirmed that his Southwest flight had been canceled and his reservations and stay in Portland would be lost without reimbursement.

41.     After speaking to customer service, Plaintiff Capdeville confirmed that in fact his flights had been canceled.

42.     Despite the fact that Plaintiff Capdeville could not take the flight he booked, and Defendant could not offer any comparable accommodations on another flight, Plaintiff Capdeville was not given a refund, but was only offered a credit for use on a future flight.

**B.     DEFENDANTS**

43.     Defendant SOUTHWEST AIRLINES CO. ("Southwest") is a corporation organized under the laws of Texas with a principal place of business located in Dallas, Texas.

44.     Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. As of December 31, 2021, Southwest had a total of 728 Boeing 737 aircraft in its fleet and 121 destinations in 42 states, the District of Columbia, the Commonwealth of Puerto Rico, and ten near-international countries: Mexico, Jamaica, The Bahamas, Aruba, Dominican Republic, Costa Rica, Belize, Cuba, the Cayman Islands, and Turks and Caicos.[1]

45.     For 2021, the Company's average aircraft trip stage length was 790 miles, with an average duration of approximately 2.1 hours, as compared with an average aircraft trip stage length of 743 miles and an average duration of

---

[1] https://otp.tools.investis.com/clients/us/southwest/SEC/sec-show.aspx?Type=html&FilingId=15534609&CIK=0000092380&Index=10000

approximately 2.0 hours in 2020, and as compared with an average aircraft trip stage length of 748 miles and an average duration of approximately 2.0 hours in 2019.[2]

## V.   FACTS

### A.   SOUTHWEST'S STRONG CALIFORNIA PRESENCE

46.   "Once singularly associated with Texas, Southwest is now an essential bridge across the north-south geographic divide in California, where white-collar workers, college students and families have come to rely on the airline the way New Yorkers depend on Amtrak or the Long Island Rail Road."[3]

47.   Southwest is the state's busiest airline, and more of its flights depart from California than from any other state in the nation, including Texas, where the company began.[4] Southwest is the top airline at seven of California's 10 busiest airports, accounting for more than half of all air traffic at the airports in Oakland, Sacramento, San Jose, Burbank and Long Beach.[5]

48.   "Southwest is almost the unofficial airline of California," Henry Harteveldt, an airlines analyst for Atmosphere Research Group, said after the airline's flight cancellations during the holidays left passengers stranded across the country.[6]

49.   In fact, "[t]wo-thirds of all seats for sale on flights within California are on Southwest flights, according to Mike Arnot, a spokesman for Cirium, an aviation analytics company. (United is a very distant second with 13 percent.)"[7]

---

[2] https://otp.tools.investis.com/clients/us/southwest/SEC/sec-show.aspx?Type=html&FilingId=15534609&CIK=0000092380&Index=10000
[3] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[4] Id.
[5] Id.
[6] Id.
[7] Id.

8

50.     "Southwest is California's busiest airline, with some 800 flights scheduled on peak days, many of which ferry residents between Northern and Southern California."[8]

51.     "Despite mild winter weather, California's medium-size airports suffered some of the worst cancellation rates in the nation over the [week of December 22, 2022] because Southwest accounts for so much of their traffic."[9]

52.     Many Southwest passengers, told they might be stranded for days, scrambled to find tickets on buses, trains and other airlines. At one point [the week of December 22, 2022], the only one-way ticket on short notice from Sacramento to Los Angeles was a first-class seat on Delta Air Lines for nearly $700, several times more than passengers are used to paying on that leg.[10] Others made a beeline for the rental car offices and opted to endure the six to nine hours it normally takes to drive from Northern to Southern California, or vice versa.[11]

53.     The airline said in a statement that it had stabilized its operations and that it planned to resume its full flight schedule Friday "with minimal disruptions." Only a few dozen Friday flights had been canceled by midday Thursday — "good news for everyone," Harteveldt said.[12]

54.     Southwest operates more flights in California than in any other place in the nation, including its home state. Southwest "carried more California travelers to, from and within California than any other airline," according to the airline's 2021 annual report.[13]

_____

[8] Southwest is California's 'Unofficial Airline.' The Meltdown Has Residents Anxious.  New York Times. https://www.nytimes.com/2022/12/29/us/southwest-california-commuters.html?searchResultPosition=1
[9] Id.
[10] Id.
[11] Id.
[12] Id.
[13] Id.

55.     Southwest remains a minor player on California's busiest intrastate route between San Francisco and Los Angeles, but it overwhelmingly dominates air travel at seven of California's 10 busiest airports. The airline accounts for 68% of total seats for sale on flights within California, said Mike Arnot, a spokesperson for Cirium, an aviation analytics company, and serves tens of millions of passengers annually.[14]

56.     Southwest accounts for more than half of all air traffic at Sacramento International Airport.[15]

57.     While it barely has a toehold at San Francisco International Airport, Southwest accounted for 80% of traffic at nearby Oakland International Airport and 63% at San Jose International Airport in the 12-month period ending on Sept. 30, according to the Bureau of Transportation Statistics.

58.     Similarly, alternative non-Southwest flights from Saint Louis, Missouri to Los Angeles California reached a price of over $2,300.00 – one way – a flight that would have taken 18 hours to arrive.  Saint Louis, Missouri to Long Beach, California on the same day would have cost up to $2,901 (with 3 stops) for $2,901 and which would have taken nearly 20 and a half hours to arrive.

**B.     SOUTHWEST'S OUTDATED SOFTWARE AND THE RESULTING CHAOS**

59.     On June 13, 2020, the Baltimore Sun released an article titled "Southwest Glitch Delays BWI Flights: Problem With Computer System Affected Airports Nationwide, Airline's Website." This article discussed how Southwest Airlines experienced problems with its computer system for a significant part of an afternoon, causing "significant flight delay" at airports around the country. Specifically, for about three hours, visitors to Southwest.com could not check into

---

[14] Id.
[15] Id.

their flights, purchase tickets, or check their flight's status. One traveler commented, "I'd like to know how a company as big as Southwest can have their whole server go down [. . .] Where's the backup plan?"

60.     According to FlightAware.com, this system failure delayed more than 600 flights as of 9:00 PM that day and resulted in 17 cancelled flights.

61.     On August 12, 2020, USA Today released an article titled "'So I Guess Southwest has Invented Time Travel': Airline Sends Passengers Bizarre Flight Changes." This article detailed how Southwest Airlines' system would re-route travelers, but would make the crucial mistake of scheduling travelers to arrive at a given airport after their connecting flights were due to leave. To illustrate, a traveler booked a nonstop flight from San Diego, California to Reno, Nevada, which was then re-routed to contain a connecting flight via Oakland, California. However, the connecting flight was due to leave 10 minutes before the first flight was scheduled to land.

62.     Southwest Airlines attempted to downplay the nonsensical flight changes by saying that passengers receiving such schedules had received preliminary flight change information that had not been finalized. One affected passenger was reportedly an information technology worker. She suspected that a computer glitch was to blame, and commented "[t]his should have been literally impossible [. . .]."

63.     But despite Southwest's assurances to the public, Southwest made no effort to remedy the technical flaws in its system but instead gave a dividend to its investors.

64.     Southwest relies on crew-assignment software called SkySolver, an off-the-shelf application that it has customized and updated, but that is nearing the end of its life, according to the airline.[16]

_____

[16] Southwest Meltdown Shows Airlines Need Tighter Software Integration.

65.     The program was developed decades ago and is now owned by General Electric Co.[17]

66.     Ask Southwest Airlines employees about their company's technology, and one word keeps coming up: "antiquated."[18]

67.     "We've been harping on them since 2015-ish every year," Mike Santoro, a captain and vice president of the Southwest Airlines Pilots Association, told CNN.[19]

68.     Southwest's scheduling system hasn't changed much since the 1990s, according to Captain Casey Murray, president of the Southwest Airlines Pilots Association.[20]

69.     Winter storms disrupted holiday travel during the 2022 holiday season, leaving thousands of travelers stranded in airports around the United States. However, not all domestic airlines were affected equally. Southwest Airlines flight cancellations accounted for the vast majority domestic flight cancellations, leaving travelers unable to visit loved ones over the holidays, and attracting the ire of the federal government.

---

https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[17] Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[18] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

[19] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

[20] How Southwest failed the holidays: Four charts explaining the cancellations. https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-dg/index.html

70.     As flights were getting cancelled around the country, it soon emerged that the root cause behind Southwest Airlines' cancellations was outdated and ineffective technology, in particular, its crew scheduling system (called "Sky Solver"). Further compounding on this issue, Southwest Airlines used an aggressive flight schedule that left it prone to greater cancellations than its competitors in the event of unusual conditions, such as nationwide storms.

71.     The result: A massive Christmas travel meltdown that scuttled holiday plans for hundreds of thousands of passengers. Nearly 16,000 flights canceled. Orphaned baggage piling up at airports and travelers told to give a shipping address.[21]



*See*, Insiders at Southwest reveal how the airline's service imploded. Available at: https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html. (Updated 30th December 2022); Last visited: January 11, 2023.

---

[21] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

72.     During the winter storm, amid a huge volume of changes to crew schedules to work through, SkySolver couldn't handle the task of matching crew members and which flights they should work, executives of the Dallas-based carrier said.[22]

73.     Southwest's software wasn't designed to solve problems of that scale, Chief Operating Officer Andrew Watterson said, forcing the airline to revert to manual scheduling.[23]

74.     "The magnitude and scale of this disruption stressed our technology and processes, forcing a great deal of manual processing," Southwest said. "Our crews are showing up in every way throughout this challenge."[24]

75.     Other airlines managed to recover by early in the December 2022 holiday week; at Southwest, the cancellations only increased.[25]

76.     While Southwest does have major connecting airports, much of its schedule involves planes and crews crisscrossing the country -- a network that aviation watchers say is more vulnerable than legacy carriers' hub-and-spoke model that can contain a disruption to particular geographic regions.[26]

77.     When something goes wrong, the Southwest software -- including the crew scheduling system tool -- leaves much of the work of rebuilding that delicate network to be done manually.[27]

_____

[22] Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[23] Id.
[24] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[25] Id.
[26] Id.
[27] Id.

78.   "It can't see the best way to fix anything when flights are canceled," said Brian Brown, president of Transport Workers Union Local 550, representing Southwest dispatchers and meteorologists. "It requires a lot more human intervention and human eyesight or brainpower, and can only handle so much."[28]

79.   The result is that airline officials "don't necessarily know where our crews are, where our planes are," Brown said.[29]

80.   Crew schedulers in another department are manually checking which pilots and flight attendants meet strict federal rules on work hours -- rules meant to keep inflight safety professionals from excessive fatigue.[30]

81.   "You end up with thousands of crew members having to call in and their wait times were hours just to talk to someone," Brown said. Software enhancements would make the process more efficient, he added.[31]

82.   The manual work meant crew members who could be working were instead stuck in lengthy phone queues waiting for instructions or for a hotel assignment to get their federally mandated rest.[32]

83.   "The phone systems that the company uses is just not working," Lyn Montgomery, who represents Southwest flight attendants at TWU Local 556, told CNN.[33]"They're just not manned with enough manpower in order to give the scheduling changes to flight attendants and that's created a ripple effect that is creating chaos throughout the nation."[34]

---

[28] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[29] Id.
[30] Id.
[31] Id.
[32] Id.
[33] Id.
[34] Id.

84.    Unlike some large rivals with hub-and-spoke networks, Southwest planes hopscotch from city to city, which may have been another complicating factor.[35]

85.    Multiple systems are involved in crew scheduling, according to a spokesman for GE Aerospace.[36]

86.    Southwest said its software isn't an end-to-end solution.[37] Rather, it's a so-called backend algorithm that airlines can supplement with other software.[38] The algorithm gathers input from other systems to provide recommendations to resolve crew-related disruptions, according to GE Aerospace.[39]

87.    Dr. Edward Rothberg, chief scientist of Gurobi Optimization LLC, a startup that develops mathematical optimization software used by carriers including Air France-KLM, said Southwest's hopscotched "point-to-point" model—rather than the hub-and-spoke model – greatly increases the difficulty of the problem, requiring more computational power than its current systems are likely able to handle.[40]

88.    Southwest Chief Executive Officer Bob Jordan said that while the carrier has good systems in some areas, those systems still need "better intelligence to talk to each other."[41] For instance, he said "The Baker," an optimization system developed by Southwest to automate disruption recovery and select flights to cancel, needs "better visibility" into its crew-scheduling systems.[42] Airlines generally have

_____

[35] Southwest Meltdown Shows Airlines Need Tighter Software Integration. https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[36] Id.
[37] Id.
[38] Id.
[39] Id.
[40] Id.
[41] Id.
[42] Id.

done a better job of maintenance and repair operations, but are much further behind in "the human aspect" of matching up crews, equipment, and passengers, said R "Ray" Wang, founder and principal analyst at IT consulting firm Constellation Research Inc.[43]

89.   Updating technology systems is particularly challenging for air carriers because of the business and operations risk of taking down a system, which can include grounded planes or stranded passengers, Mr. Crawford said.[44]

### C.   SOUTHWEST'S FLIGHT CANCELLATION DEBACLE

90.   Between December 22, 2022 and January 2, 2023, Southwest canceled nearly 16,000 flights, stranding thousands of passengers during one of the busiest travel weeks of the year.[45]

91.   During that time, the beleaguered airline had canceled more than half of its typical flight schedule, and by late Wednesday about 87% of all canceled flights in the US were from Southwest alone, according to industry trackers FlightRadar24 and FlightAware.

92.   Southwest has consistently failed to perform as well as its competitors when it comes to cancellations, according to bureau data.[46]

93.   In several years over the last decade, the airline had higher cancellation rates compared to other major airlines, the data shows.[47]

94.   The December 2022 meltdown is not the first time the company has found itself in this predicament. In October 2021, Southwest canceled more than 2,000 flights over a four-day period. While the airline blamed the crisis partly

---

[43] Id.

[44] Id.

[45] https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

[46] https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-dg/index.html

[47] Id.

on bad weather in Florida, Southwest canceled flights for far longer than its competitors.

95.    Similar to the December 2022 service mayhem, Southwest fared far worse than its competitors last October. While Southwest canceled hundreds of flights in the days following the peak of October's disruption, competitors quickly returned to normal service. Later that month, on a call with Wall Street analysts, then-CEO Gary Kelly said the company had made adjustments to prevent a similar meltdown in the future:

> "We have reined in our capacity plans to adjust to the current staffing environment, and our on time performance has improved, accordingly," said Kelly on October 21. "We are aggressively hiring to a goal of approximately 5,000 new employees by the end of this year, and we are currently more than halfway toward that goal."

*See*,https://www.cnn.com/2022/12/27/business/southwest-airlines-service-meltdown/index.html#:~:text=In%20October%202021%2C%20Southwest%20canceled,to%20adjust%20to%20those%20problems  .

96.    And, just like the latest disruption, the Southwest Airlines Pilots Association claimed the cancellations were due to "management's poor planning."[48]

97.    As early as 2020, Southwest has suffered from computer system glitches and/or crew scheduling technology issues.  For example, in June 2020, Baltimore Sun released an article titled "Southwest Glitch Delays BWI Flights: Problem With Computer System Affected Airports Nationwide, Airline's Website." This article discussed how Southwest Airlines experienced problems with its computer system for a significant part of an afternoon, causing "significant flight

---

[48] https://www.cnn.com/2022/12/27/business/southwest-airlines-service-meltdown/index.html#:~:text=In%20October%202021%2C%20Southwest%20canceled,to%20adjust%20to%20those%20problems.

delay" at airports around the country. Specifically, for about three hours, visitors to Southwest.com could not check into their flights, purchase tickets, or check their flight's status. One traveler commented, "I'd like to know how a company as big as Southwest can have their whole server go down [. . .] Where's the backup plan?"

### D.    SOUTHWEST AIRLINE'S CONTRACT OF CARRIAGE

98.    Every Southwest passenger air travel ticket incorporates by reference (including in some cases by hyperlink) and is governed by Southwest's Contract of Carriage. Southwest drafted the Contract of Carriage.

99.    Southwest reservations, purchases, ticketing, and/or transportation are governed by Southwest's Contract of Carriage.  *See*, Exhibit A[49].

100.   In summary, Section 9 of the Contract of Carriage governs in a situation where the Carrier cancels a flight, as was the case for Plaintiffs and other Class members. Specifically, with respect to Service Interruptions, the Contract of Carriage states:

> a. Failure to Operate as Scheduled
>
> (1) Canceled Flights or Irregular Operations. In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule, or changes the schedule of any flight, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:
>
> (i) Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination, in accordance with Carrier's established reaccommodation practices; or
>
> (ii) Refund the unused portion of the Passenger's fare in accordance with Section 4c.

---

[49] The Contract of Carriage attached includes the same material terms a relevant prior and further revised versions.

101.   Section 4(c)(4) specifies that the refused for the "unused transportation" must be "in accordance with the form of payment utilized for the Ticket."

102.   Further, under Southwest's Customer Service Commitment and 14 C.F.R. § 259.5, which are both incorporated into the Contract of Carriage, Southwest reiterates that "in the event a flight is delayed, canceled, or diverted" by Southwest, the airline will provide one of two options to customers: (1) rebooking on the next available Southwest flight(s) with seats available to the customer's ticketed destination, or (2) a "refund of the unused portion of your Southwest ticket."

103.   Both Section 9 of the Contract of Carriage and paragraph 12 of the Customer Service Commitment clearly provide for either rebooking or a refund in the event that Southwest cancels a flight. Neither provision provides for any "credit" for use on a future Southwest flight.

104.   Paragraph 5 of the Customer Service Commitment further provides that refunds are to be issued within seven business days from the date of a refund request for tickets purchased with a credit card, and within 20 days of a refund request for tickets purchased with cash.

105.   Plaintiffs were not given the choice of being transported on the next available flight at no additional charge. For Plaintiff Capdeville, for example, his flight was canceled and there were no alternative Southwest flights to accommodate him from the Trip's origin to his destination. He had not used any portion of the ticket for his Trip. Thus, pursuant to the terms of the Contract of Carriage, Plaintiff is entitled to a refund of the fare for the entire Trip in U.S. Dollars to his original form of payment.

/ / /

/ / /

/ / /

/ / /

/ / /

106.   The Contract of Carriage further provides, in pertinent part:

**"1. Introduction**

**a. Application of Conditions of Contract**

(1) Except as otherwise provided within specific fare rules, **reservations, purchase, ticketing and/or transportation by Southwest Airlines Co.** (hereafter "Southwest Airlines" and its Officers, Employees, contractors, and agents acting in their official capacities under the direction of Southwest Airlines [collectively, together with Southwest Airlines hereafter "Carrier"]) **are subject to this Contract of Carriage in effect on the earliest of the date on which the Ticket is reserved, purchased, or issued, and as amended through the date of travel**, in addition to any terms, conditions, and restrictions applicable to your booking channel and included on any Ticket. The terms and conditions contained in this Contract of Carriage shall govern all published routes and services provided by the Carrier as well as all fares and charges published by the Carrier. […]"

Exhibit A, Contract of Carriage at 4.

107.   The Contract of Carriage further provides:

**2. Reservations**
    **a. Reservations**
    (1) A reservation on a given flight is confirmed by the issuance of a Ticket.   See, Exhibit A: Contract of Carriage at page 9.
        ***
**4. Tickets** […]
        […]
                c.        Refunds […]
    (6) Significant Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is significantly disrupted by the Carrier before the Passenger has reached his or her final destination as a result of a flight cancellation, Carrier-caused missed connection, significant flight delay, significant schedule change, or omission of a scheduled stop caused by the Carrier, Carrier may do one of the following:

21

(i)Transport the Passenger at no additional charge on another of Southwest Airlines flight(s);

(ii)Refund the fare for the unused transportation in accordance with this Section 4; or

(iii)Provide a Flight Credit or a Transferable Flight Credit depending on the fare purchased for the unused portion of the Customer's fare in accordance with this Section 4. See also Section 9.a.

108. The Contract of Carriage further provides:

   **4.**    **Tickets** […]
   […]
        c.    Refunds […]
(3)  Form of Refunds. The Carrier shall make all refunds in U.S. dollars. See Section 8 for additional information for international travel. Eligible refunds must be requested no later than one year from the date the Ticket was issued. When no portion of the transportation has been provided, the eligible refund will be issued in accordance with this Section in an amount equal to the fare paid. When a portion of the transportation has been provided, the eligible refund will be issued in accordance with this Section in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided. Except as otherwise provided in this Contract of Carriage, following a request made by the Customer and received by the Carrier, if a Ticket or unused ancillary fee for optional services paid by a Customer is eligible for a refund, Carrier will issue such refunds as follows:

(i)  At the direction of the Customer, refunds for Tickets purchased with a credit card shall be processed either:

(a) For crediting to the credit card account used to purchase the Ticket, typically no later than seven (7) business days from the date the refund request is received by Southwest Airlines or;

(b) To the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(ii)  Refunds for Tickets purchased with cash, if cash is accepted by Carrier, typically will be issued by check no later than

twenty (20) business days after the refund request is received by the Carrier.

(iii) Refunds for Tickets purchased with an exchanged Ticket, Flight Credit, or  Transferable Flight Credit, will be processed to the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(iv)  Refunds for Tickets purchased with a Southwest® gift card will have the amount applied from the Southwest® gift card held as a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(v)  Refunds  for  Tickets  purchased  outside  of  Southwest  Airlines (for  example,  through  a  travel  agent  or  with  a  universal  air travel plan number) shall be processed for crediting via the ticket issuer and may, for example, take the form of a credit to the subscriber against whose number the Ticket was charged or a Miscellaneous Charge Order, as applicable.

(vi) Refunds for Tickets paid with any other form of payment (such as  a  Southwest  LUV  Voucher)  will,  in  the  Carrier's  sole discretion, be issued back to the original form of payment (and subject to any limitations on the original form of payment, such as an expiration date) or be processed to the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(vii)   Transferable  Flight  Credit.  Unless  otherwise  stated  by Southwest Airlines, at the direction of the Customer, the fare paid for unused Anytime or Business Select® fare segments, including  taxes  and  government  fees,  may  be  held  as  a Transferable  Flight  Credit.  When  a  Ticket  combines  an Anytime or Business Select fare segment with a Wanna Get Away® fare segment, if the Customer does not travel and the Customer cancels the Ticket at least ten (10) minutes prior to the  scheduled  departure  time,  then  the  fare  paid  for  unused travel,  including  taxes  and  government  fees,  may  be  held  as  a Transferable  Flight  Credit.  The  Passenger  named  on  the Ticket can (A) request a refund of the refundable segment associated with the Transferable Flight Credit in accordance

23

with Section 4.c.(3), (B) use a Transferable Flight Credit for travel on Southwest Airlines, or (C) if such Passenger is a Rapid Rewards Member and their Rapid Rewards number is associated with the Transferable Flight Credit prior to transfer, transfer the Transferable Flight Credit to another Rapid Rewards Member. A Transferable Flight Credit may only be transferred once. Any Transferable Flight Credit resulting from a Ticket purchased via a corporate booking tool, a GDS, SWABIZ.com, or a Southwest Airlines mobile app or the Southwest Airlines mobile website using a valid corporate credential issued by Southwest Airlines may only be transferred between employees within the same organization. A refundable flight segment associated with a Transferable Flight Credit becomes nonrefundable following the transfer to another Passenger. Although transferable, a Transferable Flight Credit may not be sold or bartered by the Passenger, a Customer, or any designee. Transferable Flight Credits obtained through prohibited sale or barter transactions are void and will not be honored for travel.

(viii) Limitation of Liability. As provided in this Contract of Carriage, Southwest Airlines may, at the discretion of Southwest Airlines, refund all or a portion of a refund payment to a person or entity other than the Passenger, which shall be deemed a valid refund. Carrier shall not be liable to the Passenger for another refund or Flight Credit or Transferable Flight Credit.

(4)    Nonrefundable Tickets.

(i)    General. As the term "nonrefundable" reflects, the fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets (including taxes and government fees) are not eligible for refunds, except as specifically stated in this Contract of Carriage, as provided in this Section, and as provided in Section 9.

(ii)    Flight Credit. Unless otherwise stated by Southwest Airlines, the fare paid for unused Wanna Get Away® fare segments, including taxes and government fees, is, in the Carrier's sole discretion, refunded in accordance with Section 4(c)(3) or

24

held as a Flight Credit either for use by the Passenger on Southwest Airlines or, as agreed to by Southwest Airlines, if evidence satisfactory to Southwest Airlines, in its sole discretion, is submitted to Southwest Airlines that an employer purchased the Ticket on behalf of its employee or the travel agent has made a refund to its client, then the Flight Credit may be held for use by the company or travel agent, as applicable.

(iii)   Transferable Flight Credit. Unless otherwise stated by Southwest Airlines, the fare paid for unused Wanna Get Away Plus fare segments, including taxes and government fees, is, in the Carrier's sole discretion, refunded in accordance with Section 4(c)(3) or held as a Transferable Flight Credit. When a Ticket combines a Wanna Get Away Plus fare segment with a Wanna Get Away® fare segment, if the Customer does not travel and the Customer cancels the Ticket at least ten (10) minutes prior to the scheduled departure time, then the fare paid for unused travel, including taxes and government fees, may be held as a Transferable Flight Credit. The Passenger named on the Ticket can; (A) use a Transferable Flight Credit for travel on Southwest Airlines or, (B) if such Passenger is a Rapid Rewards Member and their Rapid Rewards number is associated with the Transferable Flight Credit prior to transfer, transfer the Transferable Flight Credit to another Rapid Rewards Member. A Transferable Flight Credit may only be transferred once. Any Transferable Flight Credit resulting from a Ticket purchased via a corporate booking tool, a GDS, SWABIZ.com, or a Southwest Airlines mobile app or the Southwest Airlines mobile website using a valid corporate credential issued by Southwest may only be transferred between employees within the same organization. A refundable flight segment associated with a Transferable Flight Credit becomes nonrefundable following the transfer to another Passenger. Although transferable, a Transferable Flight Credit may not be sold or bartered by the Passenger, a Customer, or any designee. Transferable Flight Credits obtained through prohibited sale or barter transactions are void and will not be honored for travel.

(iv)    Changes and Exchanges. Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new Ticket. The new Ticket may be more or less expensive or subject to different terms, conditions, or restrictions from the original Ticket. If the fare is lower, in the Carrier's sole discretion, the difference will be refunded in accordance with Section 4(c)(3) or a Flight Credit or a Transferable Flight Credit depending on the fare purchased will be issued for the difference. No cash refund or credit card adjustments will be made for nonrefundable Tickets.

(5)    For Flight Credits or Transferable Flight Credits with an Expiration Date of July 27, 2022 or Earlier. If a Flight Credit or Transferable Flight Credit is not applied and travel completed on or before its expiration date, the entire amount of the Flight Credit or Transferable Flight Credit, including all taxes and government fees is forfeited.

109.    The Contract of Carriage provision the following in Section 9.

## 9.    Service Interruptions

Refer to Section 8 for conditions applicable to international travel.

a. Failure to Operate as Scheduled

(1)    Canceled Flights or Irregular Operations. In the event the Carrier cancels or fails to operate any flight according to Southwest Airlines published schedule, or significantly changes the schedule of any flight, or there is a significant delay, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions: (i) Transport the Passenger at no additional charge on Southwest Airlines next flight(s) on which space is available to the passenger's intended destination, in accordance with Southwest Airlines established re-accommodation practices; or (ii) Following a request by the Customer, refund the unused portion of the Customer's fare in accordance with Section 4.c.

(2)    Diverted Flights. In the event the Carrier diverts any flight, the Carrier, at its sole discretion, will take reasonable steps to transport

Passenger on Southwest Airlines next flight(s) on which space is available to his or her intended final destination or to provide reasonable accommodations as approved in writing in advance by Southwest Airlines.

(3)    Flight Schedule Changes. Flight schedules are subject to change without notice, and times shown are not guaranteed. At times, without prior notice to Passengers, Southwest Airlines may need to substitute other aircraft and may change, add, or omit intermediate stops. The Carrier cannot guarantee that Passengers will make connections to other flights operated by Southwest Airlines or by other airlines. In the event of flight schedule changes or service withdrawals, the Carrier will attempt to notify affected Passengers as early as possible.

(4)    Limitation of Liability. Except to the extent provided in Section 9.a., the Carrier shall not be liable for any failure or delay in operating any flight, with or without notice, for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, as defined above. For the avoidance of doubt, under no circumstances will Carrier be liable to Passenger or Customer for consequential damages.

**E.    SOUTHWEST AIRLINE'S CUSTOMER SERVICE PLAN**

110.    Southwest Airline's Customer Service Plan states the following with respect to delays within seven days of departure:

**2.    Notifying Customers of known delays, cancelations, and diversions (for flights within seven days of departure)**

If your flight experiences a delay of 30 minutes or more, is canceled, or is diverted, we use an automated system to notify you within 30 minutes of our being made aware of such flight status change. Unless you opt out, you will be notified by email, voice, or text, depending on the selection made at the time the reservation was booked (voice notification is not available for international reservations). At the airport, including the departure gate and Flight Information Display screens under our control, we will make every reasonable effort to notify you of the updated status of your flight within 30 minutes of our being made aware of such flight status change. For an international itinerary, if you do not provide contact information at the time of booking, you

will not receive automated notifications. For changes to a flight that is more than seven days from departure, see Section 10 below.

**3.     Delivering baggage on time**

We make every reasonable effort to load the items you entrust into our care onto the same plane you board and return them to you promptly at your destination. If delayed, we make every reasonable effort to return your luggage to you within 24 hours.

If your luggage is delayed or lost for reasons outside of your control, you may file a mishandled baggage report at the airport and submit a claim for consideration of reimbursement of reasonable expenses you may have incurred.  Southwest does not charge fees for the first and second checked bags (provided they are not oversize or overweight). If you paid a baggage fee to Southwest and your checked bag was delayed and not recovered, we refund the applicable fee(s) paid. See Southwest.com for more information on traveling with checked baggage.

[…]

**5.     When a refund is due, providing it promptly**

Eligible refunds are provided according to the ticket's original form of payment and rules associated with that form of payment.

Refunds for eligible Southwest tickets purchased with a credit card will be credited back to the same credit card. Our Refunds Department processes credit card refunds within seven business days from the date we receive the request. Your credit card company may then take up to 10 business days to post the credit to your account, and, based on your individual billing cycle, you will see the refund on your credit card statement within one to two billing statements.

Refunds for eligible Southwest tickets purchased with cash will be issued by check no later than 20 business days after we receive your request.

Additional information on refunds is available at Southwest.com.

[…]

**8.      Handling   "bumped"   Passengers   with   fairness   and consistency**

Southwest does not typically overbook flights; however, there may be instances where the number of Customers holding reservations exceeds the available seating capacity resulting in an oversale. In these situations, our Customer Service Agents will ask those who have checked in and received a boarding pass if they are willing to volunteer to take a later flight.

If we do not receive enough volunteers to accommodate all Customers who have purchased travel and have met our check-in requirements, we have to involuntarily deny boarding to Customers. If you are involuntarily denied boarding you will be given a written Notice of Denied Boarding to help understand our policies, compensation, and travel alternatives. You will generally be entitled to compensation and transportation on the next available Southwest flight. See Southwest.com for additional information.

**9.      Disclosing cancelation policies, frequent flyer rules, aircraft seating configuration, and lavatory availability**

Information about our cancelation policies, frequent flyer rules, aircraft-seating configuration, and lavatory availability is available over the phone with a Southwest Representative or by following the links to Southwest.com below:

● Cancelation of confirmed reservations

● Rapid Rewards Frequent Flyer Program

● Our Airplanes

**10.    Notifying Customers in a timely manner of changes in travel itineraries (more than seven days from departure)**

We sell flights several months in advance, and at times, we may adjust our schedules. We will notify you as far in advance as practicable of any change to your itinerary, including routing, departure time, and/or arrival time. We will attempt to notify you within 48 hours of our

becoming aware of the change.

You will have the option to select the revised itinerary, or, if the itinerary change is significant, you may choose an alternate flight/date within a 14-day parameter of your original travel, or cancel your trip without penalty and receive a refund upon request in accordance with our Contract of Carriage. For changes within seven days of departure, refer to Section 2 above.

**11.    Ensuring responsiveness to Customer complaints**

Compliments, complaints, or questions about service? Email, call, or write to us. Written complaints will receive an acknowledgement in writing indicating receipt of the complaint within 30 days of receipt. You will also receive a substantive response no later than 60 days after our receipt of your complaint. Contact information is available at Southwest.com.

**12.    Identifying the services we offer to help mitigate Customer inconveniences during irregular operations**

Southwest intends to operate flights as scheduled; however, there are situations that arise based on either uncontrollable and/or controllable circumstances that may cause a flight to be significantly delayed and/or canceled.

For significant flight delays or Southwest-initiated cancelations that are within our control (e.g., mechanical problems, aircraft swap) we will rebook you on the next available Southwest flight(s) with seats available to your ticketed destination at no additional cost. If you choose not to travel due to a significant delay and/or cancelation, Southwest will issue a refund of the unused portion of your Southwest ticket upon request in accordance with our Contract of Carriage.

During flight delays that are within our control of three (3) or more hours and/or Southwest-initiated cancelations that are within our control that result in a wait of three (3) or more hours for a flight at the airport, we will provide a meal voucher upon request at the airport for participating vendors within the airport or, if participating vendors and/or vouchers are not available, we will honor reasonable requests for reimbursement for meals purchased during such irregular operations.

Additionally, we may provide complimentary snacks and beverages for Customers.

If Southwest flight accommodations departing on the same day to your intended destination or applicable co-terminal city are not available following a flight delay or Southwest-initiated cancelation that is within our control (e.g., mechanical problems, aircraft swap), resulting in an overnight delay or stay, we will arrange lodging accommodations upon request if available, or will honor reasonable requests for reimbursement for lodging accommodations (provided you do not reside locally). If the lodging accommodation we arrange does not provide shuttle service to/from the airport, we will offer a voucher upon request or honor reasonable requests for reimbursement for ground transportation.

For significant flight delays or Southwest-initiated cancelations that are not within our control (e.g., weather, Air Traffic Control, safety/security-related events, FAA-required crew duty limitations, infrastructure/utility problems), we will rebook you on the next available Southwest flight(s) with seats available to the Customer's ticketed destination at no additional cost. If you choose not to travel due to a significant delay and/or cancellation, Southwest will issue a refund of the unused portion of your Southwest ticket upon request in accordance with our Contract of Carriage.

Although we do not offer complimentary lodging accommodations for significant flight delays or Southwest-initiated cancelations that are not in our control, we will seek to arrange a discount off of a lodging accommodation near the airport.

## F.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

111.   The running of any statute of limitations has been equitably tolled by Defendant's fraudulent concealment and/or omissions of critical information about the cause of its delays and/or cancellations. Through its affirmative misrepresentations and omissions, Southwest actively concealed from Plaintiffs reason(s) for the flight delays and/or cancellations.

112.   As a result of Defendants' actions, Plaintiffs were unaware, and could not have reasonably known or learned through reasonable diligence, the true reason that the flights were delayed and/or cancelled and which caused Plaintiffs and the class members the harms set forth herein and that those harms were the direct and proximate result of Defendants' acts and omissions.

## VI.   CLASS ACTION ALLEGATIONS

113.   Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide class (the "Nationwide Class"):

> All persons in the United States who purchased tickets for travel on a Southwest Airlines flight and that flight was delayed and/or cancelled (including, but not limited to in June 2020, October 2021, and December 24, 2022-January 2, 2022), and who were not provided a refund and/or reimbursed for incurred expenses as a result of the delay and/or cancellation.

114.   Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide sub-class (the "Nationwide Sub-Class"):

> All persons in the United States who purchased tickets for travel on a Southwest Airlines flight and that flight was delayed and/or cancelled from December 22, 2022 and January 2, 2023 and who were not provided a refund and/or reimbursed for incurred expenses as a result of the delay and/or cancellation and who checked luggage between December 22, 2022 and January 2, 2023.

115.   Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

116.   The Class and Sub-Class are collectively referred to herein as the "Class".

117.   Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

118.   Plaintiffs seek only damages and injunctive relief on behalf of themselves and the Class members. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or the Class members.

119.   The Class(es) meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

120.   **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

121.   **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiffs at this time, it is believed that the Class is comprised of tens of thousands if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from Southwest's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

122. **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

(i) Whether Defendant's conduct breaches its Contract of Carriage and/or Customer Service Plan;

(ii) Whether Defendant breached the Covenant of Good Faith and Fair Dealing;

(iii) Whether Defendant committed a Violation of Bailment;

(iv) Whether Defendant is required to give a refund and reimburse all related expenses as a result of the cancellations;

(v) Whether Plaintiffs and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

(vi) Whether Plaintiffs and members of the Class are entitled to compensatory damages.

(vii) Whether Plaintiffs and the Class are entitled to declaratory relief;

(viii) Whether Plaintiffs and the Class are entitled to injunctive relief.

123. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiffs and other Class members (i.e., canceling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

124. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class(es) and are committed to pursuing this matter against Defendant to

34

obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

125. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

126. **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to offer credits instead of refunds to Plaintiffs and Class members for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class as a whole.

/ / /

# COUNT I
# BREACH OF CONTRACT
### (on behalf of Plaintiffs and the Class)

127.  Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

128.  This claim for breach of contract damages or, in the alternative, specific performance of the contract's refund terms, is based on Defendant's breaches of its Contract of Carriage and/or Customer Service Plan (the "Contract").

129.  Plaintiffs, along with all putative class members, entered into a Contract of Carriage and/or Customer Service Plan with Defendant for provision of air travel in exchange for payment.

130.  The Contract of Carriage and/or Customer Service Plan were each drafted by Defendant.

131.  Plaintiffs, and all putative class members, performed under the Contract of Carriage and/or Customer Service Plan, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the Contract.

132.  Due to Defendant's cancellation of their flights, Plaintiffs, and all putative class members cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Defendant.

133.  Under the terms of the Contract of Carriage and/or Customer Service Plan drafted by Defendant, Plaintiffs and putative class members are entitled to refunds because Southwest canceled their flights and did not rebook the customers on another flight. By failing to provide refunds, Southwest has breached its Contract of Carriage and/or Customer Service Plan.

134.  In fact, Plaintiffs had to incur out-of-pocket expenses and have not been reimbursed for incurred expenses as a result of the cancellation.

135.  Southwest has further breached its Contract of Carriage and/or Customer Service Plan by failing to provide refunds within seven days for canceled tickets purchased with credit cards.

136.  As a result of Defendant's breaches of contract, Plaintiffs and the putative class members have incurred damages in an amount to be proven at trial.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (on behalf of Plaintiffs and the Class)

137.  Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

138.  In all contracts, there is an implied covenant of good faith and fair dealing to each party to perform in good faith and not engage in actions or omission to prevent satisfaction of contractual duties. In other words, the implied covenant of good faith and fair dealing is to vindicate the parties' implied understanding of the contract.

139.  Southwest Airlines owed a duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with Plaintiffs and Class Members, notably having working software allowing its flights to be properly staffed and having contingencies for foreseeable winter storms.

140.  Southwest Airlines' breaches of its' duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with Plaintiffs and Class Members for the reasons stated herein.

141.  During the proposed Class Period, Southwest Airlines breached the implied covenant of good faith and fair dealing by: (1) entering air travel contracts and accepting monies or compensation for flights that the airline had actual or constructive knowledge could not possibly be properly staffed with pilots, flight attendants, customer service representatives, baggage handlers and others, without any regard for the traveling public other than booking flights Southwest Airlines

37

knew or should have known would never be airborne irrespective of adverse weather conditions; (2) converting new dollar travel purchases to travel vouchers without permission from customers and not refunding money to purchasers or passengers for use on other competing airlines; (3) for having inadequate customer support or any effort to mitigate Southwest Airlines' breach.

142. Plaintiffs allege that Southwest Airlines materially breached and undermined their ability to perform at the time they entered travel contracts and bookings and knew they would be unable to perform promised services.

143. Southwest Airlines' breaches of its' duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with are the direct and proximate cause of Plaintiffs' and class members' damages.

144. Plaintiffs allege they suffered financial and economic harm as a result of Defendants material breach of the implied covenant and despite efforts to mitigate, and therefore, suffered reasonably certain and fixed damages in an amount according to proof.

145. As a result, Plaintiffs and Class Members are each entitled to an award of damages in amount to be determined at trial.

**COUNT III**
**VIOLATION OF BAILMENT**
**(on behalf of Plaintiffs and the Nationwide Sub-Class Members)**

146. Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

147. Plaintiffs and Class Members delivered and entrusted their luggage to Defendant for the purpose of enabling Defendant to conduct its business flying Plaintiffs and Class Members to their destinations.

148. A bailment arises where possession, but not ownership, of property is transferred from one party ("bailor") to another ("bailee"). Where a bailee has

38

received a bailment from a bailor, a duty of care is owed. Typically, a bailee is strictly liable for the bailment.

149.  In delivering and entrusting their luggage, Plaintiffs and Class members intended and understood that Defendants would adequately safeguard their luggage.

150.  Defendants accepted possession of Plaintiffs' and Class members' luggage, and by accepting possession of Plaintiffs' and Class members' luggage, Defendants understood that Plaintiffs and other Class members expected it to adequately safeguard their luggage. Accordingly, a bailment was established for the mutual benefit of the parties.

151.  During the period of bailment, Defendant, as bailee, owed Plaintiffs and all other Class members a duty of care to safeguard their luggage by maintaining adequate procedures and infrastructure to protect such luggage. In failing to maintain such adequate procedures and infrastructure, Southwest breached this duty.

152.  Defendant, as bailee, is expected to return to its owner the bailed goods (the luggage) when the bailee's time for possession of them is over.

153.  During the period of bailment, Defendant, as bailee, owed Plaintiffs and Class Members a duty of care to safeguard their luggage by maintaining reasonable procedures and practices to protect such luggage.

154.  As alleged herein, Defendant breached this duty.

155.  As a result of Defendant's breach of this duty, Plaintiffs and all other Class Members have been harmed as alleged herein.

**COUNT IV**
**INJUNCTIVE RELIEF**
**(on behalf of Plaintiffs and the Class Members)**

156.  Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

39

157.  Plaintiffs and Class Members have clear and ascertainable rights in need of protection – namely: (a) the right to have Defendants abide by their obligations under the Contract of Carriage and/or Customer Service Plan when they book a flight with Defendant; (b) the right to not have travel impacted due to Defendant's antiquated crew scheduling technology and/or SkySolver technology and inability to schedule crews and get flights off of the ground in a timely manner.

158.  Plaintiffs and Class Members have no adequate remedy at law because a legal remedy cannot protect Plaintiffs from future flights being impacted as a result of antiquated crew scheduling technology and/or SkySolver technology and cannot otherwise prevent Defendant's antiquated crew scheduling technology and/or SkySolver technology from causing delays and cancellations in the future.

159.  Plaintiffs and Class Members will suffer irreparable harm, as alleged herein, caused by Defendants if their antiquated crew scheduling technology and/or SkySolver technology is not replaced or updated, requiring injunctive relief.

160.  Plaintiffs and Class Members are likely to succeed on the merits because, as alleged herein, Defendants promised to provide a flight at a particular time and date and, unless they are forced to update their technology in a timely manner, Plaintiffs' travel may be negatively impacted via unnecessary flight delays and/or cancellations due to its antiquated crew scheduling technology.

161.  Plaintiffs and Class Members seek injunctive relief: (a) requiring Defendant to update or replace its antiquated crew scheduling technology and/or SkySolver technology; and (b) refunding Plaintiff's and the Class Members ticket fees and add on fees automatically.

/ / /

/ / /

/ / /

/ / /

/ / /

**COUNT V**
**DECLARATORY RELIEF**
**28 U.S.C. §§ 2201 and 2202**
**(on behalf of Plaintiffs and the Class)**

162.  Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

163.  An actual controversy has arisen and now exists between the parties in that Plaintiffs contend, and are informed and believe that Defendant fails to comply with applicable laws, including both common law and statutory law.

164.  A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

165.  Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

**COUNT VI**
**REDHIBITION**
**(on behalf of Plaintiffs and the Class)**

166.  Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

167.  This claim for Redhibition under Louisiana Civil Code Article 2520, et seq. is also based on Defendant's breaches of its Contract of Carriage.

168.  Under the law of Redhibition, Southwest is liable for return of the price of the ticket when it was paid plus interest from the time paid, the reimbursement of reasonable expenses occasioned by the sale and also for damages and attorney fees.

/ / /

/ / /

/ / /

41

1

## <u>REQUEST FOR RELIEF</u>

2     **WHEREFORE**, Plaintiffs, individually and on behalf of all putative Class

3   members, respectfully requests that the Court enter judgment in their favor and against

4   Defendant as follows:

5     A.    For an Order determining at the earliest possible time that this matter

6   may proceed as a class action under Rule 23 and certifying this case as such;

7     B.    For Plaintiffs and each Class member their actual compensatory

8   damages, or in the alternative, for specific performance of the refund provisions of

9   the Contract of Carriage and/or Customer Service Plan;

10    C.    For injunctive relief requiring Southwest to replace and/or update its

11   antiquated crew scheduling technology and/or SkySolver technology; and refunding

12   Plaintiff's and the Class Members ticket fees and add on fees automatically.

13    D.    For reasonable attorneys' fees and costs of suit;

14    E.    For pre-judgment interest and interest pursuant to redhibition; and

15    F.    Such further and other relief the Court deems reasonable and just.

16                        ## <u>JURY DEMAND</u>

17     Plaintiffs, on behalf of themselves and the Class of all others similarly situated,

18   hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the

19   Federal Rules of Civil Procedure.

20

21                    **AGUIRRE & SEVERSON, LLP**

22

Dated: October 13, 2023      */s/Maria C. Severson*

23                    Maria C. Severson, Esq.

24                    501 West Broadway, Suite 1050
                     San Diego, CA 92101

25                    (619) 876-5364

26                    Email:  mseverson@amslawyers.com
                     *Co-Lead Counsel for Plaintiffs*

27

28

1
2

**LAW OFFICE OF FRANCIS J. FLYNN, JR.**

3   Dated: October 13, 2023          */s/Francis J. "Casey" Flynn, Jr.*
4                                    Francis J. "Casey" Flynn, Jr., Esq.
                                     422 South Curson Avenue
5                                    Los Angeles, CA 90036
6                                    (314) 662-2836
                                     Email:  francisflynn@gmail.com
7                                    *Co-Lead Counsel for Plaintiffs*
8
**GLANCY PRONGAY & MURRAY LLP**
9

10   Dated: October 13, 2023          */s/Brian P. Murray*
11                                    Brian P. Murray, Esq.
                                     122 East 42nd Street, Suite 2920
12                                    New York, NY 10168
13                                    (212) 682-5340
                                     Email: bmurray@glancylaw.com
14                                    *Plaintiffs' Steering Committee*
15
**JIM S. HALL & ASSOCIATES**
16

17   Dated: October 13, 2023          */s/Matthew B. Moreland*
18                                    Matthew B. Moreland, Esq.
                                     800 N. Causeway Blvd., Suite 100
19                                    Metairie, LA 70001
20                                    (504) 832-3000
                                     Email: mmoreland@jimshall.com
21                                    *Plaintiffs' Steering Committee*
22
23
24
25
26
27
28

43

EXHIBIT A



**Southwest Airlines Co.**

**Contract of Carriage - Passenger**

**(CoC) – English Version**

**Revision: 38th Revised**          **Effective Date: 12/29/2022**

# Table of Contents

*1.  Introduction* .......................................................................................................................... *4*
   a.  Application of Conditions of Contract ........................................................................ 4
   b.  Definitions ................................................................................................................... 5

*2.  Reservations* ......................................................................................................................... *9*
   a.  Reservations ............................................................................................................... 9
   b.  Group Policies ........................................................................................................... 11

*3.  Fares* .................................................................................................................................... *13*
   a.  Application of Fares .................................................................................................. 13
   b.  Stopovers .................................................................................................................. 14
   c.  Military Fares ............................................................................................................ 14
   d.  Government Fares ..................................................................................................... 14
   e.  Wanna Get Away® fares and Wanna Get Away Plus fares ....................................... 15

*4.  Tickets* ................................................................................................................................. *16*
   a.  Tickets ....................................................................................................................... 16
   b.  Ticket Acceptability .................................................................................................. 17
   c.  Refunds ..................................................................................................................... 17

*5.  Check-in* .............................................................................................................................. *22*
   a.  Boarding Passes ........................................................................................................ 22
   b.  Check-in Requirements ............................................................................................. 22

*6.  Acceptance of Passengers* .................................................................................................. *23*
   a.  Refusal to Transport—General ................................................................................ 23
   b.  Refusal to Transport—Unruly/Disruptive Passenger .............................................. 24
   c.  Carriage of Children ................................................................................................. 27
   d.  Carriage of Passengers with Disabilities .................................................................. 29
   e.  Pets ........................................................................................................................... 32
   f.  Law Enforcement and Search and Rescue Dogs ...................................................... 33

*7.  Baggage* .............................................................................................................................. *34*
   a.  Carryon Baggage ...................................................................................................... 34
   b.  Acceptance of Checked Baggage ............................................................................. 35
   c.  Surveillance and Inspection of Baggage .................................................................. 36
   d.  Checking of Baggage. ............................................................................................... 36
   e.  Free Checked Baggage Allowance. .......................................................................... 37

| | | |
|---|---|---|
| f. | Excess, Oversize, and Overweight Baggage Charges | 39 |
| g. | Special Items Requiring Packing and Payment | 40 |
| h. | Unsuitable Baggage Subject to Limited Release of Liability | 41 |
| i. | Limitations of Liability | 41 |
| **8.** | ***International Travel*** | **44** |
| a. | Application of Montreal or Warsaw Convention | 44 |
| b. | Death or Injury of Passengers | 44 |
| c. | Delay of Passengers | 45 |
| d. | Destruction, Loss, or Delay of Baggage | 46 |
| e. | Time Limitations on Claims and Actions | 47 |
| f. | International Travel Documents | 47 |
| g. | Foreign Currency | 48 |
| h. | Partial Tax Refunds in Limited Circumstances | 48 |
| i. | Check-in Times for International Flights | 48 |
| j. | Travel by Persons under the Age of Eighteen (18) | 48 |
| k. | Carriage of Animals | 49 |
| l. | Firearms | 49 |
| **9.** | ***Service Interruptions*** | **50** |
| a. | Failure to Operate as Scheduled | 50 |
| b. | Denied Boarding Procedures Due to an Oversale | 50 |
| c. | Ground Transportation | 53 |
| **10.** | ***Miscellaneous*** | **54** |
| a. | Claims | 54 |
| b. | Customer Service Plan | 54 |
| c. | Choice of Law, Entire Agreement | 54 |

Southwest Airlines Co.                    3

## 1. Introduction

a. Application of Conditions of Contract

(1) Except as otherwise provided within specific fare rules, reservations, purchase, ticketing and/or transportation by Southwest Airlines Co. (hereafter "Southwest Airlines" and its Officers, Employees, contractors, and agents acting in their official capacities under the direction of Southwest Airlines [collectively, together with Southwest Airlines hereafter "Carrier"]) are subject to this *Contract of Carriage* in effect on the earliest of the date on which the Ticket is reserved, purchased, or issued, and as amended through the date of travel, in addition to any terms, conditions, and restrictions applicable to your booking channel and included on your Ticket. The terms and conditions contained in this *Contract of Carriage* shall govern all published routes and services provided by the Carrier as well as all fares and charges published by the Carrier. This *Contract of Carriage* is subject to applicable tariffs on file with the U.S. Department of Transportation and laws, regulations, and rules imposed by U.S. or foreign governmental agencies; however such tariffs, laws, regulations, and rules do not create any contractual or other obligations by the Carrier that are owed to the Passenger, the Customer, or any other person or entity, or any right of action as against the Carrier. If any portion of this *Contract of Carriage* conflicts with applicable laws, rules, or security directives from U.S. or foreign government agencies, the applicable laws, rules, or security directives shall govern. Carrier shall not be liable for any damage arising out of its compliance with any laws, government regulations, orders, rules, requirements or security directives.

By making a reservation, purchasing a Ticket, or accepting transportation, the Passenger and Customer agree to adhere to, be bound by, and comply with all of the terms, conditions, and requirements set forth herein and applicable laws and regulations, including but not limited to federal laws protecting federal, airport, and air carrier employees who have security duties from assault and interference with the performance of their duties. Transportation offered by the Carrier under this *Contract of Carriage* is subject to the Passenger's and Customer's compliance with these obligations, and a failure to comply shall constitute a material breach of this *Contract of Carriage*.

The Customer and Passenger are presumed to know their rights under the *Contract of Carriage* and there is no obligation on the Carrier to inform the Customer or the Passenger of their rights under the *Contract of Carriage*.

(2) Southwest Airlines reserves the right, in its sole discretion and to the extent not prohibited by law, to change, delete, or add to any of the terms of this *Contract of Carriage* without prior notice. All changes must be in writing and approved by an authorized representative of Southwest Airlines.

(3) If (i) this *Contract of Carriage* is amended after a Ticket is reserved, purchased, or issued but before commencement of travel, (ii) the amendment substantially affects the terms and conditions of a Passenger's Carriage, and (iii) the Passenger does not agree to be bound by the *Contract of Carriage* as amended, then the Passenger's sole recourse is to request a refund of the fare paid for unused travel. Such request for a refund must be made prior to the date on which travel was to commence. Any such refund will be issued in accordance with Section 4.c.(3).

(4) This *Contract of Carriage* does not, and shall not be construed to, create any right or cause of action against the Carrier for any obligation other than an obligation expressly undertaken by Carrier in this *Contract of Carriage*.

(5) The Carrier's obligations hereunder extend only to the Passenger and as expressly set forth herein, to the Customer. In the event of a refund payment, the Carrier may, at the discretion of the Carrier, refund all or a portion of the payment to the Customer but such payment shall not create a contractual relationship between the Carrier and such third-party payor.

(6) This *Contract of Carriage* does not create, and shall not be construed to create, any right or cause of action based on any state, local, federal or international law, statute, regulation, rule, policy, guidance, treatise, convention, or other form of legal statements or requirements, and Southwest Airlines does not, in this *Contract of Carriage*, expressly or implicitly incorporate any such law, statute, regulation, rule, policy, guidance, treatise, convention, or other form of legal statements or requirements by reference.

(7) The invalidity of any provision herein shall not affect the validity of any other provision that shall remain in full force and effect.

(8) Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, the Carrier shall not be liable for any consequential, compensatory, indirect, incidental, or punitive damages arising out of or in connection with the performance of its obligations under this *Contract of Carriage*.

b.  Definitions

**Baggage** means all luggage and contents contained inside, including suitcases, garment bags, tote bags, packages, camera and electronics bags, computer and equipment cases, briefcases, musical instruments, and similar articles, whether carried by the Passenger in the cabin or carried in the aircraft cargo compartments. Coats and wraps, when carried by the Passenger in the passenger cabin, will not be considered as Baggage.

**Boarding Pass** means a document (paper or electronic) issued by Carrier. A Southwest Airlines Boarding Pass bears the title *Boarding Pass*, the Passenger's first and last name, the flight number and date, the departure and destination airports, and a boarding group letter and number, which represents the Passenger's boarding group and reserved spot in the boarding group line. A Passenger must have a Boarding Pass to be considered as having Confirmed Reserved Space as defined in Section 9.b.(1).

Boarding Passes may be obtained at Southwest.com®, SWABIZ.com, on Southwest Airlines mobile apps, or at the airport from Carrier at:

(1) E-Ticket Check-In kiosks (where available), (2) skycap podiums (where available), (3) ticket counters, or (4) departure gate podiums. Carrier reserves the right to restrict Boarding Pass distribution to the departure gate podium.

**Carriage** means the transportation of Passengers and/or Baggage by air, gratuitously or for hire, and all services of Carrier related thereto.

**Checked Baggage** means Baggage of which Carrier takes sole custody and for which Carrier has issued a baggage claim check and Carrier or Passenger affixed a baggage tag.

**Customer** means the person, agent, or entity who held a reservation(s) or paid for, changed, or cancelled a Ticket for the Passenger.  For clarity, if the Passenger holds a reservation or purchases, changes, or cancels a Ticket, the Passenger is the Customer.

**Flight Credit** means a credit issued by Carrier pursuant to Section 2.a.(2)(v), Section 2.a.(2)(vi), Section 4.a.(4)(ii), and/or Section 4(c) in a specified dollar amount. Flight Credits unexpired on or created on or after July 28, 2022, do not expire. A Flight Credit with an expiration date on or before July 27, 2022, is and remains expired. A Southwest LUV Voucher is not a Flight Credit and maintains its specified expiration date. Flight Credits are nontransferable unless otherwise stated within a Rapid Rewards account. Flight Credits are redeemable solely for the purchase of Tickets, may not be redeemed for cash, and may not be transferred to any estate or as part of a settlement, inheritance, or will. In the event of the death of the holder of Flight Credits, Flight Credits will expire.

**Force Majeure Event** means any event outside of Carrier's control, including, without limitation, acts of God, and meteorological events, such as storms, polar vortex, rain, wind, fire, fog, flooding, earthquakes, haze, or volcanic eruption. It also includes, without limitation, a pandemic, public health emergency, catastrophe, government action, disturbance, or potentially volatile international condition, armed conflict, civil unrest or commotion, riot, embargo, war, or hostility, whether actual, threatened, or reported, strike, work stoppage, slowdown, lockout, or any other labor related dispute involving or affecting Carrier's service, mechanical difficulties by entities other than Carrier, Air Traffic Control, or the inability to obtain fuel, supplies, components, parts, fluids, airport gates, labor, landing facilities, or other items which Carrier, in its unilateral discretion, decides is reasonably necessary for the flight in question, or any fact or situation that was not foreseen, anticipated, or predicted by Carrier.

**Individual with a Disability,** as defined in 14 CFR § 382.3, means any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

**Limited Release of Liability** means Passenger's tender, and Carrier's acceptance, of checked Baggage in a condition, or of a nature, unsuitable for Carriage where Carrier limits or excludes liability for loss, damage, or delay under Section 7.

**Miscellaneous Charge Order** means a credit issued by a travel agency in a specified dollar amount with a specified expiration date. Miscellaneous Charge Orders must be used (travel booked and flown) by the Miscellaneous Charge Order's expiration date.

**Montreal Convention** means, unless the context requires otherwise, the Convention for the Unification of Certain Rules for International Carriage by Air, done at Montreal, May 28, 1999.

**Nonstop Flight** means a flight scheduled to operate between origin and destination airports without any intermediate stops.

**One-way** means Scheduled Air Service on Southwest Airlines from an originating airport to a destination airport.

**Passenger** means any person, except members of the Crew working on the flight, who is carried or will be carried in an aircraft with the consent of Carrier.

**Qualified Individual with a Disability**, as defined in 14 CFR § 382.3, means an Individual with a Disability who, as a Passenger:

(i)   With respect to obtaining a Ticket for air transportation on Southwest Airlines, offers or makes a good faith attempt to offer, purchase, or otherwise validly obtain a Ticket.

(ii)  With respect to obtaining air transportation, or other services or accommodations:

   a.  Buys or otherwise validly obtains, or makes a good faith effort to obtain, a Ticket for air transportation on Southwest Airlines and presents themselves at the airport for the purpose of traveling on the flight to which the Ticket pertains.

   b.  Meets reasonable, nondiscriminatory *Contract of Carriage* requirements applicable to all Passengers.

(iii) With respect to accompanying or meeting a traveler, using ground transportation, using terminal facilities, or obtaining information about schedules, fares, reservations, or policies, takes those actions necessary to use facilities or services offered by Carrier to the general public, with reasonable accommodations, as needed, provided by the Carrier.

**Roundtrip** means Scheduled Air Service on Southwest Airlines from an originating airport to a destination airport and back to the originating airport or Southwest Airlines-recognized co-terminal.

**Same-Plane Service** means service between an origin and destination airport with scheduled stops at one or more intermediate airports. With the exception of unexpected ground delays or other unforeseen flight disruptions, Passengers on Same-Plane Service are not required to disembark the aircraft at any intermediate stop.

**Scheduled Air Service** means any current or future flight published on Southwest Airlines website, Southwest Airlines mobile apps, or in a computer reservation system used by Carrier.

**Southwest LUV Voucher** means a voucher issued by the Carrier, at the Carrier's sole discretion in a specified dollar amount with a specified expiration date. Southwest LUV Vouchers are redeemable solely for the purchase of Tickets and may not be redeemed for cash. Southwest LUV Vouchers are not redeemable as payment toward Government-imposed segment fees, excise taxes, Passenger Facility Charges, or September 11th Security Fees or as payment toward miscellaneous charges, Southwest Airlines Group tickets, Southwest Airlines Vacations packages, or travel either wholly or in part on other air carriers. Southwest LUV Vouchers must be used (travel booked and flown) by the Southwest LUV Voucher's expiration date. Additional Terms and Conditions applicable to Southwest LUV Vouchers may be found on Southwest.com and/or accompanying receipt of the voucher. Southwest LUV Vouchers unexpired on July 28, 2022 and issued thereafter, maintain specified expiration dates and are not a Flight Credit.

**Special Drawing Rights (SDR)** means a unit of currency created by the International Monetary Fund (IMF) in 1969, which operates as a supplement to the existing reserves of member countries. The current value of an SDR in U.S. dollars is provided daily by the IMF at http://www.imf.org/external/np/fin/data/rms_sdrv.aspx.

**Standby Passengers** means Passengers who will be enplaned on a flight subject to availability of space at departure time and only after all Passengers with confirmed reserved space for such flight have been enplaned on such flight.

**Ticket** means the electronic six-digit alphanumeric confirmation number issued by Carrier or an authorized travel agent, which provides for the Carriage of the Passenger occupying a seat.

**Ticketing Time Limit (TTL)** means the time by which the Passenger must secure their Ticket for a confirmed reservation.

**Trained Service Animal** means a dog, regardless of breed or type that is individually trained to do work or perform tasks for the benefit of a Qualified Individual with a Disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. A Trained Service Animal also must be trained to behave properly in a public setting, remain under the control of the handler, and avoid engaging in disruptive behavior at all times. Animal species other than dogs, emotional support animals, comfort animals, companionship animals, and service animals in training are not Trained Service Animals for the purposes of this *Contract of Carriage*. The Carrier does not agree to admit any animal onboard the aircraft where such animal carriage is not required by the federal Air Carrier Access Act or applicable rules and regulations of the U.S. Department of Transportation.

**Transferable Flight Credit** means a Flight Credit created on or after May 17, 2022, that explicitly states within a Rapid Rewards account that it is transferable. Transferable Flight Credit may only be issued in connection with Wanna Get Away Plus, Anytime, or Business Select® fares. Transferable Flight Credits unexpired on or created on or after July 28, 2022, do not expire. A Transferable Flight Credit with an expiration date on or before July 27, 2022, is and remains expired.

## 2. Reservations

a. Reservations

   (1) Confirmation of Reservations. A reservation on a given flight is confirmed by the issuance of a Ticket.

   (2) Cancellation of Reservations.

      (i) Passenger or Customer Initiated Cancellation Prior to Date of Travel. If a Passenger or Customer cancels a Ticket at least ten (10) minutes prior to the scheduled departure time, if the Ticket is eligible for a refund, and if a refund is affirmatively requested within one year from the date the Ticket was issued, the refund will be provided consistent with Section 4.c. If a Passenger does not travel and either the Passenger or Customer fails to cancel a Ticket at least ten (10) minutes prior to the scheduled departure time, the fare paid for such unused travel associated with the Ticket will be handled in accordance with the procedures specified in Section 2.a.(2)(v).

      (ii) The Carrier has the right to cancel reservations (whether or not confirmed) due to the Customer's or Passenger's failure to comply with the rules set forth herein, including but not limited to, the failure to pay for the applicable Ticket under the conditions applicable to the fare for such travel.

      (iii) Check-in Requirements. Section 5 contains additional information on Carrier's check-in procedures.

      (iv) The Carrier will refuse to carry and will cancel the reservations (whether or not confirmed) of any Passenger when such refusal is necessary to comply with a government regulation, to protect the safety of Passengers and Crew in the discretion of the Carrier, to accommodate a request for emergency transportation in connection with the national defense, or when necessary or advisable by reason of a Force Majeure Event and the cancelled reservations will follow the rules under Sections 2.a.(2)(v)(a), (b), and (c).

      (v) No Show Policy.

         (a) If a Wanna Get Away® fare segment or Wanna Get Away Plus fare segment on a Ticket is not changed or canceled at least ten (10) minutes prior to the scheduled departure time and the Passenger does not travel, all segments associated with the Ticket are canceled, and funds (including taxes and government fees) associated with the Wanna Get Away® or Wanna Get Away Plus fare segment(s) are forfeited.

         (b) If a Business Select® fare or Anytime fare segment on a Ticket is not changed or canceled at least ten (10) minutes prior to the scheduled departure time and the Passenger does not travel, all segments associated with the Ticket are canceled, and funds (including taxes and government fees) associated with the Business Select® Fare or Anytime Fare segment(s) are held as a Transferable Flight Credit.

(c) When a Ticket contains flight segments with mixed fare types and the Ticket is not changed or canceled at least ten (10) minutes prior to the scheduled departure time and the Passenger does not travel, all segments associated with the Ticket are canceled and the individual flight segments will follow the aforementioned rules associated with the fare type in regard to forfeiture of funds under Sections 2.a.(2)(v)(a) and (b).

(d) For travel on or before 11:59 p.m. CST on June 30, 2023, when a Ticket is purchased using Rapid Rewards points and the Ticket is not changed or canceled at least ten (10) minutes prior to departure time and the Passenger does not travel, all segments associated with the Ticket are canceled, but the points will be returned to the Rapid Rewards account from which the points were initially debited. For travel on or after 12:00 a.m. CST on July 1, 2023, when a Ticket is purchased for a Wanna Get Away® or Wanna Get Away Plus™ fare using Rapid Rewards points and the Ticket is not changed or canceled at least ten (10) minutes prior to departure time and the Passenger does not travel, all segments associated with the Ticket are canceled, and the points are forfeited. Taxes and government fees associated with Rapid Rewards points and Companion Pass Tickets follow the aforementioned rules under Sections 2.a.(2)(v)(a), (b), and (c).

(vi) Prohibited Booking Practices

(a) Fraudulent, fictitious, and/or abusive bookings violate Southwest Airlines rules. Reservations made by Passengers or Customers or Tickets issued to Passengers must be made and issued only in respect of a Passenger's genuine travel requirements. Reservations made to exploit or circumvent fare and Ticket rules are strictly prohibited. Examples include (but are not limited to):

- Purchasing a Ticket without intending to fly all flights to gain lower fares (hidden cities);

- Purchasing a Ticket without intent to travel, including to gain access to our facilities;

- Combining two or more roundtrip excursion fares end-to-end to circumvent minimum stay requirements (back-to-back ticketing);

- Reserving a Ticket in someone's name without the person's consent; and

- Reserving duplicate or impossible trips; for example, multiple trips for the same Passenger around the same time (i.e., trips a Passenger physically could not complete), multiple trips for the same Passenger departing from the same city on the same date, or any multiple reservations containing conflicting or overlapping itineraries (such as departures for the same Passenger from multiple cities at the same time).

(b) If Carrier finds evidence that the Passenger or Customer is using a prohibited practice, then without advance notice to the Passenger or Customer, Carrier reserves the right to the following:

- Cancel any unused part of the Ticket;

- Cancel any other reservations that it believes, in its sole discretion, were made without intent to travel;

- Refuse to let the Passenger and Passenger's Checked Baggage fly;

- Not refund an otherwise refundable Ticket;

- Charge the Customer for what the Ticket would have cost if the Customer hadn't engaged in a prohibited practice, and;

- Require the Passenger or Customer to refund to Southwest Airlines any compensation Southwest Airlines provided to the Passenger or Customer (such as costs for delivering Baggage or reimbursements for clothes or toiletries).

(c) If Carrier proactively cancels a Ticket, the fare paid for the unused portions of travel that are canceled by Carrier may be refunded or applied toward a Flight Credit or a Transferable Flight Credit depending on the fare purchased in accordance with this *Contract of Carriage*.

(vii) Limitation of Liability. The Customer and Passenger agree that the Carrier will not be liable for any type of special, incidental, consequential, or any other type of damages when the Carrier cancels the reservations of any Passenger pursuant to Section 2.a.(2).

b. Group Policies

(1) Groups Booked as Individuals. When ten (10) or more Passengers are booked by a single individual, company, corporation, booking agency, or other entity for travel on the same scheduled flight(s), the reservations must be made as a group through Southwest Airlines Group Desk and are otherwise subject to cancellation, and all applicable group policies, procedures, and terms and conditions set forth in a group travel agreement must be followed. In the event of a conflict between this *Contract of Carriage* and applicable group policies, procedures, and terms and conditions set forth in a group travel agreement (including fare rules and refunds), such group policies, procedures, and terms and conditions set forth in a group travel agreement shall apply. If a booking entity fails to make such reservations as a group, Southwest Airlines reserves the right, in its sole discretion, to assess a penalty upon and/or revoke the authority of the booking entity to sell Southwest Airlines transportation services.

(2) Group Reservations. Southwest Airlines reserves the right to:

   (i)  Limit seats by flight for group reservations.

   (ii)  Cancel group reservation requests.

   (iii) Make changes to group reservations to accommodate Southwest Airlines flight schedule.

   (iv) Not accept group reservations.

   (v)  Require that group reservations be converted to ticketed individual reservations at the applicable individual fare or be forfeited if group reservation utilization reveals what Southwest Airlines considers, in its sole discretion, to be an inadequate usage of reserved seats.

(3) Travel on Group Reservations is valid on flights operated by Southwest Airlines only and is not available for travel on itineraries that combine flights with other carriers.

## 3. Fares

a. Application of Fares

(1) Transportation is subject to the fares and charges in effect when the Ticket is purchased. The fare is guaranteed once a reservation is purchased and Ticket is issued. If a Ticket is purchased before an increase in the fare becomes effective, the Ticket shall be honored for transportation between the airports and at the fare for which it was purchased.

(2) Changes to any portion of a Ticket initiated by the Customer or the Passenger, after its original issue will be subject to the fares, fare rules, tax increases, and charges in effect on the date the change is initiated. For these purposes, a change constitutes a change in flight number, origin, destination, intermediate points, flight date, flight time, class of service, or fare.

(3) Fares may be obtained on Southwest Airlines websites at Southwest.com or SWABIZ.com; through Southwest Airlines mobile apps; from Southwest Airlines by telephone at 1 (800) 435-9792 (1-800-I-FLY-SWA), in Spanish at 1 (800) 826-6667 (1-800-VAMONOS), from Mexico (Border Cities) at 001 (800) 435-9792 (English) or 001-(800) 826-6667 (Spanish), through TTY service at 1 (800) 533-1305; at a ticket counter of Carrier; or through a travel agent or other entity authorized by Carrier to access Southwest Airlines fares.

(4) All published fares and charges are stated in U.S. currency.

(5) At the airport, on the day of travel, when Passengers voluntarily request to travel standby on an itinerary differing from their purchased Ticket, the Carrier will quote an estimated amount for that standby travel, including taxes and government fees, in line with the planned standby itinerary at the time of request by the Passenger. Voluntary standby travel is subject to the availability of seats at departure time. Passengers flying standby have an unconfirmed status for all scheduled stops at any intermediate or connecting points on the flight and must receive confirmation of reserved space for each intermediate or connecting points on the flight in order to be provided travel on such flight.

Because the Passenger's requested (voluntary standby) itinerary may not be available as originally planned, and a new itinerary may be required, the amount of the taxes and government fees may vary from the initial estimated amount at the time that the Passenger made the request for standby travel. Passengers who travel on an itinerary of a standby nature are responsible for any change in taxes and/or fees that result from the Passenger's final completed ticketed routing, regardless of the initial proposed standby upgrade quote.

b.  Stopovers

(1) A stopover is a deliberate interruption of the itinerary by the Passenger. No stopovers are permitted on published fares, except upon combination of individually purchased One-way fares.

c.  Military Fares

(1) United States military personnel on active duty (including reservists, National Guard members, and Coast Guard members with active orders and cadets/midshipmen attending the U.S. Air Force Academy, U.S. Naval Academy, U.S. Military Academy [West Point], and the U.S. Coast Guard Academy) and their authorized dependents are eligible for military fares. Military dependents ages two (2) through eleven (11) years old must be accompanied by a military Passenger or a military dependent Passenger at least twelve (12) years of age. Military personnel who have been discharged from active military duty and their authorized dependents traveling together remain eligible for military fares if travel will be completed within seven (7) days of the military member's date of discharge.

(2) Government Transportation Requests (GTRs) are not permitted or accepted for purchase of transportation booked at a military fare.

A valid United States Uniformed Services Active Duty Identification Card or a copy of discharge orders must be presented at the time of check-in for military personnel. Dependents, other than dependents traveling with a discharged military member within seven (7) days of the member's discharge from active duty, must present a United States Uniformed Services Identification and Privilege Card marked Active.

(3) Military fares are not available on Southwest.com and may only be purchased by calling Carrier or at an airport ticket counter of Carrier. Passengers travelling on a military fare will be able to check in and secure a boarding position twenty-four (24) hours prior to the scheduled departure time for the flight; however, since eligibility verification is required, Passengers will need to verify ID at the airport ticket counter in order to receive a Boarding Pass.

d.  Government Fares

(1) Federal government fares are not available on Southwest.com and may only be purchased through an eligible federal government personnel's authorized travel management system, travel agency, or commercial travel office or through the Southwest Airlines Government Reservation Desk by calling 1 (888) 871-8167. Eligible federal government personnel should use their agency's preferred channel for purchasing a Ticket.

(2) State government fares are not available on Southwest.com and may only be purchased through an eligible state government personnel's authorized travel agency or through the Southwest Airlines Government Reservation Desk by calling 1 (888) 871-8167. Eligible state government personnel should use their agency's preferred channel for purchasing a Ticket.

e.   Wanna Get Away® fares and Wanna Get Away Plus fares

(1)  Wanna Get Away® fares and Wanna Get Away Plus fares are discounted, restricted, and nonrefundable fares.

## 4. Tickets

a. Tickets

(1) No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification acceptable to the Carrier to confirm that transportation has been purchased. Such Ticket shall entitle the Passenger to transportation subject to this *Contract of Carriage* and, in particular, certain terms and conditions as follows.

(i) Such Ticket is valid between the points of origin and destination via the specific routing designated on the Passenger's itinerary only.

(ii) The Passenger is in compliance with fare requirements as provided in Section 3.c., including proof of age and status, where applicable, that entitle the Passenger to military fares.

(iii) The Passenger is in compliance with any other requirements of the Passenger's fare rules.

(iv) The Passenger's Ticket is in the Passenger's own name.

(v) The Ticket has not been altered or improperly issued.

(2) Tickets are Nontransferable. Tickets are nontransferable unless:

(i) Specified explicitly on the Ticket, or;

(ii) Passenger holds a Ticket purchased subject to an agreement with Southwest Airlines and, in accordance with such agreement, the purchasing company or its designated travel agent is permitted to request a Ticket exchange replacing the Passenger's name with a different Passenger on a new Ticket. If the company or its designated travel agent makes the Ticket exchange request as permitted by the foregoing clause (ii) at least 24 hours prior to the original scheduled departure time for the flight, then the name of the Passenger on the ticketed reservation may be changed in accordance with the terms of such corporate agreement and Carrier shall not be liable for any type of actual, special, incidental, or consequential damages (including for transportation, a refund, or a Flight Credit[s] or Transferable Flight Credit[s]) to the Passenger named on the Ticket prior to the Ticket exchange.

Except as expressly permitted by this *Contract of Carriage*, the Carrier is not liable to the holder of a Ticket for use or refund of such Ticket when presented by a person other than the person named on the Ticket. If a Ticket is used by a person other than the person named on the Ticket, the Carrier shall not be liable for the loss, destruction, damage, or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

(3) Purchase of Additional Seat. The purchase of more than one seat for use by a single Passenger is required when necessary to transport large musical instruments or electronic audio/video, medical, or otherwise sensitive equipment unsuitable for Carriage as Checked Baggage, as specified in Section 7. In addition, the purchase of more than one seat for use by a single Passenger may sometimes be necessary to accommodate the pet of a Passenger with unique seating needs, per Section 6.(e)(7).

It is the Passenger's responsibility to notify the Carrier of any unique seating needs. In accordance with Section 6, the Carrier may refuse to transport individuals who are unable or unwilling to comply with  the Carrier's seating requirements. Purchase of more than one seat for use by a single Passenger for the sole purpose of seeking additional personal space is prohibited, except in limited circumstances when the Carrier, in its discretion, permits it.

(4) Tickets Issued Outside of Carrier's Systems.

   (i) For Passengers holding a Ticket issued by an entity other than Southwest Airlines (such as an authorized travel agent), flight changes, Ticket exchanges and refunds must be processed via the Ticket's original booking source/agent in order to retain the forms of payment on the initial Ticket and keep the Ticket and funds associated with such Ticket accessible to the initial booking source/agent.

   (ii) If a Customer or Passenger holding a Ticket issued by an entity other than Southwest Airlines (such as an authorized travel agent) exchanges, cancels, or surrenders such Ticket via a Southwest Airlines system or by a Southwest Airlines Agent, the funds associated with such Ticket henceforth become nonrefundable. Thereafter, upon surrender or cancellation of the unused Ticket, the fare paid for unused travel will be held as a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

b.  Ticket Acceptability

   (1) Tickets Accepted. The Carrier will accept only Southwest Airlines Tickets. Any Tickets issued in conjunction with travel on another airline will not be accepted unless required by federal government regulation or at the Carrier's sole discretion.

   (2) In the event that a Passenger does not comply with the terms and conditions in this *Contract of Carriage*, their Ticket shall be invalidated, and the Carrier has the right to:

      (i) Cancel any remaining portion of the Passenger's itinerary.

      (ii) Refuse to allow the Passenger to board or check Baggage.

      (iii) Confiscate the Ticket.

c.  Refunds

   (1) Refundable Tickets.  The fare paid for unused travel by Customers who purchase fully refundable, unrestricted Tickets, including taxes and government fees, may, for any reason and upon surrender or cancellation of the unused Ticket, be refunded in accordance with Section 4.c.(3).

(2) Changes, Exchanges, and No Show. Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new Ticket. Subject to Section 2.a.(2)(i), Southwest Airlines' unrestricted fares are fully refundable if cancelled and then refunded instead of exchanging or changing your Ticket. If a fully refundable fare segment on a reservation is not changed or canceled at least ten (10) minutes prior to departure time and the Passenger does not travel, all segments associated with the reservation are canceled, and funds (including taxes and government fees) associated with the fully refundable fare segment(s) are held as a Transferable Flight Credit. When the Ticket combines a fully refundable fare with a Wanna Get Away® or Wanna Get Away Plus nonrefundable fare and the Passenger does not travel on the Wanna Get Away® or Wanna Get Away Plus segment and has not canceled the reservation at least ten (10) minutes prior to the scheduled departure time, the fare paid for unused travel will be forfeited or held in accordance with Section 2.a.(2)(v) and all remaining segments of the reservation are canceled.

(3) Form of Refunds. The Carrier shall make all refunds in U.S. dollars. See Section 8 for additional information for international travel. Eligible refunds must be requested no later than one year from the date the Ticket was issued. When no portion of the transportation has been provided, the eligible refund will be issued in accordance with this Section in an amount equal to the fare paid. When a portion of the transportation has been provided, the eligible refund will be issued in accordance with this Section in an amount equal to the difference, if any, between the total fare paid and the fare applicable to the transportation provided. Except as otherwise provided in this *Contract of Carriage*, following a request made by the Customer and received by the Carrier, if a Ticket or unused ancillary fee for optional services paid by a Customer is eligible for a refund, Carrier will issue such refunds as follows:

(i) At the direction of the Customer, refunds for Tickets purchased with a credit card shall be processed either:

(a) For crediting to the credit card account used to purchase the Ticket, typically no later than seven (7) business days from the date the refund request is received by Southwest Airlines or;

(b) To the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(ii) Refunds for Tickets purchased with cash, if cash is accepted by Carrier, typically will be issued by check no later than twenty (20) business days after the refund request is received by the Carrier.

(iii) Refunds for Tickets purchased with an exchanged Ticket, Flight Credit, or Transferable Flight Credit, will be processed to the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(iv) Refunds for Tickets purchased with a Southwest® gift card will have the amount applied from the Southwest® gift card held as a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(v) Refunds for Tickets purchased outside of Southwest Airlines (for example, through a travel agent or with a universal air travel plan number) shall be processed for crediting via the ticket issuer and may, for example, take the form of a credit to the subscriber against whose number the Ticket was charged or a Miscellaneous Charge Order, as applicable.

(vi) Refunds for Tickets paid with any other form of payment (such as a Southwest LUV Voucher) will, in the Carrier's sole discretion, be issued back to the original form of payment (and subject to any limitations on the original form of payment, such as an expiration date) or be processed to the form of a Flight Credit or a Transferable Flight Credit depending on the fare purchased.

(vii) Transferable Flight Credit.  Unless otherwise stated by Southwest Airlines, at the direction of the Customer, the fare paid for unused Anytime or Business Select® fare segments, including taxes and government fees, may be held as a Transferable Flight Credit. When a Ticket combines an Anytime or Business Select fare segment with a Wanna Get Away® fare segment, if the Customer does not travel and the Customer cancels the Ticket at least ten (10) minutes prior to the scheduled departure time, then the fare paid for unused travel, including taxes and government fees, may be held as a Transferable Flight Credit. The Passenger named on the Ticket can (A) request a refund of the refundable segment associated with the Transferable Flight Credit in accordance with Section 4.c.(3), (B) use a Transferable Flight Credit for travel on Southwest Airlines, or (C) if such Passenger is a Rapid Rewards Member and their Rapid Rewards number is associated with the Transferable Flight Credit prior to transfer, transfer the Transferable Flight Credit to another Rapid Rewards Member. A Transferable Flight Credit may only be transferred once. Any Transferable Flight Credit resulting from a Ticket purchased via a corporate booking tool, a GDS, SWABIZ.com, or a Southwest Airlines mobile app or the Southwest Airlines mobile website using a valid corporate credential issued by Southwest Airlines may only be transferred between employees within the same organization. A refundable flight segment associated with a Transferable Flight Credit becomes nonrefundable following the transfer to another Passenger. Although transferable, a Transferable Flight Credit may not be sold or bartered by the Passenger, a Customer, or any designee. Transferable Flight Credits obtained through prohibited sale or barter transactions are void and will not be honored for travel.

(viii) Limitation of Liability.  As provided in this *Contract of Carriage*, Southwest Airlines may, at the discretion of Southwest Airlines, refund all or a portion of a refund payment to a person or entity other than the Passenger, which shall be deemed a valid refund.  Carrier shall not be liable to the Passenger for another refund or Flight Credit or Transferable Flight Credit.

(4) Nonrefundable Tickets.

(i) General. As the term "nonrefundable" reflects, the fare paid for unused travel by Passengers who purchase restricted, nonrefundable Tickets (including taxes and government fees) are not eligible for refunds, except as specifically stated in this *Contract of Carriage*, as provided in this Section, and as provided in Section 9.

(ii)  Flight Credit. Unless otherwise stated by Southwest Airlines, the fare paid for unused Wanna Get Away® fare segments, including taxes and government fees, is, in the Carrier's sole discretion, refunded in accordance with Section 4(c)(3) or held as a Flight Credit either for use by the Passenger on Southwest Airlines or, as agreed to by Southwest Airlines, if evidence satisfactory to Southwest Airlines, in its sole discretion, is submitted to Southwest Airlines that an employer purchased the Ticket on behalf of its employee or the travel agent has made a refund to its client, then the Flight Credit may be held for use by the company or travel agent, as applicable.

(iii)  Transferable Flight Credit. Unless otherwise stated by Southwest Airlines, the fare paid for unused Wanna Get Away Plus fare segments, including taxes and government fees, is, in the Carrier's sole discretion, refunded in accordance with Section 4(c)(3) or held as a Transferable Flight Credit. When a Ticket combines a Wanna Get Away Plus fare segment with a Wanna Get Away® fare segment, if the Customer does not travel and the Customer cancels the Ticket at least ten (10) minutes prior to the scheduled departure time, then the fare paid for unused travel, including taxes and government fees, may be held as a Transferable Flight Credit. The Passenger named on the Ticket can; (A) use a Transferable Flight Credit for travel on Southwest Airlines or, (B) if such Passenger is a Rapid Rewards Member and their Rapid Rewards number is associated with the Transferable Flight Credit prior to transfer, transfer the Transferable Flight Credit to another Rapid Rewards Member. A Transferable Flight Credit may only be transferred once. Any Transferable Flight Credit resulting from a Ticket purchased via a corporate booking tool, a GDS, SWABIZ.com, or a Southwest Airlines mobile app or the Southwest Airlines mobile website using a valid corporate credential issued by Southwest may only be transferred between employees within the same organization. A refundable flight segment associated with a Transferable Flight Credit becomes nonrefundable following the transfer to another Passenger. Although transferable, a Transferable Flight Credit may not be sold or bartered by the Passenger, a Customer, or any designee. Transferable Flight Credits obtained through prohibited sale or barter transactions are void and will not be honored for travel.

(iv)  Changes and Exchanges. Ticket changes and exchanges within the same reservation will result in the initial Ticket being applied as the form of payment for the new Ticket. The new Ticket may be more or less expensive or subject to different terms, conditions, or restrictions from the original Ticket. If the fare is lower, in the Carrier's sole discretion, the difference will be refunded in accordance with Section 4(c)(3) or a Flight Credit or a Transferable Flight Credit depending on the fare purchased will be issued for the difference. No cash refund or credit card adjustments will be made for nonrefundable Tickets.

(5)  For Flight Credits or Transferable Flight Credits with an Expiration Date of July 27, 2022 or Earlier. If a Flight Credit or Transferable Flight Credit is not applied and travel completed on or before its expiration date, the entire amount of the Flight Credit or Transferable Flight Credit, including all taxes and government fees is forfeited.

(6) Significant Delays or Involuntary Cancellations. If a Passenger's scheduled transportation is significantly disrupted by the Carrier before the Passenger has reached his or her final destination as a result of a flight cancellation, Carrier-caused missed connection, significant flight delay, significant schedule change, or omission of a scheduled stop caused by the Carrier, Carrier may do one of the following:

(i)   Transport the Passenger at no additional charge on another of Southwest Airlines flight(s);

(ii)  Refund the fare for the unused transportation in accordance with this Section 4; or

(iii) Provide a Flight Credit or a Transferable Flight Credit depending on the fare purchased for the unused portion of the Customer's fare in accordance with this Section 4. See also Section 9.a.

## 5. Check-in

a. Boarding Passes

(1) General. Boarding Passes may be obtained at Southwest.com, SWABIZ.com, Southwest Airlines mobile app, or at the airport from Carrier at:

(i) E-Ticket Check-In kiosks (where available)

(ii) Skycap podiums (where available)

(iii) Ticket counters, or

(iv) Departure gate podiums. The Carrier reserves the right, in its sole discretion, to restrict Boarding Pass distribution to the departure gate podium.

(2) Standby Travel. Boarding Passes for Standby Passengers are available for issuance only at the flight's departure gate. A Boarding Pass must be retrieved by Standby Passengers at the flight's departure gate for each scheduled stop at any intermediate or connecting points on the flight.

(3) Invalid Boarding Passes. A Boarding Pass that has been altered or improperly issued shall not be valid and will not be accepted by Carrier.

(4) Transferability of Boarding Passes. Boarding Passes are nontransferable unless explicitly stated on the Boarding Pass. The Carrier is not liable to the holder of a Boarding Pass for use of such Boarding Pass when presented by a person other than the person to whom it was issued. If a Boarding Pass is used by a person other than the person to whom it was issued, the Carrier shall not be liable for the loss, destruction, damage, or delay of such unauthorized person's Baggage or other personal property or the death or injury of such unauthorized person arising from or in connection with such unauthorized use.

b. Check-in Requirements

(1) Ten-Minute Rule. Failure of a Passenger to obtain a Boarding Pass and be present, available, and appropriate as described in Section 6 for boarding in the flight's boarding gate area at least ten (10) minutes before the scheduled departure time may result in cancellation of the Passenger's reservation without notice at the Carrier's sole discretion. Refer to Section 8 for information regarding check-in requirements for international travel.

(2) Early Departure. Southwest Airlines reserves the right, in its sole discretion, to depart early when all Passengers who have met the check-in requirements as outlined in Section 5.b.(1) are onboard the aircraft. The scheduled departure and arrival times as published for the flight will not be changed or otherwise affected if Southwest Airlines departs early. It is the Passenger's responsibility to arrive at the departure airport with adequate time to allow for check-in requirements and security screening.

## 6. Acceptance of Passengers

By purchasing and accepting Carriage under this *Contract of Carriage,* the Passenger agrees to adhere to and comply with all the requirements of this Section 6. Transportation offered by the Carrier under this *Contract of Carriage*, including International Travel described in Section 8, is subject to the Passenger's compliance with these obligations, and a Passenger's failure to comply shall constitute a material breach of this *Contract of Carriage*.

a.  Refusal to Transport—General

The Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances listed below. The fare of any Passenger denied transportation or removed from Southwest Airlines aircraft en route under the provisions of this Section 6.a. will be refunded in accordance with Section 4.c.(3). The sole recourse of any Passenger refused transportation or removed en route under this Section 6.a. will be the recovery of the refund value of the unused portion of his or her Ticket. Under no circumstances shall Carrier be liable to any Passenger for any type of special, incidental, consequential, or other type of damages.

(1) Safety. Whenever such action is necessary, with or without notice, for reasons of aviation safety as determined unilaterally by the Carrier, the Carrier may cancel or delay a flight without any type of special, incidental, consequential, or other type of damages owed to the Passenger. Such reasons, in the unilateral judgment of the Carrier, may include, without limitation, the lack of sufficient materials, staffing, or supplies for a flight to be operated.

(2) Force Majeure Event. Whenever advisable due to a Force Majeure Event.

(3) Government Request or Regulation. Whenever such action is necessary to comply with any Federal Aviation Regulation or other applicable government regulation or request, or to comply with any governmental request for emergency transportation in connection with the national defense.

(4) Incompatible Medical Requirements. The Carrier will refuse to transport persons requiring the following medical equipment or services, which either are not authorized or cannot be accommodated on the Carrier's aircraft: medical oxygen for use onboard the aircraft except FAA-approved and Carrier-accepted Portable Oxygen Concentrators (POCs), incubators, medical devices requiring electrical power from the aircraft, or travel on a stretcher.

(5) Comfort and Safety. The Carrier may refuse to transport, or remove from the aircraft at any point, any Passenger in any of the circumstances listed below as may be necessary in the discretion of the Carrier for the comfort or safety of such Passenger or other Passengers and Crew Members:

(i)  Persons who are barefoot and older than five (5) years of age, unless required due to a disability.

(ii)  Persons who are unable to occupy a seat with the seatbelt fastened.

(iii) Persons who have an offensive odor, unless caused by a disability.

Southwest Airlines Co.                                          23

(iv) Any person who cannot be transported safely for any reason, whose carriage poses a safety risk (including poses a direct threat in accordance with 14 CFR § 382), whose carriage would violate FAA or TSA requirements or applicable requirements of a government or when such transport may be inimical to safety under 49 U.S.C. § 44902.

(v)  As set forth below, any person who acts inappropriately, violently, or poses any potential threat to any other person onboard the aircraft of the public generally.

(6)    Prisoners. The Carrier may refuse to transport Prisoners (persons charged with or convicted of a crime) under escort of law enforcement personnel; other persons in the custody of law enforcement personnel who are being transported while wearing manacles or other forms of restraint; persons brought into the airport in manacles or other forms of restraint; persons who have resisted escorts; or escorted persons who express to the Carrier an objection to being transported on the flight.

b.   Refusal to Transport—Unruly/Disruptive Passenger

The Carrier may, in its sole discretion, refuse to transport, or may remove from an aircraft at any point, any Passenger in any of the circumstances described below. A Passenger who is so refused or removed is without further recourse to the Carrier for any damages claimed by Passenger, including the refund value of any unused portion of their Ticket, and may be liable to Carrier for costs and damages as set forth in Section 6.b.(4).

(1) The Passenger, at all times, agrees to conduct themselves in a manner that is not disruptive, unruly, or in contravention of any federal law, applicable regulation, government directive or request, or the laws of any state which has jurisdiction over the aircraft.

Conduct is considered to be disruptive or unruly when a Passenger fails to adhere to orderly rules of conduct while embarking upon or being carried onboard Southwest Airlines aircraft or fails to follow the instructions of the Crew and thereby disturbs the good order and discipline onboard the aircraft or in the airport. (In this section, the term "Crew" shall mean flight crew, cabin crew, or any other employee of the Carrier.) Disruptive or unruly conduct includes, but is not limited to the following:

(i)    Interfering in any way with or disrupting the operation of the aircraft or any of its components or parts;

(ii)   Interfering in any way with or disrupting the Crew, including, but not limited to: failing to cooperate or interfering with the Crew's duties; verbal or physical assault of the Crew; refusing to follow instructions to board or leave the aircraft; or using portable electronic devices in contravention of instructions from the Crew;

(iii)  Refusing to follow or obey the instructions of any member of the Crew (e.g., instructions to fasten a seat belt, a command to return to one's seat, instructions not to smoke, or instructions to turn off a portable electronic device) or disrupting a safety announcement;

(iv)  Verbal confrontation with Crew Members or other Passengers;

(v) Physical confrontation with Crew Members or other Passengers;

(vi) Refusing to permit the search of his or her person or property by Carrier, Crew, or an authorized government agency for explosives, hazardous materials, contraband, or concealed, deadly, or dangerous weapons or articles;

(vii) Refusing to produce positive identification acceptable to the Carrier upon request. For international travel, any Passenger refusing to obtain and complete all documentation required for entry into and exit from each country, as well as comply with the laws, requirements, or procedures of each country listed on such itinerary;

(viii) Making an intentional misrepresentation in response to a question or inquiry by the Carrier or Crew, or otherwise attempting to commit, or committing, a fraudulent act against the Carrier;

(ix) Making threats against the safety of the Crew, Passengers, and aircraft (includes all types of threats, whether directed against a person, [e.g., threat to injure someone], or intended to cause confusion and chaos, such as statements referring to a bomb threat, or simply any threatening behavior that could affect the safety of the Crew, Passengers, and aircraft);

(x) Boarding or attempting to board an aircraft when the Passenger has an infectious disease or infection that poses a direct threat (as defined in 14 CFR § 382.3) to the health or safety of Passengers and/or Crew that cannot be eliminated by a modification of policies, practices, or procedures, or by the provision of auxiliary aids or services;

(xi) Boarding or attempting to board an aircraft with a weapon (Carrier will carry Passengers who meet the qualifications and conditions established in 49 CFR § 1544.219);

(xii) Being or appearing to be intoxicated or under the influence of drugs or alcohol;

(xiii) Engaging in, or threatening, sexual abuse or harassment;

(xiv) Engaging in lewd, obscene, or patently offensive behavior, including wearing clothes that are lewd, obscene, or patently offensive;

(xv) Refusing to comply with instructions given by Carrier or Crew prohibiting the solicitation of items for sale or purchase, including airline Tickets, reduced-rate travel passes, or travel award certificates;

(xvi) Smoking or attempting to smoke onboard the aircraft; and

(xvii) Other types of riotous, disorderly, offensive, threatening, intimidating, violent, or belligerent behavior (e.g., screaming; annoying behavior; kicking and/or banging seat backs/tray tables; harassment related to race, color, gender, religion, national origin, disability, age, ethnicity, or sexual orientation).

(2) Carrier Action.

If the Carrier determines in its sole discretion that a Passenger has failed or is failing to comply with any of the requirements of this section, the Carrier may take any of the following actions that it considers necessary to prevent the continued disruptive or unruly conduct, protect aircraft Passengers and/or Crew, and/or protect the good order, safety, and discipline onboard the aircraft including:

- Physical restraint of that Passenger
- Diversion of the aircraft
- Removal of that Passenger from the aircraft and termination of carriage of that Passenger
- Refusal to carry that Passenger on ticketed and/or future flights
- Reporting of that Passenger to law enforcement authorities

(3) Exoneration of Liability.

(i) Carrier is not liable to a Passenger who fails to comply with any of the requirements of this section for any type of actual, special, incidental, or consequential damages arising out of any actions the Carrier may undertake as described in Section 6.b.(2).

(ii) In any action for damages, however founded, if the Carrier proves that the loss or damage was caused or contributed to by the disruptive or unruly conduct of the Passenger claiming compensation, the Carrier shall be exonerated from liability to the extent the conduct caused or contributed to the damage.

(iii) When the loss or damage is claimed by a person other than that Passenger, the Carrier, to the extent permitted by applicable law, shall likewise be exonerated from its liability to the extent it proves that the damage was caused or contributed to by the unruly or disruptive conduct of that Passenger.

(iv) In the case of damage occasioned by delay, the Carrier shall not be liable if it proves that:

(a) The delay was caused by the disruptive or unruly conduct of that Passenger; or

(b) In the case of International Travel, the Carrier and its agents took all measures that could reasonably be required to avoid the damage caused wholly or partly by that Passenger's unruly or disruptive conduct, or that it was impossible for it or them to take such measures.

(4) Carrier's Right of Recourse Against Disruptive/Unruly Passenger

    (i)   Passenger agrees that they shall be liable, upon demand by the Carrier, for all of the Carrier's costs and damages incurred as a result of that Passenger's disruptive or unruly conduct within the meaning of this section including, but not limited to the following:

- Repair or replacement of property, including Baggage, that was damaged or destroyed by the disruptive or unruly conduct of that Passenger or that resulted from efforts to subdue, restrain, or remove that disruptive or unruly Passenger;

- Any damage, including death or bodily injury, of any Passenger or Crew member caused or contributed to by the disruptive or unruly conduct of that Passenger;

- Compensation for delay to Passengers, Crew Members, and Carrier caused by the disruptive or unruly conduct of that Passenger; and

- The costs incurred by the Carrier attributable to any diversion or delay or other interference with the operation of the aircraft due to the disruptive or unruly conduct of that Passenger, including landing and parking fees, fuel purchases, and payments for food and lodging made available to Passengers as a result of the diversion.

    (ii)   The Carrier expressly preserves any other right of recourse or remedy it may have under applicable law against any Passenger engaged in disruptive or unruly conduct, including without limitation, all rights of contribution and indemnity.

c.   Carriage of Children

(1) Accompanied Minor Children

    (i)   Infants younger than fourteen (14) days of age. The Carrier will not accept for carriage any infant younger than fourteen (14) days of age, unless a written statement is provided by an attending physician approving such infant for air travel. Infants must be accompanied by a Passenger twelve (12) years old or older.

    (ii)   Children fourteen (14) days old and younger than two (2) years old. One child fourteen (14) days up to two (2) years old on the date of travel may be carried on the lap of an accompanying Passenger twelve (12) years of age or older. If an adjacent unoccupied seat is available, the child may be secured in an FAA-approved child restraint device without charge. However, if the child is traveling without a confirmed reservation and no adjacent unoccupied seats are available, the child restraint device may have to be transported as Checked Baggage.

    (iii) See Section 8 for additional requirements for the Carriage of Children for international travel.

(2)  Unaccompanied Minor Children

(i)  Children younger than five (5) years old. Carrier will not accept for Carriage any child less than five (5) years old unless accompanied by a Passenger at least twelve (12) years of age.

(ii)  Children five (5) through eleven (11) years old. Unaccompanied children ages five (5) through eleven (11) years old will be required to use the Carrier's unaccompanied minor service and will be accepted for Carriage by the Carrier provided the child has a Ticket and the flight on which he or she travels does not require a change of aircraft or flight number. Unaccompanied children age five (5) through eleven (11) years old who are traveling standby may only travel on Nonstop Flights. However, any unaccompanied child age five (5) through eleven (11) years old will not be accepted for Carriage if, because of operational disruptions, the Carrier determines, in its sole discretion, that the flight on which the child holds a reservation is anticipated to terminate short of or bypass the child's destination. The Carrier will not transport unaccompanied minor children on international itineraries. See Section 8 for additional information.

(iii)  Child drop off and pick up. The parent or guardian who brings an unaccompanied minor child to the departure airport will be required to remain at the departure gate until the flight is airborne.  The Carrier must be furnished with documentation (duplicate of which must be in the child's possession) that the child will be met by another parent or guardian upon deplaning at his or her destination. The parent or guardian meeting the child at his or her destination will be required to present a valid government-issued photo ID and sign a release form designated by the Carrier.

(iv)  Unaccompanied Minor Charge. In addition to the applicable fare, children for whom unaccompanied minor Carriage is required must pay the applicable unaccompanied minor charge. Following a request by the Customer, the unaccompanied minor charge may be refundable under the following circumstances:

- The reservation is canceled by the Customer.

- The Carrier cancels the flight, and the Customer elects to not rebook.

- The child does not travel unaccompanied (i.e., the fee was paid, but an accompanying adult ultimately travels with the child).
An eligible refund will be issued in accordance with Section 4.c.3.

(3) Child Restraint Systems

(i) Unless unoccupied seats are available on a flight, the Carrier requires a reservation and purchase of a Ticket for Carriage of a child restraint system on board the aircraft to use during flight. Only federally approved child restraint systems (CRSs) are permitted for use onboard Southwest Airlines aircraft. Federal regulations prohibit the use of child booster seats and harness or vest-type restraining devices, unless such devices have been specifically approved by the Federal Aviation Administration under a Type Certificate (TC), Supplemental Type Certificate (STC), or Technical Standard Order (TSO). Passengers are responsible for providing Carrier copies of TC, STC, or TSO documentation for review at the departure gate. CRSs will be considered as items of carryon Baggage counting toward the accompanying Passenger's carryon allowance, unless the child has been ticketed and a seat reserved for use of the CRS.

d. Carriage of Passengers with Disabilities

(1) The Carrier will transport Qualified Individuals with a Disability pursuant to the Air Carrier Access Act and the U.S. Department of Transportation regulations, 14 CFR § 382, unless the Carriage of such individuals may impair the safety of the flight, pose a direct threat, or violate Federal Aviation Regulations; however, this should not be construed as imposing a contractual obligation of any kind on Carrier. Customers and Passengers do not have a private right of action to enforce the ACAA or any other federal law or regulation relating to individuals with a disability. Pursuant to 14 CFR § 382.113, the Carrier will not provide certain extensive inflight special services such as assistance in eating, assistance with elimination functions in the lavatory or at the Passenger's seat, or provision of medical services. Carrier may require, at its sole discretion, pursuant to 14 CFR § 382.29, that a Qualified Individual with a Disability be accompanied by a safety assistant as a condition of being provided air transportation in the following circumstances:

(i) When the Passenger is unable to comprehend or respond appropriately to safety instructions from the Carrier, including the safety briefing required by 14 CFR § 121.571(a)(3) and (a)(4) because of a mental disability;

(ii) When the Passenger has a mobility impairment so severe that the Passenger is unable to physically assist in his or her own emergency evacuation of the aircraft; or

(iii) When the Passenger has both severe hearing and severe vision impairments that prevent the Passenger from establishing a means of communication with the Carrier in order to permit transmission of the safety briefing required by 14 CFR § 121.571 (a)(3) and (a)(4).

If the Carrier determines, in its sole discretion that an individual meeting the criteria above must travel with a safety assistant and the individual disagrees and believes they are capable of traveling independently, the Carrier will not charge the individual for Carriage of a safety assistant of the Carrier's choosing. If a seat is not available for the safety assistant and the Individual with a Disability is unable to travel on the flight, the Individual with a Disability will be eligible for denied boarding compensation. For purposes of determining whether a seat is available, the safety assistant shall be deemed to have checked in at the same time as the individual with the disability.

(2) Assistive Devices. Mobility and other assistive devices used by a Qualified Individual with a Disability may be carried in the aircraft cabin in addition to the carryon Baggage allowance. If necessary due to the Passenger's disability, the Carrier will provide assistance in loading, stowing, and retrieving carryon items, including assistive devices. If the assistive device cannot be carried in the Passenger cabin pursuant to FAA regulations, the assistive device will be checked and carried free of charge in addition to the free Baggage allowance. No oversize or excess weight charges will be assessed for the assistive device. Assistive devices not for the personal use of the Passenger will be accepted subject to a limited release of liability and may be subject to oversized or overweight charges as described in Section 7.f.

(3) Limitation of Liability. The Carrier's liability with respect to damage to or loss of mobility and other assistive devices shall not exceed the documented original purchase price of the assistive device pursuant to 14 CFR § 382.131. The Carrier will also compensate the Passenger for other reasonable expenses incurred as a direct result of the loss of, damage to, or delayed delivery of the mobility or assistive device.

(4) Trained Service Animals

(i) Per 14 CFR §382.72 to §382.80, the Carrier permits fully Trained Service Animals used by a Qualified Individual with a Disability, as that term is defined in this *Contract of Carriage*, to accompany the Passenger onboard the aircraft at no charge. See Section 8 for additional information for international travel. The Carrier does not agree to admit any animal onboard the aircraft where such animal carriage is not required by the federal Air Carrier Access Act or applicable rules and regulations of the U.S. Department of Transportation.

(ii) Per 14 CFR §382.73, to determine if an animal is a Trained Service Animal that must be accepted for transport, the Carrier may ask appropriate questions of the Qualified Individual with a Disability, or may observe the behavior of the animal. To travel with a Trained Service Animal, a Qualified Individual with a Disability must provide a completed U.S. Department of Transportation *Service Animal Air Transportation Form*.

(iii) Per 14 CFR §382.79, Carrier may refuse to transport a Trained Service Animal if:

(a) The animal poses a direct threat to the health or safety of others;

(b) The animal causes a significant disruption in the cabin or at an airport gate area, or its behavior on the aircraft or at an airport gate area indicates that it has not been trained to behave properly in public (e.g., running freely, barking, or growling repeatedly at other persons on the aircraft, biting or jumping on people, or urinating or defecating in the cabin or gate area); or

(c) The animal's carriage would violate applicable safety or health requirements of any U.S. federal agency, U.S. territory, or foreign government.

(iv) For large Trained Service Animals, which do not fit in the Passenger's lap or foot space, the Carrier will be guided by the procedures set forth in 14 CFR §382.77.

(v)   The Trained Service Animal must be harnessed, leashed, or otherwise tethered at all times by the Trained Service Animal user or handler while in the airport and on the aircraft.

(vi)   Carrier will accept a maximum of two (2) Trained Service Animals per Qualified Individual with a Disability.

(vii)   A Trained Service Animal accompanied by a trainer will be permitted to travel aboard Southwest Airlines aircraft only if the animal is being delivered to the domicile of a Qualified Individual with a Disability who either owns or, upon delivery, will take immediate ownership of the animal for that individual's personal use. No charge will be assessed for Carriage of a Trained Service Animal being delivered to the domicile of the animal's owner under such circumstances.

(viii)   Carrier only accepts service animals in training from Canine Companions for Independence (CCI). CCI dogs are transported at no charge and are exempt from the requirements for pets. The following guidelines apply to the transport of CCI dogs:

- CCI ID or letter must be presented.

- Current vaccination record on CCI or veterinarian letterhead must be presented.

- Young or small puppies may need to be transported in carriers.

- Trainers and dogs preboard after Passengers with disabilities.

- Cabin seating restrictions apply (e.g., no exit row, must not block egress).

(ix)   The local laws and regulations at a Qualified Individual with a Disability's final or intermediate destination(s) may apply to the Passenger and impose further requirements or restrictions. Qualified Individuals with a Disability assume full responsibility for compliance with all governmental laws and regulations, including but not limited to, health certificates, permits, and vaccinations required by the country, state, or territory from and/or to which the Trained Service Animal is being transported. The Carrier is not liable for any assistance or information provided by the Carrier to any Qualified Individual with a Disability relating to compliance with such laws and regulations. Subject to applicable laws and regulations, a Qualified Individual with a Disability is solely responsible for any expenses incurred or any consequences resulting from his or her failure to comply with applicable laws and regulations. The Carrier expressly reserves the right to seek reimbursement from a Qualified Individual with a Disability for any loss, damage, or expense suffered or incurred by the Carrier resulting from such Qualified Individual with a Disability's failure to comply with applicable laws and regulations.

e. Pets

(1) Pets Allowed in the Cabin.  The Carrier may accept small vaccinated domestic cats and dogs at least eight (8) weeks old contained in a pet carrier and traveling with a Passenger. One (1) pet carrier may be allowed per Passenger. The pet carrier may contain up to two (2) animals of the same species. Unaccompanied Minors may not travel with a pet. The Carrier reserves the right to limit the number of pet carriers per flight to six (6), and pets will be accepted on a first-come, first-served basis.

(2) Pet Carriers. All pets in the cabin must be carried in an appropriate pet carrier and remain in the carrier at all times (including head and tail) while in the gate area, during boarding/deplaning, and while onboard the aircraft.  The pet carriers must be leak-proof and well ventilated, and the pet(s) must be able to stand up and move around the carrier with ease.  The pet carrier must be of a size small enough to fit under the seat in front of the Passenger and must remain stowed under the seat in front of the Passenger during the entire duration of the flight. Passengers traveling with a pet may not occupy an exit row seat or a seat with no forward under seat stowage.

(3) Pet Fares. All occupied pet carriers are subject to the applicable pet fare. Pet reservations can only be booked by calling Carrier. The pet fare must be collected at the airport ticket counter and may not be applied toward future travel if unused.  A Passenger traveling with a pet must check the pet in at the airport ticket counter and pay the pet fare before proceeding to the departure gate. Following a request by the Passenger or Customer, the pet fare may be refundable if the reservation is canceled by the Customer. Following a request by the Passenger or Customer, the pet fare will be refunded if the Carrier cancels the flight and the Passenger or Customer elects not to rebook.

An eligible refund will be issued in accordance with Section 4.c.(3).

(4) Pets Incompatible with Air Travel. The Carrier retains the right, at its sole discretion, to refuse to transport any pet that exhibits aggressive behavior or any other characteristics that appear to the Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft. The pet(s) must be healthy, harmless, inoffensive, odorless, and require no attention during the flight. If the pet becomes ill during the flight, oxygen or other first aid procedures will not be administered. In the event of an emergency, an oxygen mask will not be available for the pet. The Carrier assumes no liability for the heath or wellbeing of carryon pets.

(5) No Pets Carried in Cargo Compartment.  The Carrier will not transport pets in the aircraft cargo compartments.

(6) No Pets will be accepted on international itineraries. See Section 8 for additional information.

(7) In accordance with Section 4.a.(3), purchase of an additional seat may be required, at discretion of the Carrier, to accommodate the pet of a Passenger with unique seating needs.

(8) No pets are accepted on itineraries between the continental United States and Hawaii.

f.   Law Enforcement and Search and Rescue Dogs

(1)   Law Enforcement and Search and Rescue Dogs Allowed in the Cabin. The Carrier accepts fully-trained law enforcement service dogs trained in explosives or drug detection (or other specific functions) and search and rescue dogs for transportation, without charge, when accompanied by their respective handlers on official business. See Section 8 for additional information for international travel.

(2)   Documentation. Each Passenger traveling with a law enforcement or search and rescue dog must present a letter of mission and a copy of the animal's certification.

(3)   Law enforcement and search and rescue animals in training will not be accepted by the Carrier for transport.

(4)   Law Enforcement and Search and Rescue Dogs Incompatible with Air Travel. The Carrier retains the right, at its sole discretion, to refuse to transport any dog that exhibits aggressive behavior or any other characteristics that appear to the Carrier to be incompatible with air travel at the airport, in the boarding gate area, or onboard the aircraft.

(5)   No Law Enforcement or Search and Rescue Dogs Carried in Cargo Compartment. The Carrier will not transport law enforcement or search and rescue dogs in the aircraft cargo compartments.

## 7. Baggage

a. Carryon Baggage

(1) General. The Carrier, in its sole discretion, will determine whether or not any Baggage, because of its weight, size, contents, or character, may be carried in the passenger cabin of the aircraft. All carryon Baggage must be stowed underneath a seat or in an overhead bin.

(2) Responsibility of Passenger. Carryon Baggage is the sole responsibility of the Passenger.

(3) Allowable Carryon Baggage. Passengers are restricted to one item of carryon Baggage (e.g., roller bag, garment bag, tote bag) that does not exceed external dimensions of 10" x 16" x 24" plus one smaller personal type item (e.g., purse, briefcase, laptop computer case, backpack, small camera), provided that such items are capable of being carried onboard the aircraft by one Passenger without additional assistance, unless the Passenger requires assistance due to a disability, and are capable of being stowed under a seat or in an overhead compartment. Sizing boxes or charts with 10" x 16" x 24" dimensions are located at many of the Carrier's curbside check-in locations (where available), ticket counters, departure gates, boarding locations, and on many jet bridges. The Carrier reserves the right to further restrict the number of carryon items.

(i) A roller bag that otherwise would meet the 10" x 16" x 24" dimensions if the wheels were removed will be accepted.

(ii) Oversized articles of reasonable carryon size that protrude from only one side of the sizing box or chart and, because of their fragile nature, would be at greater than normal risk of damage if carried in the cargo hold (e.g., blueprints, map tubes, fishing poles, artwork, media cameras/video equipment) are considered personal type items and may be carried in the passenger cabin if remaining onboard space permits and the item fits in an overhead bin without depriving other Passengers of sufficient overhead bin space.

(iii) A small musical instrument is considered a personal-type item and may be carried in the passenger cabin regardless of whether it meets the 10" x 16" x 24" dimensions if the instrument can be stowed safely in a suitable baggage compartment in the aircraft cabin or under a passenger seat, and there is space for such stowage at the time the Passenger boards the aircraft.

(iv) Other medical assistance items (e.g., breast pumps, breast milk) may be carried in the aircraft cabin in addition to the carryon Baggage allowance when they can be stowed pursuant to FAA regulations. For assistive devices for qualified Passengers with disabilities, see Section 6.d.(2).

(4) Outerwear. In addition to the carryon Baggage allowance provided herein, a coat, jacket, wrap, or similar outer garment may be carried onboard the aircraft.

(5) Instruments and Equipment. The following conditions apply to acceptance for Carriage in the cabin of large musical instruments and electronic, computer, audio/video, or other equipment and parts thereof, the size or shape of which prevents such instruments or equipment from being handled as normal carryon Baggage.

   (i)   The instrument or equipment must be contained in a case or covered so as to avoid injury to other Passengers.

   (ii)  A reservation must be made for the instrument or equipment at a charge no greater than the lowest published, publicly available fare for each seat used.

   (iii) Customer must purchase a Ticket for the instrument or equipment for each seat used. Typically, a Customer will be charged the lowest published, publicly available fare for such.

   (iv) The instrument or equipment must be stowed pursuant to FAA requirements for carriage of carryon Baggage.

(6) The Carrier, at its sole discretion, will not transport items of carryon Baggage that it determines may be harmful or dangerous to a Passenger(s), the flight crew, or the aircraft.

b.   Acceptance of Checked Baggage

(1) General.  The Carrier, in its sole discretion, may  accept personal property of the Passenger as Baggage subject to the following conditions:

   (i)   The Carrier will only accept Baggage for transportation on a flight on which the Passenger is transported.

   (ii)  The Carrier will only accept Baggage for transportation if it and its contents can withstand ordinary handling, and if its weight, size, and character render it suitable for transportation on the particular aircraft on which it is to be carried, unless the Passenger agrees to assume the risk of checking the Baggage and the Carrier accepts the Baggage subject to a limited release of liability, as outlined in Section 7.h.

   (iii) Each piece of Baggage tendered to the Carrier must have a current identification tag or label with the Passenger's name, address, and telephone number.

   (iv) With the exception of musical instruments or wheelchairs, mobility aids, and other assistive devices used by a Qualified Individual with a Disability, the Carrier will not accept as Baggage any item having outside measurements (i.e., the sum of the greatest outside length plus height plus width) that exceed eighty (80) inches or that weigh more than one hundred (100) pounds. The Carrier will not accept as Baggage any musical instrument if the sum of the length, height, and width of the outside linear dimensions of the instrument (including case or covering) exceeds one hundred fifty (150) inches, or the weight of the musical instrument exceeds one hundred sixty-five (165) pounds (including case or covering).

   (v)  The Carrier will not accept Baggage to an intermediate stop or connection point on the Passenger's Ticket or to a point beyond the Passenger's final ticketed destination.

(vi) The Carrier will not accept Baggage that, because of its nature, contents, or characteristics (e.g., sharp objects, paint, corrosives, or other prohibited hazardous materials), might cause injury to Passengers or the Carrier, damage to aircraft or other equipment, or damage to other Baggage.

(vii) The Carrier will not accept Baggage that it determines cannot safely be carried in the Baggage compartment of the aircraft for any reason.

(viii) In total, a Ticketed Passenger (including military Passengers) may not check more than twenty (20) pieces of Baggage per flight. This limitation includes the Carrier's Free Checked Baggage Allowance and any special items in accordance with Section 7.e., Section 7.f., and Section 7.g.

c.  Surveillance and Inspection of Baggage

(1) All Baggage tendered to the Carrier for transportation is subject to surveillance and inspection by electronic and/or physical means with or without the Passenger's consent or knowledge by the Carrier and/or authorized government agencies.

d.  Checking of Baggage.  The Carrier provides no guarantee or assurance that Baggage will arrive on the same flight as Passenger.

(1) The Carrier will not accept or hold Baggage from a Passenger on day of travel at the Carrier's airport ticket counter or curbside check-in locations (where available) if tendered to Carrier earlier than four (4) hours in advance of flight departure time.

(2) Where available, Baggage may be accepted at an earlier time at authorized offsite Baggage check-in facilities.

(3) Baggage must be checked at the Carrier's airport ticket counter or curbside check-in locations (where available) at least forty-five (45) minutes prior to the flight's scheduled departure time. See Section 8 for additional requirements for international travel. Passengers who present baggage to be checked after the minimum check-in time may be refused transport.

(4) Check-In Time Limits. The Carrier has the right to cancel reservations (whether or not confirmed), deny boarding, and/or refuse the acceptance of Baggage of any Passenger who fails to present himself or herself within the applicable check-in or loading gate time limits for Passengers and/or Baggage.

(5) Baggage checked in forty-five (45) minutes or less prior to a flight's scheduled departure time is subject to Section 7.h.(8).

(6) Baggage for international flights will not be accepted if presented to the Carrier sixty (60) minutes or less (seventy-five [75] minutes or less for flights departing from Aruba) prior to scheduled departure. Passengers cannot voluntarily separate from luggage on international flights.

e.  Free Checked Baggage Allowance.  Carrier provides no guarantee or assurance that Baggage will arrive on the same flight as Passenger.

(1) General. Upon presentation by a Passenger of a valid Ticket, the Carrier will transport two (2) pieces of Checked Baggage without charge, each piece of which has outside measurements (i.e., the sum of the greatest outside height plus length plus width) not exceeding sixty-two (62) inches, does not weigh more than fifty (50) pounds per piece, and provided such Baggage is suitable to be checked for Carriage in the cargo hold of the aircraft.

(2) Military Baggage Allowance. Military Passengers traveling on active duty or permanent change of station (PCS) orders will be exempt from the two (2)-piece Baggage limit and will not be subject to excess, oversize, or overweight Baggage charges, provided that none of the pieces of Baggage exceeds one hundred (100) pounds in weight and eighty (80) inches in size (outside length plus height plus width). In total, a Ticketed Passenger (including military Passengers) may not check more than twenty (20) pieces of Baggage per flight.  This limitation includes the Carrier's Free Checked Baggage allowance and any special items in accordance with Section 7.e., Section 7.f., and Section 7.g.

(3) Travel Equipment for Infants and Small Children. One (1) stroller and one (1) Child Restraint Device (car seat) per fare-paying Passenger will be accepted subject to a limited release of liability, as outlined in Section 7.h. The Carrier will accept these items without charge and these items will not count toward a Passenger's free Checked Baggage Allowance.

(4) Firearms. Carrier will not accept assembled firearms and ammunition for transportation, except as provided below and subject to the size and weight specifications contained below and in Section 7.f. The Carrier will not accept firearms or ammunition for international travel. See Section 8 for additional information.

(i)  General. Firearms (e.g., BB guns, sport rifles, shotguns, and handguns) may be transported as Checked Baggage, so long as they are unloaded and encased in a hard sided, locked container acceptable to the Carrier for withstanding normal Checked Baggage handling without sustaining damage to the firearm, with the Passenger retaining possession of the key or combination to the container lock. Firearms may not be packed loose inside Checked Baggage. Locking, hard-sided Baggage will not be considered an acceptable container.

(ii) Ammunition. Small arms ammunition for personal use will be accepted if transported in Checked Baggage only and in the manufacturer's original packaging or an equivalent fiber, wood, or metal container specifically designed to carry ammunition. The total gross weight of the ammunition must not exceed eleven (11) pounds per person. The allotment of ammunition for multiple Passengers must be packaged separately rather than combined into one bag. Loaded magazines or clips must be fully enclosed to completely secure the ammunition, packaged in a separate container in checked baggage, or recessed in the weapon case to provide complete and secure enclosure of the ammunition. Loaded magazines that are secured in tactical vests are not considered as fully enclosed or secured.

(iii) Gun Boxes. Gun boxes designed to hold no more than two (2) sporting rifles, shotguns or handguns are exempt from oversize Baggage charges; however, they will be subject to excess Baggage and weight charges, if applicable.

(5) Sporting Equipment. Any of the items listed below may be checked in substitution of one (1) piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis. If the item of sporting equipment exceeds fifty (50) pounds in weight or sixty-two (62) inches in size (outside length plus height plus width), excess weight and size charges may apply in accordance with Section 7.f.

(i) Archery equipment, including a bow, arrows, and an average size target (large target stands cannot be accepted), so long as the bow and arrows are encased in a container acceptable to the Carrier for withstanding normal Baggage handling without sustaining damage to the equipment.

(ii) Baseball/Softball equipment, including one (1) bag generally consisting of four (4) bats, one (1) helmet, one (1) pair of cleats, one (1) uniform, one (1) glove, and one (1) pair of batting gloves. The catcher may have additional equipment.

(iii) Bicycles (defined as non-motorized and having a single seat) properly packed in a hard-sided bicycle box that falls within the dimensions and weight limits established for normal Checked Baggage, (i.e., sixty-two [62] inches or less in overall dimensions and less than fifty [50] pounds in weight). Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage. Bicycles packaged in cardboard or soft-sided cases will be accepted subject to a limited release of liability, as outlined in Section 7.h.

(iv) Boogie board, kneeboard, or wakeboard.

(v) Bowling bag, including ball(s) and shoes, that falls within the dimensions and weight limits established for normal Checked Baggage, (i.e., sixty-two [62] inches or less in overall dimensions and less than fifty [50] pounds in weight).

(vi) Fishing tackle box and fishing rod, so long as the rod is encased in a cylindrical fishing rod container suitable to the Carrier for withstanding normal Checked Baggage handling without sustaining damage to the rod.

(vii) Golf bag in hard-sided golf bag carrying case provided by Passenger, including clubs, balls, and shoes. (Hooded golf bags or golf bags in a soft-sided carrying case provided by the Passenger will be accepted subject to a limited release of liability, as outlined in Section 7.h).

(viii) Hockey and/or lacrosse equipment including two (2) hockey or lacrosse sticks taped together and one (1) equipment bag generally consisting of pads, helmets, pants, jersey, gloves, and skates/cleats.

(ix) SCUBA equipment, provided air tanks are empty and all accompanying equipment (e.g., BCD, weight belt, one [1] regulator, one [1] tank harness, one [1] tank pressure gauge, one [1] mask, two [2] fins, one [1] snorkel, one [1] knife, and one [1] safety vest) are encased together in a container acceptable to the Carrier.

      (x)   Skateboard.

      (xi)  Snow ski equipment, including skis or snowboards, ski boots, and ski poles, including one (1) pair of skis or one (1) snowboard, one (1) set of poles, and one (1) pair of ski/snowboard boots encased in a container(s) acceptable to the Carrier.

      (xii) Water ski equipment encased in a container(s) acceptable to the Carrier and including no more than one (1) pair of water skis and one (1) life preserver.

  (6) Musical Instruments. Musical instruments may be checked in substitution of one (1) piece of the free Checked Baggage allowance for each Passenger at no charge on a one-item-for-one-bag basis. If the musical instruments exceed fifty (50) pounds (including case or covering) in weight or sixty-two (62) inches in size (outside length plus height plus width, including case or covering), excess weight and size charges may apply in accordance with Section 7.f.

f.   Excess, Oversize, and Overweight Baggage Charges

  (1) Excess Baggage. Each piece of Baggage in excess of the free Baggage allowance specified above that is not in excess of sixty-two (62) inches (outside length plus height plus width) and is fifty (50) pounds or less will be accepted for a charge of Seventy-Five and 00/100 dollars ($75.00) per item One-way.

  (2) Oversize Baggage. Subject to Section 7.f.(4), Baggage in excess of sixty-two (62) inches but not more than eighty (80) inches (outside length plus height plus width) and musical instruments in excess of sixty-two (62) inches but not more than one hundred fifty (150) inches (outside length plus height plus width, including case or covering) will incur an oversize charge of Seventy-Five and 00/100 dollars ($75.00) per item One-way.

  (3) Overweight Baggage. Subject to Section 7.f.(4), Baggage weighing between fifty-one (51) and one hundred (100) pounds and musical instruments weighing between fifty-one (51) and one hundred sixty-five (165) pounds (including case or covering) will be accepted as Checked Baggage for an excess weight charge of Seventy-Five and 00/100 dollars ($75.00) per item One-way.

  (4) Excess, Oversize, and/or Overweight Baggage Embargos. Excess, oversize, and/or overweight Baggage may not be accepted on flights to/from certain cities during certain specified dates. Contact Southwest Airlines Reservations or Southwest.com Baggage Policies for a list of cities and effective dates.

  (5) Prohibited Baggage. Baggage in excess of eighty (80) inches (outside length plus height plus width) and/or Baggage weighing more than one hundred (100) pounds will not be accepted for Carriage, except if mobility or other assistive devices, or if hanging garment sample bags with outside length, width, and height measurements up to a maximum of one hundred ten (110) inches, if flexible, or as provided in Section 7.e.

g. Special Items Requiring Packing and Payment

The items listed below shall be acceptable for Carriage as Checked Baggage upon the Passenger's compliance with the special packing requirements and payment of the applicable one-way charge as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(1) Bicycle (defined as non-motorized and having a single seat) properly packed in a bicycle box or hard sided case larger than sixty-two (62) inches in total dimensions will be accepted as Checked Baggage.  Pedals and handlebars must be removed and packaged in protective materials so as not to be damaged by or cause damage to other Baggage. Bicycles packaged in cardboard or soft sided cases will be accepted subject to a limited release of liability, as outlined in Section 7.h.

(2) Camera, film, video, lighting, and sound equipment will be accepted when tendered by representatives of network or local television broadcasting companies or commercial filmmaking companies. A charge will be applied for each item in excess of the free Baggage allowance.

(3) Javelins in a single bag, regardless of the number of javelins encased together, will be accepted.

(4) Kayak (other than a sea kayak). Paddle(s) must be secured to the kayak.

(5) Life Raft must fit Checked Baggage dimensions and the inflating cartridge must be removed.

(6) Surfboard and kiteboards.

(i) Surfboards and kiteboards may be subject to a limited release of liability, as outlined in Section 7.h.

(ii) Intrastate Hawaii Travel: Surfboards checked on an itinerary that is for wholly intrastate Hawaii travel (Tickets that have an origin and destination solely in the state of Hawaii) are not subject to applicable One-way charges as long as they meet weight restrictions as outlined on our website, https://www.southwest.com/html/customer-service/baggage/index.html.

(7) Vaulting poles will be accepted in a single bag, regardless of the number of poles in the bag.

(8) Wind surfing board, sail, and boom.

h.   Unsuitable Baggage Subject to Limited Release of Liability

The Carrier may, at its sole discretion, but is not obligated to, accept Baggage unsuitable for Carriage as Checked Baggage, subject to a Limited Release of Liability, as provided below:

(1)  Voluntary separation for which the Carrier is not liable for delay;

(2)  Fragile and unsuitably packed items for which the Carrier is not liable for damage and loss of contents;

(3)  Previously damaged items for which the Carrier is not liable for damage and loss of contents;

(4)  Inadequately packaged or over-packed items for which the Carrier is not liable for damage and loss of contents;

(5)  Perishable items for which the Carrier is not liable for spoilage, damage, or delay;

(6)  Soft-sided cases or unprotected/unpacked items, for which the Carrier is not liable for damage and loss of contents;

(7)  High-Value Items described in paragraph (i)(2) of this Section, for which Carrier assumes no responsibility for loss, damage, or delay;

(8)  Late-tendered Baggage for which the Carrier is not liable for delay; and

(9)  Items where specific requirements under this Section are not met, for which the Carrier is not liable for loss, damage, or delay.

The Passenger's tender of unsuitable baggage for check-in constitutes the Passenger's agreement to the Limited Release of Liability specified in this paragraph. The Carrier, in its sole discretion, may require the Passenger to sign a Limited Release of Liability form, but it is not necessary.

i.   Limitations of Liability

(1)  General.  The liability, if any, of the Carrier for loss of, damage to, or delay in the delivery of Checked or carryon Baggage and/or its contents, with the exception of wheelchairs, mobility aids, and assistive devices used by a Qualified Individual with a Disability, is limited to the proven amount of damage or loss, but in no event shall be greater than Three Thousand Eight Hundred and 00/100 dollars ($3,800.00) per fare paying Passenger pursuant to 14 CFR § 254.4 unless the Passenger at time of check-in has declared the value of the baggage to be in excess of Three Thousand Eight Hundred and 00/100 dollars ($3,800.00) ("excess valuation") and has paid an additional charge of One and 00/100 dollar ($1.00) for each One Hundred and 00/100 dollars ($100.00) of excess valuation. See Paragraph (2) below for excess valuation limitations and Section 8 for information regarding international travel.

(i)   The Carrier will compensate the Passenger for reasonable, documented damages incurred as a direct result of the loss of, damage to, or substantially delayed delivery of such Baggage up to the limit of liability, provided the Passenger has exercised reasonable efforts and good judgment to minimize the amount of damage. Actual value for reimbursement of lost or damaged property shall be determined by the documented original purchase price less depreciation for prior usage.

(ii)  The Carrier does not assume liability for claims of missing or damaged articles if a Passenger's Checked Baggage is not damaged, delayed, or lost.

(iii) For a Passenger who is travelling standby on a Carrier reduced-rate pass of any kind (e.g., employee travel, companion pass, guest pass, dependent pass, or other airline industry employee travel), Carrier's liability for loss of, damage to, or delay in the delivery of Checked Baggage or carryon Baggage and/or its contents is governed and limited by the policies, agreements, and terms and conditions applicable to such travel.

(2) Excess Valuation.

The declared excess valuation for baggage shall not exceed One Thousand Two Hundred Fifty and 00/100 dollars ($1,250.00) above the Three Thousand Eight Hundred and 00/100 dollars ($3,800.00) limitation of Carrier's the liability established by this *Contract of Carriage*, for a total maximum declared valuation of Five Thousand Fifty and 00/100 dollars ($5,050.00). Excess valuation coverage is not available for money; jewelry; photographic, video and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable instruments; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables.

(i)   When excess value is declared, the Passenger's Baggage and its contents may be inspected by the Carrier. Such Baggage must be checked, and excess valuation coverage will apply only to the point to which it is checked by the Carrier and claimed by the Passenger.

(3) Baggage Delivery.

(i)   General. The Carrier will pay delayed Checked Baggage delivery charges only so long as such Baggage was tendered to the Carrier by the Passenger at least forty-five (45) minutes prior to the scheduled departure time of the Passenger's first flight. If a Passenger's Baggage is tendered to the Carrier less than forty-five (45) minutes prior to the scheduled departure of the Passenger's first flight, the Carrier will make reasonable efforts, but cannot guarantee, to transport such Baggage on the Passenger's flights, and the Carrier will not assume responsibility for delivery charges if such Baggage arrives at the Passenger's destination on a subsequent flight. See Section 8 for conditions applicable to international travel.

(4) Personal Property Carried Onboard Aircraft.  Except as otherwise provided in Section 8, the Carrier assumes no responsibility and will not be liable for loss of or damage to personal property carried onboard an aircraft by a Passenger.

(5) High-Value Items Unsuitable for Carryon or Checked Baggage. The Carrier assumes no responsibility for and will not be liable for money; jewelry; photographic, video, and optical equipment; computers and other electronic equipment; computer software; silverware and china; fragile or perishable items; liquids; precious gems and metals; negotiable instruments; securities; business or personal documents; samples; items intended for sale; paintings, artifacts, and other works of art; antiques; collectors' items; unique or irreplaceable items; heirlooms; research, experimental, and scholastic items and documents; manuscripts; furs; irreplaceable books or publications; and similar valuables contained in carryon Baggage or Checked Baggage. For the Passenger's protection, these items should not be transported in or as Checked Baggage. See Section 8 for information about coverage for international travel.

(6) Normal Wear and Defects. The Carrier assumes no responsibility and will not be liable for loss or damage arising from normal wear and tear, such as cuts, scratches, scuffs, stains, dents, punctures, marks, and dirt. Furthermore, the Carrier assumes no liability for defects in Baggage manufacture.

(7) Previously Damaged Items. The Carrier assumes no responsibility and will not be liable for further damage to previously damaged items. The Carrier may, but is not obligated to, accept previously damaged items subject to a limited release of liability, as outlined in Section 7.h.

(8) Claims. In the case of loss of, damage to, or substantial delay in delivery of Checked Baggage, a claim will not be entertained by the Carrier unless the following steps are completed by the Passenger:

   (i)  In all cases, the Passenger must notify the Carrier of the claim and receive a Baggage report number not later than four (4) hours after either:

      (a)  Arrival of the flight on which the loss, damage, or delay is alleged to have occurred, or;

      (b)  Receipt of the Baggage, whichever is applicable to the claim; and

   (ii)  In all cases, the Passenger must submit either:

      (a)  The completed Lost/Delayed Report Receipt form provided by the Carrier, or;

      (b)  A written correspondence that includes the Baggage report number to the Carrier not later than twenty-one (21) days after the occurrence of the event giving rise to the claim; and

   (iii) In the case of lost Baggage, the Passenger must also submit a completed Property Loss Claim form to the Carrier. The form will be mailed to the Passenger upon receipt of written notice of the claim as stated in Section 7.i.(8)(ii). The form must be completed and postmarked within thirty (30) days of date of issue by the Carrier.

## 8. International Travel

a. Application of Montreal or Warsaw Convention

(1) For the purposes of international carriage governed by the Montreal Convention or the Warsaw Convention, whichever may apply, the liability rules set out in the applicable Convention as implemented by this Section are fully incorporated by reference in this *Contract of Carriage* and shall supersede any other provisions of this contract which may be inconsistent with those rules.

b. Death or Injury of Passengers

(1) The Carrier shall be liable under Article 17 of the Montreal Convention or Warsaw Convention, whichever may apply, for recoverable compensatory damages sustained in the case of death or bodily injury of a Passenger, as provided in the following paragraphs:

(i) The Carrier shall not be able to exclude or limit its liability for damages not exceeding One Hundred Twenty Eight Thousand Eight Hundred Twenty-One (128,821) Special Drawing Rights for each Passenger.

(ii) The Carrier shall not be liable for damages to the extent that they exceed One Hundred Twenty Eight Thousand Eight Hundred Twenty-One (128,821) Special Drawing Rights for each Passenger if the Carrier proves that:

(a) Such damage was not due to the negligence or other wrongful act or omission of the Carrier or its agents; or

(b) Such damage was solely due to the negligence or other wrongful act or omission of a third party.

(iii) The Carrier reserves all other defenses and limitations available under the Montreal Convention or Warsaw Convention, whichever may apply, to such claims including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention, except that the Carrier shall not invoke Articles 20 and 22(1) of the Warsaw Convention in a manner inconsistent with paragraphs (i) and (ii) hereof.

(iv) With respect to third parties, the Carrier reserves all rights of recourse against any other person, including, without limitation, rights of contribution and indemnity.

(v) The Carrier agrees that, subject to applicable law, recoverable compensatory damages for such claims may be determined by reference to the laws of the country of the domicile or country of permanent residence of the Passenger.

(2) In cases of bodily injury or death, the Carrier shall make an advance payment where the Carrier determines it is necessary to meet the immediate economic needs of, and hardship suffered by, a Passenger as provided in the following paragraphs:

(i) Unless a dispute arises over the identity of the person to whom an advance payment shall be made, the Carrier shall, without delay, make the advance payment to the Passenger in an amount or amounts determined by the Carrier in its sole discretion. In the event of death of a Passenger, the amount of the advance payment shall not be less than Sixteen Thousand (16,000) Special Drawing Rights, which shall be paid to a representative of the Passenger's next of kin eligible to receive such advance payment as determined by the Carrier in its sole discretion.

(ii) The Carrier shall make the advance payment as an advance against the Carrier's liability under the Montreal Convention or the Warsaw Convention, whichever may apply. An advance payment shall not constitute recognition of liability. An advance payment shall be offset against, or deducted from the payment of, any settlement or judgment with respect to any claim for compensation on behalf of the Passenger.

(iii) The Carrier, in making an advance payment, does not waive any rights, defenses, or limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply, to any claim, nor shall acceptance of an advance payment constitute a release of any claim, whatsoever, by any person.

(iv) The Carrier, in making an advance payment, preserves its right to seek contribution or indemnity from any other person for such payment, which shall not be deemed to be a voluntary contribution or contractual payment on the part of the Carrier.

(v) The Carrier may recover an advance payment from any person where it is proven that the Carrier is not liable for any damage sustained by the Passenger, or where it is proven that the person was not entitled to receive the payment, or where and to the extent that it is proven that the person who received the advance payment caused, or contributed to, the damage.

c. Delay of Passengers

(1) The Carrier shall be liable for damage occasioned by delay in the carriage of Passengers by air, as provided in the following paragraphs or pursuant to local law for flights departing from an international location:

(i) The Carrier shall not be liable if it proves that it and its agents took all measures that could reasonably be required to avoid the damage, or that it was impossible for it or them to take such measures.

(ii) Airport, Air Traffic Control, security, and other facilities or personnel, whether public or private, not under the control and direction of the Carrier are not agents of the Carrier, and the Carrier is not liable to the extent the delay is caused by these kinds of facilities or personnel.

(iii) Damages occasioned by delay are subject to the terms, limitations and defenses set forth in the Montreal Convention and the Warsaw Convention, whichever may apply. They include foreseeable compensatory damages sustained by a Passenger and do not include mental injury damages.

(iv) The Carrier reserves all defenses and limitations available under the Montreal Convention or the Warsaw Convention, whichever may apply to claims for damage occasioned by delay, including, but not limited to, the exoneration defense of Article 20 of the Montreal Convention and Article 21 of the Warsaw Convention. Under the Montreal Convention, the liability of the Carrier for damage caused by delay is limited to Five Thousand Three Hundred Forty-Six (5,346) Special Drawing Rights per Passenger. The limits of liability shall not apply in cases described in Article 22 (5) of the Montreal Convention or Article 25 of the Warsaw Convention, whichever may apply.

d. Destruction, Loss, or Delay of Baggage

(1) The Carrier is liable for damages sustained in the case of destruction or loss of, damage to, or delay of Checked Baggage  and unchecked Baggage, as provided in the following paragraphs:

(i) Except as provided below, the liability of the Carrier is limited to One Thousand Two Hundred Eighty-Eight (1,288) Special Drawing Rights for each Passenger in the case of destruction, loss, damage, or delay of Baggage, whether checked or unchecked, under the Montreal Convention or the Warsaw Convention, whichever may apply. Unless the Passenger proves otherwise:

(a) All Baggage checked by a Passenger shall be considered to be the property of that Passenger;

(b) A particular piece of Baggage, checked or unchecked, shall not be considered to be the property of more than one (1) Passenger;

(c) Unchecked Baggage, including personal items, shall be considered to be the property of the Passenger in possession of the Baggage at the time of embarkation.

(ii) If a Passenger makes, at the time Checked Baggage is handed to the Carrier, a special declaration of interest and has paid a supplementary sum, if applicable, the Carrier will be liable for destruction, loss, damage, or delay of such Checked Baggage in an amount not exceeding the declared amount, unless the Carrier proves that the declared amount is greater than the Passenger's actual interest in delivery at destination.  The declared amount, and the Carrier's liability, shall not exceed the total amount of declaration permissible under the Carrier's regulations, inclusive of the limitation of paragraph (1)(i) hereof. In the case of transportation under the Warsaw Convention, no supplementary sum shall apply unless the declared amount exceeds Twenty-Two (22) Special Drawing Rights per kilogram of the total recorded weight of the checked Baggage at the time the Baggage is handed to the Carrier. Nevertheless, the Carrier may impose charges for pieces of Baggage in excess of any free allowance the Carrier may provide.

Southwest Airlines Co.                                46

(iii) In the case of unchecked Baggage, the Carrier is liable only to the extent the damage resulted from its fault, or that of its agents.

(iv) The Carrier is not liable for destruction, loss, damage, or delay of baggage not in the charge of the Carrier, including Baggage undergoing security inspections or measures not under the control and direction of the Carrier.

(v) The Carrier reserves all defenses and limitations available under the Montreal Convention and the Warsaw Convention, whichever may apply, to such claims including, but not limited to, the defense of Article 20 of the Warsaw Convention and Article 19 of the Montreal Convention, and the exoneration defense of Article 21 of the Warsaw Convention and Article 20 of the Montreal Convention, except that the Carrier shall not invoke Article 22(2) and (3) of the Warsaw Convention in a manner inconsistent with paragraph (i) hereof. The limits of liability shall not apply in cases described in Article 25 of the Warsaw Convention or Article 22(5) of the Montreal Convention, whichever may apply.

e.   Time Limitations on Claims and Actions

(1) Under the Montreal Convention and the Warsaw Convention, whichever may apply, an action for damages must be brought within two (2) years, and a complaint must be made to the Carrier no later than seven (7) calendar days in the case of damage to baggage, and twenty-one (21) calendar days in the case of delay thereof.

f.   International Travel Documents

(1) Each Passenger traveling on an international itinerary is solely responsible for obtaining and completing all documentation required for entry into and exit from each country, as well as for complying with the laws, requirements or procedures of each country listed on such itinerary.  The Carrier is not liable for any assistance or information provided by any employee or agent of the Carrier to any Passenger relating to such documents or compliance with such laws.

(2) Parents/guardians of persons under eighteen (18) years of age are responsible for compliance with all requirements and procedures for persons under eighteen (18) years of age traveling internationally, which may include, but may not be limited to, documentary evidence, such as a notarized letter of relationship and permission for the child's travel from the birth parent(s) or legal guardian(s) not present.

(3) The Carrier reserves the right, in its sole discretion, to deny boarding to any Passenger whose documentation is deemed by either Carrier or a governmental agency to be insufficient for travel or who otherwise does not comply with laws, requirements, or procedures of the specific country the Passenger is traveling to, departing from, transiting through, or returning to.

(4) Subject to applicable laws and regulations, the Passenger is solely responsible for any expenses incurred or any consequences resulting from his or her failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations. Carrier expressly reserves the right to seek reimbursement from the Passenger for any loss, damage, or expense suffered or incurred by Carrier resulting from Passenger's failure to obtain, complete, or present sufficient documentation for entry into and exit from each country, as well as for complying with the applicable laws and regulations.

g. Foreign Currency

(1) To the extent permitted by local law, Passenger agrees to contract exclusively in U.S. dollars.

(2) All refunds will be subject to government laws, rules, regulations, or orders of the country in which the Ticket was originally purchased and of the country in which the refund is being made.

(3) Refunds will be made in the currency in which the fare was paid, or, at Carrier's election where legally permissible, in U.S. dollars in the amount equivalent to the amount due in the currency in which the fare or fares for the flight covered by the Ticket as originally issued was collected.

h. Partial Tax Refunds in Limited Circumstances

(1) For administrative purposes, the Carrier may collect certain taxes, fees, and charges imposed by a governmental entity without regard to whether the Passenger is exempt from the tax, fee, or charge by applicable law. Additional information regarding such taxes, fees, and charges (including the potential availability if any of a refund) may be found on Southwest.com.

i. Check-in Times for International Flights

(1) Minimum check-in time for Passengers (with or without Checked Baggage) is at least sixty (60) minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight. For flights departing Aruba, the minimum check-in time for Passengers (with or without Checked Baggage) is at least seventy-five (75) minutes prior to scheduled departure. Passengers who do not meet this check-in time will not be permitted to check-in or board the flight.

(2) Passengers must arrive at the gate and be ready to board at least ten (10) minutes prior to scheduled departure. See Section 2.a.(2) and Section 5.b. for complete information on check-in requirements.

j. Travel by Persons under the Age of Eighteen (18)

(1) Unaccompanied Travel of Persons under the Age of Eighteen (18). The Carrier will not transport a person under the age of eighteen (18) on an international flight unless accompanied by a parent or companion at least eighteen (18) years of age or older.

(2) Persons under the Age of Eighteen (18) Accompanied by One (1) Parent or Someone who is not a Parent. Special documentation may be required for admission to or departure from certain countries when a person under the age of eighteen (18) is accompanied by only one (1) parent or a person who is not the legal guardian. See Section 8.f.

(3) Children fourteen (14) days old and younger than two (2) years old carried on the lap of an accompanying Passenger twelve (12) years of age or older. When a child fourteen (14) days old and younger than two (2) years old is added as a lap child to the reservation of an accompanying Passenger twelve (12) years of age or older, applicable government-imposed taxes and fees must be paid, and a Ticket will be issued for each such lap child.

k.  Carriage of Animals

(1) Pets. No pets are accepted on international itineraries.

(2) Law Enforcement and Search and Rescue Dogs. Law enforcement and search and rescue dogs are allowed subject to the requirements contained in Section 6.f., except where prohibited due to a conflict of law.

(3) Trained Service Animals. Trained Service Animals for Qualified Individuals with a Disability are accepted as required by 14 CFR § 382, except where prohibited due to a conflict of law. See Section 6.d.(4) for more information.

l.  Firearms

(1) The Carrier will not accept firearms or ammunition for international travel.

## 9. Service Interruptions

Refer to Section 8 for conditions applicable to international travel.

a. Failure to Operate as Scheduled

(1) Canceled Flights or Irregular Operations.  In the event the Carrier cancels or fails to operate any flight according to Southwest Airlines published schedule, or significantly changes the schedule of any flight, or there is a significant delay, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:

(i) Transport the Passenger at no additional charge on Southwest Airlines next flight(s) on which space is available to the Passenger's intended destination, in accordance with Southwest Airlines established re-accommodation practices; or

(ii) Following a request by the Customer, refund the unused portion of the Customer's fare in accordance with Section 4.c.

(2) Diverted Flights.  In the event the Carrier diverts any flight, the Carrier, at its sole discretion, will take reasonable steps to transport Passenger on Southwest Airlines next flight(s) on which space is available to his or her intended final destination or to provide reasonable accommodations as approved in writing in advance by Southwest Airlines.

(3) Flight Schedule Changes.  Flight schedules are subject to change without notice, and times shown are not guaranteed. At times, without prior notice to Passengers, Southwest Airlines may need to substitute other aircraft and may change, add, or omit intermediate stops. The Carrier cannot guarantee that Passengers will make connections to other flights operated by Southwest Airlines or by other airlines.  In the event of flight schedule changes or service withdrawals, the Carrier will attempt to notify affected Passengers as early as possible.

(4) Limitation of Liability. Except to the extent provided in Section 9.a., the Carrier shall not be liable for any failure or delay in operating any flight, with or without notice, for reasons of aviation safety or when advisable, in its sole discretion, due to Force Majeure Events, as defined above. For the avoidance of doubt, under no circumstances will Carrier be liable to Passenger or Customer for consequential damages.

b. Denied Boarding Procedures Due to an Oversale

(1) The following definitions, as prescribed in 14 CFR § 250.1, pertain solely to the denied boarding compensation provisions of this section:

**Airport** means the airport at which the direct or connecting flight on which the Passenger holds Confirmed Reserved Space is planned to arrive, or some other airport serving the same metropolitan area, provided that the transportation to the other airport is accepted (i.e., used) by the Passenger.

**Alternate Transportation** means air transportation with a confirmed reservation at no additional charge, operated by a Carrier as defined below or other transportation accepted and used by the Passenger in the case of denied boarding.

*Carrier* means:

(i) A direct air carrier, except a helicopter operator, holding a certificate issued by the Department of Transportation pursuant to 49 U.S.C. § 41102 or that has been found fit to conduct commuter operations under 49 U.S.C. § 41738, or an exemption from 49 U.S.C. § 41102, authorizing the scheduled transportation of persons; or

(ii) A foreign air carrier holding a permit issued by the Department pursuant to 49 U.S.C. § 41302, or an exemption from that provision, authorizing the scheduled foreign air transportation of persons.

**Class of Service** means seating in the same cabin class such as First, Business, or Economy class, or in the same seating zone if the Carrier has more than one (1) seating product in the same cabin such as Economy and Premium Economy class.

**Confirmed Reserved Space** means space on a specific date and on a specific flight and Class of Service of the Carrier which has been requested by a Passenger, including a Passenger with a "zero fare ticket," and which the Carrier or its agent has verified, by appropriate notation on the Ticket or in any other manner provided therefore by the Carrier, as being reserved for the accommodation of the Passenger.

**Fare** means the price paid for air transportation including all mandatory taxes and government fees. It does not include ancillary fees for optional services.

**Stopover** means a deliberate interruption of a journey by the Passenger, scheduled to exceed four (4) hours, at a point between the place of departure and the place of final destination.

**Zero Fare Ticket** means a Ticket acquired without a substantial monetary payment such as by using frequent flyer points or vouchers, or a consolidator Ticket obtained after a monetary payment that does not show a Fare amount on the Ticket. A Zero Fare Ticket does not include free or reduced rate air transportation provided to airline employees and guests.

(2) Request for Volunteers.

(i) In the event of an oversold flight, the Carrier shall request volunteers for denied boarding before using any other boarding priority pursuant to 14 CFR § 250.2b. A "volunteer" is a person, including the holder of a Zero Fare Ticket, who responds to the Carrier's request for volunteers and who willingly accepts the Carrier's offer of compensation, in any amount, in exchange for relinquishing their Confirmed Reserved Space. Any other Passenger denied boarding is considered to have been denied boarding involuntarily, even if that Passenger accepts denied boarding compensation.

(ii) The Carrier will advise each Passenger solicited to volunteer for denied boarding, no later than the time the Carrier solicits that Passenger to volunteer, whether he or she is in danger of being involuntarily denied boarding and, if so, the compensation the Carrier is obligated to pay if the Passenger is involuntarily denied boarding. If an insufficient number of volunteers come forward, Carrier may deny boarding to other Passengers in accordance with Carrier's boarding priority rules as specified in Section 9.b.(6).

(3) Conditions for Payment of Compensation to Passengers Involuntarily Denied Boarding due to an Oversale. Subject to the exception in Section 9.b.(4) the Carrier will tender to a Passenger the amount of compensation specified in Section 9.b.(5), provided that:

(i) The Passenger holds a Ticket, including a Zero Fare Ticket, for Confirmed Reserved Space and presents himself or herself for Carriage at the appropriate time and place, having complied fully with the Carrier's requirements as to ticketing, check-in, and acceptability for transportation in accordance with this *Contract of Carriage*; and

(ii) Other than for reasons set forth in Section 6, or when resulting from substitution, for operational or safety reasons, of an aircraft having a lesser seating capacity than the aircraft originally scheduled, the Carrier is unable to accommodate the Passenger on the flight for which the Passenger holds a Confirmed Reserved Space, and such flight departs without the Passenger.

(4) Comparable Transportation. The Passenger will not be eligible for compensation if the Carrier offers comparable air transportation, or other transportation used by the Passenger at no extra cost, that, at the time such arrangements are made, is planned to arrive at the airport of the Passenger's next Stopover or, if none, at the Airport of the Passenger's final destination no later than one (1) hour after the planned arrival time of the Passenger's original flight or flights.

(5) Involuntarily Denied Boarding Compensation for an Oversale pursuant to 14 CFR § 250.5.

(i) Compensation shall be at least two hundred percent (200%) of the Fare to the Passenger's destination or first Stopover, or Seven Hundred Seventy-Five and 00/100 dollars ($775.00), whichever is lower, if the Carrier offers Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Airport of the Passenger's first Stopover, or if none, the Airport of the Passenger's final destination:

• More than one (1) hour but less than two (2) hours after the planned arrival time of the Passenger's original flight on a domestic itinerary; or

• More than one (1) hour but less than four (4) hours after the planned arrival time of the Passenger's original flight on an international itinerary; and

(ii) Compensation shall be at least four hundred percent (400%) of the Fare to the Passenger's destination or first Stopover, or One Thousand Five Hundred Fifty and 00/100 dollars ($1,550.00), whichever is lower, if the Carrier does not offer Alternate Transportation that, at the time the arrangement is made, is planned to arrive at the Airport of the Passenger's first Stopover, of if none, the Airport of the Passenger's final destination:

• Less than two (2) hours after the planned arrival time of the Passenger's original flight on a domestic itinerary; or

• Less than four (4) hours after the planned arrival time of the Passenger's original flight on an international itinerary.

(iii) Compensation will be paid by the Carrier on the day and at the place where the denied boarding occurs, except that if Carrier arranges, for the Passenger's convenience, alternate means of transportation that departs before the payment can be made, payment will be sent by mail or other means within twenty-four (24) hours after the time the denied boarding occurs.

(iv) Compensation will initially be provided in the form of a draft payable to the Passenger. With the Passenger's consent, the Carrier may also offer a *Southwest LUV Voucher* to be applied toward future travel in lieu of the draft. The Passenger may refuse Carrier's offer of a voucher and insist on receiving compensation by draft in the amount specified in Section 9.b.(5).

(v) Acceptance of compensation by the Passenger relieves the Carrier from any further liability to the Passenger or Customer caused by the Carrier's failure to honor the confirmed reservation.

(6) Denied Boarding Priority Rules. The Carrier's boarding priority is established on a first-come, first-served basis in the order boarding positions are secured. In determining which Passengers holding Confirmed Reserved Space shall be denied boarding involuntarily, the Carrier shall deny boarding in reverse order from the order in which the Passengers' boarding positions were secured (i.e., the last Passenger who receives a boarding position will be the first Passenger denied boarding involuntarily in an oversale situation), with no preference given to any particular person or category of Fares.

(7) Written Explanation of Denied Boarding Compensation and Boarding Priority Rules. When a denied boarding occurs, the Carrier will give Passengers who are denied boarding involuntarily a written explanatory statement describing the terms and conditions of denied boarding compensation and the Carrier's boarding priority rules.

(8) In addition to the denied boarding compensation specified herein, the Carrier shall refund all unused ancillary fees for optional services paid by a Passenger who is voluntarily or involuntarily denied boarding. An eligible refund will be issued in accordance with Section 4.c.(3). The Carrier is not required to refund the ancillary fees for services that are provided with respect to the Passenger's Alternate Transportation.

c.   Ground Transportation

(1) Unless provided at the direction of the Carrier, the Carrier does not assume responsibility for the ground transportation of any Passenger or his or her Baggage between any Airport used by the Carrier and any other location. Ground Transportation is at the Passenger's expense.

## 10. Miscellaneous

a. Claims

   (1) No claim for personal injury or death of a Passenger will be entertained by Carrier unless written notice of such claim is received by Southwest Airlines within twenty-one (21) days after the occurrence of the event giving rise to the claim.

   (2) No legal action on any claim described above may be maintained against Carrier unless commenced within one (1) year of Southwest Airlines written denial of a claim, in whole or in part.

   (3) **Class Action Waiver**. Both Passenger and Customer agree to waive any right to assert any claim against the Carrier as a representative or member in any class or representative action. To the extent the Passenger or the Customer is permitted by law or court of law to proceed with a class or representative action against the Carrier, the Passenger and Customer agree that neither the Passenger, the Customer, nor any legal or other representative or person purporting to act on behalf of the either shall:

      (i) Be entitled to recover attorneys' fees or costs associated with pursuing the class or representative action; and

      (ii) Submit a claim or otherwise participate in any recovery secured through the class or representative action. See Section 8 for additional information for international travel.

b. Customer Service Plan

   (1) The *Southwest Airlines Customer Service Plan ("CSP")* is issued by Southwest Airlines pursuant to 14 CFR § 259.5. The *CSP* reflects Southwest Airlines dedication to high quality customer service but is not a contract, and does not create any contractual obligations on the part of Carrier. In addition, if there is any conflict between the language of the *CSP* and the *Contract of Carriage,* the *Contract of Carriage* shall govern.

c. Choice of Law, Entire Agreement

   (1) Any and all matters arising out of or relating to this *Contract of Carriage* and/or the subject matter hereof shall be governed by, construed, and enforced in accordance with the laws of the United States of America and, to the extent not preempted by federal law, the laws of the State of Texas without regard to conflict of law principles, regardless of the legal theory upon which such matter is asserted.

   (2) This *Contract of Carriage* represents the entire, integrated agreement between the parties relating to transportation by the Carrier, and shall supersede all prior representations, understandings or agreements pertaining thereto, either oral or written. No other covenants, warranties, undertakings, or understandings may be implied, in law or in equity.

   (3) To the extent that an implied covenant of good faith and fair dealing would otherwise be deemed applicable to this *Contract of Carriage*, the agreement to transport the Passenger, or any aspect of the relationship between the Carrier, the Customer, and the Passenger, to the extent permissible by applicable state law the implied covenant of good faith and fair dealing is hereby rendered inapplicable and is disclaimed.

d. Consent to Use of Personal Data. Upon booking a Ticket for transportation, purchasing other services, or participating in any Carrier program or service such as Rapid Rewards, the Passenger and Customer hereby authorize Carrier and its authorized agents to: Collect, process, retain, and use, and Transfer to third parties, including, but not limited to, subcontractors, agents, affiliates, marketing partners, other carriers, and government agencies, for their use, processing and retention, any and all personal data that is provided to Carrier when Carrier believes in good faith that it is in the interests of aviation security or that disclosure is otherwise necessary or advisable or as Carrier deems necessary to carry out any and all business purposes related to the program or services being requested and/or in the promotion of other information, goods, and services that may be of interest to the Passenger or Customer, including, but not limited to, the following purposes: Making a reservation; Purchasing a Ticket; Purchasing cargo services; Participating in Rapid Rewards; Obtaining ancillary services, including accommodating special service requests; Accounting, billing and auditing; checking credit or other payment mechanisms; Operating frequent flyer programs; systems testing, maintenance and development; Customer relations; Sales and marketing; Promotions for Carrier; Statistical analysis; Developing and tailoring current and future services; Facilitating travel, including obtaining immigration, security, and customs clearance; Complying with applicable laws, regulations, government requests, law enforcement requests, and/or valid court orders; Providing data to third parties or governmental or law enforcement agencies to comply with, or assist in the development of, security, safety, or health measures for Passengers, baggage or cargo, or to provide for the prevention or detection of imminent criminal acts or the apprehension or prosecution of offenders; and Protecting the legal rights of Carrier. If a Passenger or Customer wants to learn more about the *Southwest Airlines Privacy Policy*, it may be viewed at Southwest.com. This policy is merely a statement of administrative protocol; it is not a contract, nor is it made, or intended to be made, a part of this *Contract of Carriage*, nor does it create any contractual or legal rights.