Francis J Flynn , Jr., Esq., SBN 304712
casey@lawofficeflynn.com
**LAW OFFICE OF FRANCIS J. FLYNN, JR.**
6057 Metropolitan Plz.
Los Angeles, CA 90036
Telephone:  314-662-2836

Michael J. Aguirre, Esq., SBN 060402
maguirre@amslawyers.com
Maria C. Severson, Esq., SBN 173967
mseverson@amslawyers.com
Elijah T. Gaglio, Esq., SBN 324799
egaglio@amslawyers.com
**AGUIRRE & SEVERSON, LLP**
501 West Broadway, Suite 1050
San Diego, CA 92101
Telephone:  (619) 876-5364

**Co-Lead Counsel for Plaintiffs**

*Additional Counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In Re:  Southwest Airlines Co. Flight Disruption Litigation*<br><br>This Document Relates to: All Actions | Lead Case No. 3:23-cv-00306-AJB-SBC<br><br>Consolidated with:<br><br>Case No. 3:23-cv-00313-AJB-SBC<br>Case No. 3:23-cv-00633-AJB-SBC<br>Case No. 3:23-CV-0306-AJB-SBC<br><br>**CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**1.  BREACH OF CONTRACT;**<br><br>**2.  BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; AND**<br><br>**3.  VIOLATION OF BAILMENT**<br><br>**JURY TRIAL DEMANDED** |

1

Plaintiffs MARY SMITH, MATT GROVE, PAULA HILL, EVA PIÑA, AND ERIC F. CAPDEVILLE, ("Plaintiffs"), individually and on behalf of all others similarly situated as set forth herein, by and through Plaintiffs' undersigned counsel, bring this class action lawsuit against SOUTHWEST AIRLINES CO. ("Defendant" or "Southwest") and alleges, based upon information and belief and the investigation of Plaintiffs' counsel as follows:

## I.   INTRODUCTION

1.   Southwest Airlines Company ("Southwest") relies on an crew-assignment software ironically called SkySolver, an off-the-shelf application that it has customized and updated, but that is nearing the end of its life, according to the airline.[1] And as explained more fully herein, this outdated software has a propensity to fail, and its failure has resulted in flight cancelations during the class period for sometimes lasting several weeks.

2.   Indeed, on December 22, 2022, Southwest Airlines began canceling flights nationwide blaming the failure on a weather-driven issue. Subsequently, Southwest continued to cancel flights blaming weather through Wednesday, December 28, 2022, resulting in more than 14,500 flights cancelled since the prior Friday. On Wednesday, December 28, 2022 alone, Southwest cancelled 2,500 flights. Southwest CEO Bob Jordan confirmed the airline needed to upgrade its legacy systems. The Department of Transportation also confirmed that the cancellations came about as a result of Southwest's decision and actions.

3.   Southwest's response to the internally created crisis was to suggest customers could submit receipts for flight cancellations from December 24, 2022 through January 2, 2023 for consideration of reimbursement.

---

[1] Southwest Meltdown Shows Airlines Need Tighter Software Integration. Available at: https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

4. Section 9 of the Contract of Carriage specifically governs situations where the Carrier cancels a flight. According to Section 9(a)(1), in the event the Carrier cancels or fails to operate a flight according to the published schedule, the Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, either: (i) Transport the Passenger at no additional charge on the next flight(s) on which space is available to the Passenger's intended destination, or (ii) Refund the unused portion of the Passenger's fare.

5. Indeed, in the applicable Contract of Carriage, in the plain language of the contract ("**at the request of the passenger**"), in the event of cancellation, Southwest promised Plaintiffs not just the remedy option of refund or credit, but transport at no additional charge **on Southwest Airlines next flight(s) on which space is available to the Passenger's intended destination**, in accordance with Southwest Airlines established reaccommodation practices, but that option was not made available to Plaintiffs in a reasonable period of time.

6. As a result of the flight cancelations, Plaintiffs requested that Southwest transport them on the next flight(s) on which space is available to their intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

7. For example, Plaintiff Mary Smith's flight was canceled on December 29, 2022; she was rebooked for December 30,2022 but that was also canceled, and she was then rebooked on the next available flight on January 3, 2023. Not surprisingly, she purchased a replacement ticket to return home on Delta Air Lines.

8. Furthermore, in these circumstances not uncommon in this case because of Southwest's Skysolver software where Defendants breached its "self-imposed" promise to provide "transportation" within a reasonable period of time and instead just provided a refund/credit, Plaintiffs assert that the limitations of liability provision in the Contract of Carriage is an unlawful liquidated damages penalty under Texas law.

9.     Indeed, Southwest makes the "self-imposed" promise not to violate any applicable law in its contract of carriage; in this case, Texas law does not allow for a liquidated damages penalty in a contract.

10.     In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation". *See also* TEX.BUS. & COM.CODE § 2.718(a); *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340 (Tex. 1979).

11.     But when Plaintiffs' plane is cancelled, and Plaintiffs have to find another airplane to fly them to their destination because of Southwest's failure to provide transportation to their destination within a reasonable period of time, the cost of the day of, or next day plane ticket, other out of pocket expenses, and lost time in travel is so well in excess of Southwest's refunding or crediting of Plaintiffs' tickets or to make the amount Southwest paid to Plaintiff's an unreasonable measure of damages, and, therefore, an unlawful liquidated damages penalty.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because (a) the aggregated claims of putative class members exceed $5 million, exclusive of interest and costs; (b) there are at least hundreds of putative class members; and (c) at least one of the members of the putative class is a citizen of a different state than Defendants.

13.     This Court has personal jurisdiction over Defendant because Defendant, directly or through its agents, conducts business in the State of California and within this District. Specifically, Defendant markets in this District and operates flights to and from this District. Through its business operations in this District, Defendant intentionally avails itself of the markets within this District to render the exercise of jurisdiction by this Court just and proper.

14.     Through its business operations in this District, Defendant intentionally availed itself of the markets within this District and has sufficient minimum contacts with this State to render the exercise of jurisdiction by this Court just and proper.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Court sits in a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## II.    CONSOLIDATED ACTION

16.     On September 1, 2023, by Order of the United States District Court for the Southern District of California, Document 21, the Court consolidated the actions *Smith v. Southwest Airlines, Co.*, Case No. 3:23-cv-00313-AJB-SBC, *Hill and Pina v. Southwest Airlines Co.*, Case No. 3:23-cv-00633-AJB-SBC, *Grove v. Southwest Airlines Co.,* 3:23-CV-0306-AJB-SBC, and referenced additional plaintiff Eric Capdeville.

17.     Plaintiffs in this action bring this consolidated amended complaint in this District because a large portion of the Class resides in this District and a substantial amount of substantial part of the events or omissions giving rise to the Class Members' claims occurred in this Division.

## III.   PARTIES

### A.    PLAINTIFFS

**Mary Smith**

18.      Plaintiff MARY SMITH, over seventy years old, is a citizen of the state of California residing in Milpitas, California.

19.     Plaintiff Smith purchased from Southwest a ticket for a flight on December 29, 2022 from San Jose, California (stop in Las Vegas) to Indianapolis, Indiana:  Confirmation# 3GQRVZ, 12/29/22: SJC(6:50AM) -LAS(10:20AM) - IND(Arrival @ 4:45PM)

20.     December 29, 2022, while Plaintiff Smith, who is over seventy years old, was at the airport waiting for the delayed flight until Southwest cancelled Plaintiff's

flight.  She waited for over 10 hours before Defendant canceled the flight, and she was without her luggage for twelve hours.

21.    Southwest was unable to rebook her on a same day flight, but instead booked a flight for December 30, 2022.

22.    On December 30, 2022, Southwest canceled the re-booked flight.

23.    In fact, the next available flight on Southwest from San Jose, California to Indianapolis, Indiana was not until after January 3, 2022, approximately 5 days after the original flight (assuming that the January 3, 2022 flight would even take off.)

24.    As a result of the flight cancelation, Plaintiff Smith requested that Southwest transport her on the next flight(s) on which space is available to her intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

25.    Accordingly, Plaintiff Smith was forced to purchase a replacement flight through Delta Airlines.

26.    Given the holiday season and the increased supply and demand created as a result of the Southwest debacle, the cost of the Delta Airlines ticket was $720.00 for the one-way flight.

27.    Defendant did not issue Plaintiff Smith a refund of the price of Plaintiff's ticket within (7) seven days of cancelation.

28.    Defendant did not reimburse Plaintiff Smith for her compensatory damages of various out of pocket expenses incurred as a result of Southwest's cancelation of the ticketed flight within hours of the ticketed flight and the inability of Southwest to provide a replacement flight within a reasonable period of time. Plaintiff's Smith's out of pocket expenses include, but are not limited to, the cost of a replacement ticket, hotel room, Ubers, and other costs caused as a result of cancelling her ticket within hours of the flight during the holiday season.

29.     To make matters worse, Plaintiff Smith was without her luggage for nearly twelve hours, which included (among other important belongings) her medication.

30.     Defendant did not reimburse Plaintiff Smith for her compensatory damages incurred as a result of Southwest's breach of the bailment of luggage by failing to deliver Plaintiff's luggage within a reasonable period of time of the cancelled flights.

**Matt Grove**

31.     Plaintiff Matt Grove is a citizen of the state of California residing in San Diego, California.

32.     Plaintiff Grove purchased from Southwest a ticket for a flight on December 23, 2022 from Oakland, California to San Diego, Califonria, Confirmation # 52621915818.

33.     On December 23, 2022, Plaintiff Grove was at the airport waiting for the delayed flight until Southwest canceled Plaintiff Grove's flight. He waited for over 1.5 hours before Southwest canceled the flight.

34.     As a result of the flight cancelation, Plaintiff Grove requested that Southwest transport him on the next flight(s) on which space is available to his intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

35.     Accordingly, Plaintiff Grove was forced to rent a car and then drive from Oakland to San Diego in a rental car at a cost of approximately $200.00.

36.     Defendant did not reimburse Plaintiff Grove for his compensatory damages of various out of pocket expenses incurred as a result of Southwest's cancelation of the ticketed flight within hours of the ticketed flight and the inability of Southwest to provide a replacement flight within a reasonable period of time. Plaintiff's Grove's out of pocket expenses include, but are not limited to, the cost of

a rental car and attendant expenses related thereto and the loss of time, caused as a result of cancelling his ticket within hours of the flight during the holiday season.

**Paula Hill**

37.    Plaintiff Paula Hill is a resident of the County of San Diego who purchased Southwest Airline tickets for roundtrip travel between San Diego, California and Kansas City from December 25, 2022 through January 2, 2023, but said flights were canceled by Southwest Airlines and travel was delayed.

38.    As a result of the flight  cancelation, Plaintiff Hill requested that Southwest transport her on the next flight(s) on which space is available to her intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

39.    Because of Southwest Airlines' wrongful conduct as alleged herein, Plaintiff was not able to spend Christmas and New Years with family as intended upon her purchase of the tickets.

40.    Defendant did not issue Plaintiff Hill a refund/credit within seven days of cancelation.

**Eva Piña**

41.    Plaintiff Eva Piña is a resident of the County of San Diego who purchased Southwest Airline tickets for roundtrip travel between San Diego and Sacramento, California from December 21, 2022 through December 26, 2022, but said flights were canceled by Southwest Airlines and travel was delayed.

42.    As a result of the flight cancelation, Plaintiff Piña requested that Southwest transport her on the next flight(s) on which space is available to her intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

43.    Because of the Southwest Airlines wrongful conduct as alleged herein, Plaintiff Piña was forced to find an alternative means of travel to get back to San

Diego by booking a car through a rental service for an 8-hour drive from Sacramento to San Diego.

44.    Defendant did not issue Plaintiff Piña a refund/credit of the price of Plaintiff's ticket within seven days of cancelation.

45.    Defendant did not reimburse Plaintiff Piña for her compensatory damages of various out of pocket expenses incurred as a result of Southwest's cancelation of the ticketed flight within hours of the ticketed flight and the inability of Southwest to provide a replacement flight within a reasonable period of time. Plaintiff's Piña's out of pocket expenses include, but are not limited to, the cost of a rental car and attendant expenses related thereto and the loss of time, caused as a result of cancelling her ticket within hours of the flight during the holiday season.

46.    Defendant did not issue Plaintiff Piña a refund/credit within seven days of cancelation.

**Eric F. Capdeville**

47.    ERIC F. CAPDEVILLE is a Louisiana citizen who resides in Marrero, Louisiana, Parish of Jefferson.

48.    On or about October 10, 2022, Plaintiff Capdeville purchased two tickets for travel Tuesday, December 27, 2022 from New Orleans, Louisiana (MSY) to Portland, Oregan (PDX) for himself and his daughter, which included a connecting flight to Pheonix, Arizona (PHX) (the "Trip") through Southwest Airlines.

49.    Prior to departing, Plaintiff Capdeville saw the news that thousands of flights had been cancelled by Southwest Airlines. Upon checking, Plaintiff Capdeville confirmed that his Southwest flight had been canceled and his reservations and stay in Portland would be lost without reimbursement.

50.    After speaking to customer service, Plaintiff Capdeville confirmed that in fact his flights had been canceled.

51.    As a result of the flight cancelation, Plaintiff Capdeville requested that Southwest transport him on the next flight(s) on which space is available to his

intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

52.     After Plaintiff Capdeville confirmed that his Southwest flight had been canceled, his events reservations and hotel reservations in Portland could not be used, were  not refundable and were lost without reimbursement because Southwest was not able to transport him on a flight until after the date of event tickets and hotel stays.

53.     Accordingly Plaintiff Capdeville attempted to make other travel plans to go to Portland, but unable to find a viable ticket to go to Portland, he bought a plane ticket to instead have a vacation in Boston.

54.     Defendant did not reimburse Plaintiff Capdeville for his compensatory damages of various out of pocket expenses incurred as a result of Southwest's cancelation of the ticketed flight.

55.     To Plaintiff's knowledge, Defendant did not issue Plaintiff Capdeville a refund/credit at all and, as well, not within seven days of cancelation.

**B.     DEFENDANTS**

56.     Defendant SOUTHWEST AIRLINES CO. ("Southwest") is a corporation organized under the laws of Texas with a principal place of business located in Dallas, Texas.

57.     Southwest Airlines Co. (the "Company" or "Southwest") operates Southwest Airlines, a major passenger airline that provides scheduled air transportation in the United States and near-international markets. As of December 31, 2021, Southwest had a total of 728 Boeing 737 aircraft in its fleet and 121 destinations in 42 states, the District of Columbia, the Commonwealth of Puerto Rico, and ten near-international countries: Mexico, Jamaica, The Bahamas, Aruba,

Dominican Republic, Costa Rica, Belize, Cuba, the Cayman Islands, and Turks and Caicos.[2]

58.    For 2021, the Company's average aircraft trip stage length was 790 miles, with an average duration of approximately 2.1 hours, as compared with an average aircraft trip stage length of 743 miles and an average duration of approximately 2.0 hours in 2020, and as compared with an average aircraft trip stage length of 748 miles and an average duration of approximately 2.0 hours in 2019.[3]

## V.    FACTS

### A. SOUTHWEST'S SELF-IMPOSED OBLIGATIONS UNDER SOUTHWEST'S CONTRACT OF CARRIAGE

59.    The Ticket and "Southwest Airlines Co. Contract of Carriage – Passenger" (hereinafter "Contract of Carriage" or "CoC") govern the dispute at issue. Southwest drafted the Contract of Carriage.

60.    Southwest reservations, purchases, ticketing, and/or transportation are governed by Southwest's Contract of Carriage.  *See*, **Exhibit A**[4].

61.    Every Southwest passenger air travel ticket incorporates by reference (including in some cases by hyperlink) and is governed by Southwest's Contract of Carriage. Southwest drafted the Contract of Carriage.  *See*, **Exhibit A**.

62.    In the ticket and the Contract of Carriage, Southwest made the self-imposed promise and entered a contract with Plaintiffs to get them to their respective destinations.  *See*, CoC 4a. Tickets (1) ("(1) No person shall be entitled to transportation except upon presentation of a valid Ticket or proof of identification

---

[2] *See*, https://otp.tools.investis.com/clients/us/southwest/SEC/sec-show.aspx?Type=html&FilingId=15534609&CIK=0000092380&Index=10000
[3] *See*, https://otp.tools.investis.com/clients/us/southwest/SEC/sec-show.aspx?Type=html&FilingId=15534609&CIK=0000092380&Index=10000
[4] The Contract of Carriage attached includes the same material terms as relevant prior and further revised versions.

acceptable to the Carrier to confirm that transportation has been purchased. Such Ticket shall entitle the Passenger to transportation subject to this Contract of Carriage and, in particular, certain terms and conditions as follows. (i) Such Ticket is valid between the points of origin and destination via the specific routing designated on the Passenger's itinerary only. […]." Southwest reservations, purchases, ticketing, and/or transportation are governed by Southwest's Contract of Carriage.  *See*, **Exhibit A**. (CAC ¶99)

63.    Section 9 of the Contract of Carriage governs in a situation where the Carrier cancels a flight, as was the case for Plaintiffs and other Class members. Specifically, with respect to Service Interruptions, the Contract of Carriage states:

a. Failure to Operate as Scheduled

1) Canceled Flights or Irregular Operations. **In the event Carrier cancels or fails to operate any flight according to Carrier's published schedule,** or changes the schedule of any flight, **Carrier will, <u>at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions</u>:**

i. <u>**Transport the Passenger at no additional charge on Carrier's next flight(s) on which space is available to the Passenger's intended destination,**</u> in accordance with Carrier's established reaccommodation practices; or

ii. Refund the unused portion of the Passenger's fare in accordance with Section 4c.

(**Exhibit A**) (emphasis added).

64.    Indeed, in the applicable Contract of Carriage, in the plain language of the contract ("<u>**at the request of the passenger**</u>"), in the event of cancellation, Southwest promised Plaintiffs not just the remedy option of refund or credit, but transport at no additional charge <u>**on Southwest Airlines next flight(s) on which space is available to the Passenger's intended destination**</u>, in accordance with

Southwest Airlines established reaccommodation practices, but that option was not made available to Plaintiffs in a reasonable period of time.

65.     Just as Southwest cannot wait an unreasonable amount of time before providing a refund or credit, it cannot provide its customers with available space on one of its planes in some distant future.

66.     Accordingly, in the unique facts of this case, where Defendants breached its "self-imposed" promise to provide "transportation" […] "between the points of origin and destination via the specific routing designated on the Passenger's itinerary only" and failed to provide to passengers the option of a Southwest plane with availability within a reasonable period of time, Plaintiffs have a contractual right to get compensatory damages from Southwest, including the cost of a replacement ticket on a different airline that did have available airplanes, ground transportation, hotels, and other damages which naturally flow from Southwest's failures.  Defendant cannot rely on its limitation of liability when it fails to give a promised remedy in its limitation for liability, and instead it must provide compensatory damages for that breached promise in its limitation for liability.[5]

67.     Plaintiffs requested that Southwest accommodate them on the next available flight with Southwest if available within a reasonable period of time.

68.     For example as alleged *supra*, Mary Smith's flight was canceled on December 29, 2022; she was rebooked for December 30, 2022 but that was also canceled, she was then rebooked on the next available flight on January 3, 2023 (assuming that the next available flight would even take off.)  Not surprising, she purchased a replacement ticket to return home on Delta Air Lines.

---

[5] In addition, as explained in the next section, the limitations of liability is nothing more than a liquidated damages penalty as the refund of the ticket is not reasonably related to the cost of replacement ticket on a different airline under the unique facts of this case.

69.    Critically, Southwest call center also stopped accepting calls during this time period for a length of time that discovery will establish.

70.    Furthermore, as discussed infra, Defendants had no future flights with space available based on the unfair, negligent, grossly negligent, and/or fraudulent conduct in how they maintained its software, a material fact unfairly, negligently, grossly negligently, and/or fraudulently omitted from Plaintiffs during the winter travel season of Christmas vacation break, when every lost day of vacation matters.

### TEXAS LAW DOES NOT ALLOW LIQUIDATED DAMAGES PENALTY, AND DEFENDANTS LIMITATION OF LIABILITY PROVISION IS A LIQUIDATED DAMAGES PENALTY

71.    At the beginning of the Contract of Carriage, Defendant makes this "self-imposed" promise:

"**(8)  Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, the Carrier shall not be liable for any consequential, compensatory, indirect, incidental, or punitive damages arising out of or in connection with the performance of its obligations under this** Contract of Carriage."

(CoC at §I(a)(8)).

72.    In addition to specific instances in the CoC where Southwest modifies its generic limitation of liability, Southwest, in its "self-imposed promises, also modifies its generic limitation of liability in the CoC to the extent such limitation expressly violates any applicable law. The applicable law, Texas law, expressly does not permit for a liquidated damages penalty in a contract under the facts of this case.

73.    In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation". *See also* TEX.BUS. & COM.CODE § 2.718(a); *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340 (Tex. 1979).

74.     Since actual damages (to wit, the out-of-pocket expenses that Plaintiffs incurred to get to their city of destination) are not uncertain nor would they be impossible or difficult to calculate, the liquidated damages provision substituting for actual damages expressly violates these applicable Texas laws.

75.     Indeed, Southwest's promised liquidated damages "remedy" for its cancellation is to offer them available space on the next Southwest plane and/or a credit or full refund to compensate its customers. In the unique facts of this case, where Defendant Southwest does not make a Southwest plane available with space for booking canceled customers, the remedy is limited to a credit or full refund to compensate customers.  But when Plaintiffs' plane is cancelled, and Plaintiffs have to find another airline to fly them to their destination on the day of cancellation, while stranded at the airport, the cost of the day of, or next day plane ticket, other out of pocket expenses, and lost time in travel is so well in excess of Southwest's refunding or crediting of Plaintiffs' tickets or to make the amount Southwest paid to Plaintiff's an unreasonable measure of damages, and, therefore, an unlawful liquidated damages penalty.

76.     Additionally, the harm caused by the breach is not incapable or difficult of estimation as at the time of breach there is a fair market value for a replacement ticket, a replacement rental car, the cost of gas, the cost of replacement items, etc.

77.      In addition, Southwest has breached its Contract of Carriage and/or Customer Service Plan by failing to provide refunds within seven days for canceled tickets purchased with credit cards.

78.     Accordingly, the limitations of liability is an unlawful liquidated damages; therefore, Plaintiff states a claim for breach of contract, and Defendant's motion to dismiss should be denied.

**B.     SOUTHWEST'S OUTDATED SOFTWARE AND THE RESULTING CHAOS**

15

79.     On June 13, 2020, the Baltimore Sun released an article titled "Southwest Glitch Delays BWI Flights: Problem With Computer System Affected Airports Nationwide, Airline's Website." This article discussed how Southwest Airlines experienced problems with its computer system for a significant part of an afternoon, causing "significant flight delay" at airports around the country. Specifically, for about three hours, visitors to Southwest.com could not check into their flights, purchase tickets, or check their flight's status. One traveler commented, "I'd like to know how a company as big as Southwest can have their whole server go down [. . .] Where's the backup plan?"

80.     According to FlightAware.com, this system failure delayed more than 600 flights as of 9:00 PM that day and resulted in 17 cancelled flights.

81.     On August 12, 2020, USA Today released an article titled "'So I Guess Southwest has Invented Time  Travel': Airline Sends Passengers Bizarre Flight Changes." This article detailed how Southwest Airlines' system would re-route travelers, but would make the crucial mistake of scheduling travelers to arrive at a given airport after their connecting flights were due to leave. To illustrate, a traveler booked a nonstop flight from San Diego, California to Reno, Nevada, which was then re-routed to contain a connecting flight via Oakland, California. However, the connecting flight was due to leave 10 minutes before the first flight was scheduled to land.

82.     Southwest Airlines attempted to downplay the nonsensical flight changes by saying that passengers receiving such schedules had received preliminary flight change information that had not been finalized. One affected passenger was reportedly an information technology worker. She suspected that a computer glitch was to blame, and commented "[t]his should have been literally impossible [. . .]."

83.     But despite Southwest's assurances to the public, Southwest made no effort to remedy the technical flaws in its system but instead gave a dividend to its investors.

84.     Southwest relies on crew-assignment software called SkySolver, an off-the-shelf application that it has customized and updated, but that is nearing the end of its life, according to the airline.[6]

85.     The program was developed decades ago and is now owned by General Electric Co.[7]

86.     Ask Southwest Airlines employees about their company's technology, and one word keeps coming up: "antiquated."[8]

87.     "We've been harping on them since 2015-ish every year," Mike Santoro, a captain and vice president of the Southwest Airlines Pilots Association, told CNN.[9]

88.     Southwest's scheduling system hasn't changed much since the 1990s, according to Captain Casey Murray, president of the Southwest Airlines Pilots Association.[10]

89.     Winter storms disrupted holiday travel during the 2022 holiday season, leaving thousands of travelers stranded in airports around the United States. However, not all domestic airlines were affected equally. Southwest Airlines flight cancellations

---

[6] *Southwest Meltdown Shows Airlines Need Tighter Software Integration.* https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[7] *Southwest Meltdown Shows Airlines Need Tighter Software Integration.* https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[8] *Insiders at Southwest reveal how the airline's service imploded.* https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

[9] *Insiders at Southwest reveal how the airline's service imploded.* https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

[10] *How Southwest failed the holidays: Four charts explaining the cancellations.* https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-dg/index.html

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:23-CV-00306-AJB-SBC

accounted for the vast majority domestic flight cancellations, leaving travelers unable to visit loved ones over the holidays, and attracting the ire of the federal government.

90.    As flights were getting cancelled around the country, it soon emerged that the root cause behind Southwest Airlines' cancellations was outdated and ineffective technology, in particular, its crew scheduling system (called "Sky Solver"). Further compounding on this issue, Southwest Airlines used an aggressive flight schedule that left it prone to greater cancellations than its competitors in the event of unusual conditions, such as nationwide storms.

91.    The result: A massive Christmas travel meltdown that scuttled holiday plans for hundreds of thousands of passengers. Nearly 16,000 flights canceled. Orphaned baggage piling up at airports and travelers told to give a shipping address.[11]



*See*, Insiders at Southwest reveal how the airline's service imploded. Available at: https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html. (Updated 30th December 2022); Last visited: January 11, 2023.

---

[11] *Insiders at Southwest reveal how the airline's service imploded.*
https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

92.     During the winter storm, amid a huge volume of changes to crew schedules to work through, SkySolver couldn't handle the task of matching crew members and which flights they should work, executives of the Dallas-based carrier said.[12]

93.     Southwest's software wasn't designed to solve problems of that scale, Chief Operating Officer Andrew Watterson said, forcing the airline to revert to manual scheduling.[13]

94.     "The magnitude and scale of this disruption stressed our technology and processes, forcing a great deal of manual processing," Southwest said. "Our crews are showing up in every way throughout this challenge."[14]

95.     Other airlines managed to recover by early in the December 2022 holiday week; at Southwest, the cancellations only increased.[15]

96.     While Southwest does have major connecting airports, much of its schedule involves planes and crews crisscrossing the country -- a network that aviation watchers say is more vulnerable than legacy carriers' hub-and-spoke model that can contain a disruption to particular geographic regions.[16]

97.     When something goes wrong, the Southwest software -- including the crew scheduling system tool -- leaves much of the work of rebuilding that delicate network to be done manually.[17]

---

[12] *Southwest Meltdown Shows Airlines Need Tighter Software Integration.* https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980
[13] *Id.*
[14] Insiders at Southwest reveal how the airline's service imploded. https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[15] *Id.*
[16] *Id.*
[17] *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:23-CV-00306-AJB-SBC

98.     "It can't see the best way to fix anything when flights are canceled," said Brian Brown, president of Transport Workers Union Local 550, representing Southwest dispatchers and meteorologists. "It requires a lot more human intervention and human eyesight or brainpower, and can only handle so much."[18]

99.     The result is that airline officials "don't necessarily know where our crews are, where our planes are," Brown said.[19]

100.   Crew schedulers in another department are manually checking which pilots and flight attendants meet strict federal rules on work hours -- rules meant to keep inflight safety professionals from excessive fatigue.[20]

101.   "You end up with thousands of crew members having to call in and their wait times were hours just to talk to someone," Brown said. Software enhancements would make the process more efficient, he added.[21]

102.   The manual work meant crew members who could be working were instead stuck in lengthy phone queues waiting for instructions or for a hotel assignment to get their federally mandated rest.[22]

103.   "The phone systems that the company uses is just not working," Lyn Montgomery, who represents Southwest flight attendants at TWU Local 556, told CNN.[23]"They're just not manned with enough manpower in order to give the scheduling changes to flight attendants and that's created a ripple effect that is creating chaos throughout the nation."[24]

---

[18] *Insiders at Southwest reveal how the airline's service imploded.*
https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:23-CV-00306-AJB-SBC

104.   Unlike some large rivals with hub-and-spoke networks, Southwest planes hopscotch from city to city, which may have been another complicating factor.[25]

105.   Multiple systems are involved in crew scheduling, according to a spokesman for GE Aerospace.[26]

106.   Southwest said its software isn't an end-to-end solution.[27] Rather, it's a so-called backend algorithm that airlines can supplement with other software.[28] The algorithm gathers input from other systems to provide recommendations to resolve crew-related disruptions, according to GE Aerospace.[29]

107.   Dr. Edward Rothberg, chief scientist of Gurobi Optimization LLC, a startup that develops mathematical optimization software used by carriers including Air France-KLM, said Southwest's hopscotched "point-to-point" model—rather than the hub-and-spoke model – greatly increases the difficulty of the problem, requiring more computational power than its current systems are likely able to handle.[30]

108.   Southwest Chief Executive Officer Bob Jordan said that while the carrier has good systems in some areas, those systems still need "better intelligence to talk to each other."[31] For instance, he said "The Baker," an optimization system developed by Southwest to automate disruption recovery and select flights to cancel, needs "better visibility" into its crew-scheduling systems.[32] Airlines generally have done a better job of maintenance and repair operations, but are much further behind in "the

---

[25] *Southwest Meltdown Shows Airlines Need Tighter Software Integration.* https://www.wsj.com/articles/southwest-meltdown-shows-airlines-need-tighter-software-integration-11672687980

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

human aspect" of matching up crews, equipment, and passengers, said R "Ray" Wang, founder and principal analyst at IT consulting firm Constellation Research Inc.[33]

109.   Updating technology systems is particularly challenging for air carriers because of the business and operations risk of taking down a system, which can include grounded planes or stranded passengers, Mr. Crawford said.[34]

## C.7   SOUTHWEST'S FLIGHT CANCELLATION DEBACLE

110.   Between December 22, 2022 and January 2, 2023, Southwest canceled nearly 16,000 flights, stranding thousands of passengers during one of the busiest travel weeks of the year.[35]

111.   During that time, the beleaguered airline had canceled more than half of its typical flight schedule, and by late Wednesday about 87% of all canceled flights in the US were from Southwest alone, according to industry trackers FlightRadar24 and FlightAware.

112.   Southwest has consistently failed to perform as well as its competitors when it comes to cancellations, according to bureau data.[36]

113.   In several years over the last decade, the airline had higher cancellation rates compared to other major airlines, the data shows.[37]

114.   The December 2022 meltdown is not the first time the company has found itself in this predicament. In October 2021, Southwest canceled more than 2,000 flights over a four-day period. While the airline blamed the crisis partly on

---

[33] *Id.*

[34] Id.

[35] https://www.cnn.com/travel/article/southwest-airlines-meltdown-closer-look/index.html

[36] https://www.cnn.com/2022/12/29/business/southwest-cancellations-history-charts-dg/index.html

[37] Id.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:23-CV-00306-AJB-SBC

bad weather in Florida, Southwest canceled flights for far longer than its competitors.

115.   Similar to the December 2022 service mayhem, Southwest fared far worse than its competitors last October. While Southwest canceled hundreds of flights in the days following the peak of October's disruption, competitors quickly returned to normal service. Later that month, on a call with Wall Street analysts, then-CEO Gary Kelly said the company had made adjustments to prevent a similar meltdown in the future:

> "We have reined in our capacity plans to adjust to the current staffing environment, and our on time performance has improved, accordingly," said Kelly on October 21. "We are aggressively hiring to a goal of approximately 5,000 new employees by the end of this year, and we are currently more than halfway toward that goal."

*See*, https://www.cnn.com/2022/12/27/business/southwest-airlines-service-meltdown/index.html#:~:text=In%20October%202021%2C%20Southwest%20canceled,to%20adjust%20to%20those%20problems.

116.   And, just like the latest disruption, the Southwest Airlines Pilots Association claimed the cancellations were due to "management's poor planning."[38]

117.   As early as 2020, Southwest has suffered from computer system glitches and/or crew scheduling technology issues.  For example, in June 2020, Baltimore Sun released an article titled "Southwest Glitch Delays BWI Flights: Problem With Computer System Affected Airports Nationwide, Airline's Website." This article discussed how Southwest Airlines experienced problems with its computer system for a significant part of an afternoon, causing "significant flight delay" at airports around the country. Specifically, for about three hours, visitors to Southwest.com could not

---

[38] https://www.cnn.com/2022/12/27/business/southwest-airlines-service-meltdown/index.html#:~:text=In%20October%202021%2C%20Southwest%20canceled,to%20adjust%20to%20those%20problems.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:23-CV-00306-AJB-SBC

check into their flights, purchase tickets, or check their flight's status. One traveler commented, "I'd like to know how a company as big as Southwest can have their whole server go down [. . .] Where's the backup plan?"

### F.     EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

118.   The running of any statute of limitations has been equitably tolled by Defendant's fraudulent concealment and/or omissions of critical information about the cause of its delays and/or cancellations. Through its affirmative misrepresentations and omissions, Southwest actively concealed from Plaintiffs reason(s) for the flight delays and/or cancellations.

119.   As a result of Defendants' actions, Plaintiffs were unaware, and could not have reasonably known or learned through reasonable diligence, the true reason that the flights were delayed and/or cancelled and which caused Plaintiffs and the class members the harms set forth herein and that those harms were the direct and proximate result of Defendants' acts and omissions.

## VI.   CLASS ACTION ALLEGATIONS

120.   Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide class (the "Nationwide Class"):

> All persons in the United States who purchased tickets for travel on a Southwest Airlines flight and that flight was cancelled (including, but not limited to, in June 2020, October 2021, and December 24, 2022-January 3, 2023), and who were not reimbursed for incurred out-of-pocket expenses to get to their travel destination and/or were not provided a refund/credit within seven days.

121.   Pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide sub-class (the "Nationwide Sub-Class"):

> All persons in the United States who purchased tickets for travel on a Southwest Airlines flight and that flight was cancelled (including, but

not limited to in June 2020, October 2021, and December 24, 2022-January 2, 2023), and who checked luggage and there was a delay before their luggage was returned to them and/or they incurred out of pocket expenses due to a delay.

122.   Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff, and any Judge sitting in the presiding court system who may hear an appeal of any judgment entered.

123.   The Class and Sub-Class are collectively referred to herein as the "Class".

124.    Plaintiffs reserve the right to amend or modify the Class definitions with greater specificity or division after having had an opportunity to conduct discovery.

125.   Plaintiffs seek only damages and injunctive relief on behalf of themselves and the Class members. Plaintiffs disclaim any intent or right to seek any recovery in this action for personal injuries, wrongful death, or emotional distress suffered by Plaintiffs and/or the Class members.

126.   The Class(es) meets the criteria for certification under Rule 23(a), (b)(1), (b)(2), (b)(3) and (c)(4).

127.   **Risk of Inconsistent or Varying Adjudications. Fed. R. Civ. P. 23(b)(1).** As the proposed class members include thousands of persons across all 50 states, there is significant risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendant. For example, declaratory relief may be entered in multiple cases, but the ordered relief may vary, causing the Defendant to have to choose the court order with which it will comply.

128.   **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical. While the exact number of class members is unknown to Plaintiffs at this time, it is believed that the Class is comprised of tens of thousands if not hundreds of thousands of members geographically dispersed throughout the United States. Affected consumer's names and addresses are available from Southwest's records, and class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include electronic mail, U.S. Mail, internet notice, and/or published notice.

129.   **Predominance of Common Issues. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any questions affecting individual class members. The common questions include:

(i)     Whether Defendant's conduct breaches its Contract of Carriage and/or Customer Service Plan;

(ii)    Whether Defendant breached the Covenant of Good Faith and Fair Dealing;

(iii)   Whether Defendant committed a Violation of Bailment;

(iv)    Whether Defendant is required to give a refund and reimburse all related expenses as a result of the cancellations;

(v)     Whether Plaintiffs and members of the Class are entitled to damages, costs, or attorneys' fees from Defendant; and

(vi)    Whether Plaintiffs and members of the Class are entitled to compensatory damages.

(vii)   Whether Plaintiffs and the Class are entitled to declaratory relief;

(viii)  Whether Plaintiffs and the Class are entitled to injunctive relief.

130. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same unlawful conduct and damaged in the same way. Defendant's conduct that gave rise to the claims of Plaintiffs and other Class members (i.e., canceling flights without giving refunds in breach of the Contract of Carriage) is the same for all Class members.

131. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class(es) and are committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in litigating consumer claims. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

132. **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs and class members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class member would also strain the court system. Moreover, individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

27

133.   **Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole. Moreover, Defendant continues to offer credits instead of refunds to Plaintiffs and Class members for flights that they cancel, thus making declaratory relief a live issue and appropriate to the Class as a whole.

**COUNT I**
**BREACH OF CONTRACT**
**(on behalf of Plaintiffs and the Class)**

134.   Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

135.   This claim for breach of contract damages is based on Defendant's breaches of its Contract of Carriage and/or Customer Service Plan (the "Contract").

136.   Plaintiffs, along with all putative class members, entered into a Contract of Carriage and/or Customer Service Plan with Defendant for provision of air travel in exchange for payment.

137.   The Contract of Carriage and/or Customer Service Plan were each drafted by Defendant.

138.   Plaintiffs, and all putative class members, performed under the Contract of Carriage and/or Customer Service Plan, specifically, by tendering payment for the airline tickets to Defendant and complied with all conditions precedent under the Contract.

139.   Due to Defendant's cancellation of their flights, Plaintiffs, and all putative class members cannot use their airline tickets through no fault of their own and they are not getting the benefit of their bargain with Defendant.

140.   Section 9 of the Contract of Carriage specifically governs situations where the Carrier cancels a flight. According to Section 9(a)(1), in the event the

28

Carrier cancels or fails to operate a flight according to the published schedule, the Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, either: (i) Transport the Passenger at no additional charge on the next flight(s) on which space is available to the Passenger's intended destination, or (ii) Refund the unused portion of the Passenger's fare.

141.   Indeed, in the applicable Contract of Carriage, in the plain language of the contract ("**at the request of the passenger**"), in the event of cancellation, Southwest promised Plaintiffs not just the remedy option of refund or credit, but transport at no additional charge **on Southwest Airlines next flight(s) on which space is available to the Passenger's intended destination**, in accordance with Southwest Airlines established reaccommodation practices, but that option was not made available to Plaintiffs in a reasonable period of time.

142.   As a result of the flight cancelations, Plaintiffs requested that Southwest transport them on the next flight(s) on which space is available to their intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation.

143.   For example, Plaintiff Mary Smith's flight was canceled on December 29, 2022; she was rebooked for December 30, 2022 but that was also canceled, and she was then rebooked on the next available flight on January 3, 2023. Not surprisingly, she purchased a replacement ticket to return home on Delta Air Lines.

144.   As another example, Plaintiff Eva Pina's December 26, 2022 flight was canceled, and she was so informed at the airport. Southwest was not able to transport her, and she ultimately expended money and resources to travel from Sacramento to San Diego via rental car.

145.   Furthermore, Plaintiffs assert that the limitations of liability provision in the Contract of Carriage is an unlawful liquidated damages penalty under Texas law. The provision limiting Plaintiffs' damages to the cost of the plane ticket is a liquidated

damages penalty because actual damages are neither uncertain nor difficult to calculate.

146.   Indeed, Southwest makes the "self-imposed" promise not to violate any applicable law, in this case, Texas law does not allow for a liquidated damages penalty in a contract.

147.   In its Contract of Carriage, Defendants make this "self-imposed" promise:

> "**(8)  Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, the Carrier shall not be liable for any consequential, compensatory, indirect, incidental, or punitive damages arising out of or in connection with the performance of its obligations under this** Contract of Carriage."

(CoC at §I(a)(8)).

148.   The limitations of liability provision in the Contract of Carriage is an unlawful liquidated damages penalty under Texas law. The provision limiting Plaintiffs' damages to the cost of the plane ticket is a liquidated damages penalty because actual damages are neither uncertain nor difficult to calculate.

149.   In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation".  See also TEX.BUS. & COM.CODE § 2.718(a); *Rio Grande Valley Sugar Growers, Inc. v. Campesi*, 592 S.W.2d 340 (Tex. 1979) (applying Texas law,

150.   Here, since actual damages (to wit, the out-of-pocket expenses that Plaintiffs incurred to get to their city of destination) are not uncertain nor would they be impossible or difficult to calculate, the liquidated damages provision substituting for actual damages is impermissible.

151.   Indeed, Southwest's promised liquidated damages "remedy" for its cancellation is to offer them available space on the next Southwest plane and/or a credit or full refund to compensate its customers. In the unique facts of this case,

where Defendant Southwest does not make a Southwest plane available with space for booking canceled customers, the remedy is limited to a credit or full refund to compensate customers.  But when Plaintiffs' plane is cancelled, and Plaintiffs have to find another airline to fly them to their destination on the day of cancellation, while stranded at the airport, the cost of the day of, or next day plane ticket, other out of pocket expenses, and lost time in travel is so well in excess of Southwest's refunding or crediting of Plaintiffs' tickets or to make the amount Southwest paid to Plaintiff's an unreasonable measure of damages, and, therefore, an unlawful liquidated damages penalty.

152.   Additionally, the harm caused by the breach is not incapable or difficult of estimation as at the time of breach there is a fair market value for a replacement ticket, a replacement rental car, the cost of gas, the cost of replacement items, etc.

153.   Accordingly, the limitations of liability is an unlawful liquidated damages; therefore, Plaintiff states a claim for breach of contract, and Defendants' motion to dismiss should be denied.

154.   In addition, Southwest has breached its Contract of Carriage and/or Customer Service Plan by failing to provide refunds within seven days for canceled tickets purchased with credit cards.

155.   As a result of Defendant's breaches of contract, Plaintiffs and the putative class members have incurred damages in an amount to be proven at trial, including the cost of replacement tickets on other airlines, ground transportation, hotels, and other out-of-pocket expenses.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (on behalf of Plaintiffs and the Class)

156.   Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

157.   Southwest had a duty of good faith and fair dealing due to its special relationship with Plaintiffs, where there was unequal bargaining power between Southwest and Plaintiff airline customers/passengers and a risk exists that Southwest may take advantage of them based upon the imbalance of power.

158.   Southwest is a common carrier in the business of carrying passengers and goods, and holds itself out for hire. As a common carrier, Southwest is held to a higher standard and degree of care to passengers.

159.   Southwest had exclusive control over Plaintiffs relating to their flights, and later, relating to the processing and denial of claims.

160.   Southwest Airlines owed a duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with Plaintiffs and Class Members, notably having working software allowing its flights to be properly staffed and having contingencies for foreseeable winter storms.

161.   Southwest Airlines' breaches of its' duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with Plaintiffs and Class Members for the reasons stated herein.

162.   During the proposed Class Period, Southwest Airlines breached the implied covenant of good faith and fair dealing by: (1) entering air travel contracts and accepting monies or compensation for flights that the airline had actual or constructive knowledge could not possibly be properly staffed with pilots, flight attendants, customer service representatives, baggage handlers and others, without any regard for the traveling public other than booking flights Southwest Airlines knew or should have known would never be airborne irrespective of adverse weather conditions; (2) converting new dollar travel purchases to travel vouchers without permission from customers and not refunding money to purchasers or passengers for use on other competing airlines; (3) for having inadequate customer support or any effort to mitigate Southwest Airlines' breach, leaving Plaintiff passengers in distress.

163.   Plaintiffs allege that Southwest Airlines materially breached and undermined their ability to perform at the time they entered travel contracts and bookings and knew they would be unable to perform promised services.

164.   Southwest Airlines' breaches of its' duty of good faith and fair dealing in regards to its Contract of Carriage and/or Customer Service Plan with are the direct and proximate cause of Plaintiffs' and class members' damages.

165.   Plaintiffs allege they suffered financial and economic harm as a result of Defendants material breach of the implied covenant and despite efforts to mitigate, and therefore, suffered reasonably certain and fixed damages in an amount according to proof.

166.   As a result, Plaintiffs and Class Members are each entitled to an award of damages in amount to be determined at trial.

**COUNT III**
**VIOLATION OF BAILMENT**
**(on behalf of Plaintiff Mary Smith and the Nationwide Sub-Class Members)**

167.   Plaintiffs reallege and reincorporate its allegations in the preceding paragraphs as if fully set forth herein.

168.   Under Texas law, to create a bailment there must be: (1) delivery of personal property from one person, the bailor, to another, the bailee, for a specific purpose; (2) acceptance of delivery by the bailee; (3) an express or implied contract between the parties that the specific purpose will be realized; and (4) an agreement between the parties that the property will be either returned to the bailor or dealt with according to the bailor's direction. *State of Tex. v. $281,420.00 in U.S. Currency*, 312 S.W.3d 547, 551 (Tex. 2010) (citation omitted).

169.   Section 7 of the Contract of Carriage (Baggage) provides:

> The Carrier will compensate the Passenger for reasonable, documented damages incurred as a direct result of the loss of, damage to, or substantially delayed delivery of such Baggage up to the limit of

33

liability, provided the Passenger has exercised reasonable efforts and good judgment to minimize the amount of damage.

170.   Plaintiffs and Class Members delivered and entrusted their luggage to Defendant for the purpose of enabling Defendant to conduct its business flying Plaintiffs and Class Members to their destinations.

171.   A bailment arises where possession, but not ownership, of property is transferred from one party ("bailor") to another ("bailee"). Where a bailee has received a bailment from a bailor, a duty of care is owed. Typically, a bailee is strictly liable for the bailment.

172.   In delivering and entrusting their luggage, Plaintiffs and Class members intended and understood that Defendants would adequately safeguard their luggage.

173.   Defendants accepted possession of Plaintiffs' and Class members' luggage, and by accepting possession of Plaintiffs' and Class members' luggage, Defendants understood that Plaintiffs and other Class members expected it to adequately safeguard their luggage. Accordingly, a bailment was established for the mutual benefit of the parties.

174.   During the period of bailment, Defendant, as bailee, owed Plaintiffs and all other Class members a duty of care to safeguard their luggage by maintaining adequate procedures and infrastructure to protect such luggage. In failing to maintain such adequate procedures and infrastructure, Southwest breached this duty.

175.   Defendant, as bailee, is expected to return to its owner the bailed goods (the luggage) when the bailee's time for possession of them is over.

176.   During the period of bailment, Defendant, as bailee, owed Plaintiffs and Class Members a duty of care to safeguard their luggage by maintaining reasonable procedures and practices to protect such luggage.

177.   The CoC requires passengers to notify Southwest of the claim and receive a baggage number, and must submit either a completed Lost/Delayed Report Receipt or a written correspondence.  (Exhibit, A CoC 8(i))

34

178.   In particular, passenger must provide:

The completed Lost/Delayed Report Receipt form provided by the Carrier, or;

(b) A written correspondence that includes the Baggage report number to the Carrier not later than twenty-one (21) days after the occurrence of the event giving rise to the claim; and

(iii) In the case of lost Baggage, the Passenger must also submit a completed Property Loss Claim form to the Carrier. The form will be mailed to the Passenger upon receipt of written notice of the claim as stated in Section 7.i.(8)(ii). The form must be completed and postmarked within thirty days of date of issue by the Carrier.

   (Exhibit A, CoC 8(i))

179.   Nevertheless, at the time of the cancelations, Southwest's call center was shut down, and Southwest was completely unresponsive to Plaintiffs' request for their baggage.

180.   As alleged *supra*, long lines were formed at Southwest ticketing desks at the airport, and people would wait in line for hours only to be told by the Southwest employee that they were not sure what was going on and they know how had no idea how long this debacle would last.

181.   When they asked for their luggage, they were told to wait in another queue, and at some cases, passengers had to pick through piles of luggage to find their own luggage.  (See ¶85)

182.   Indeed, Plaintiff Smith has alleged that she requested her luggage from Southwest, and she experienced a significant delay in receiving her luggage that lasted twelve hours.

183.   To the extent that this is a contractual requirement of notice to sue on the bailment contract, Plaintiffs' performance of notice should be excused or deemed futile because it was impossible to submit a claim for the baggage as required by the

COC during the class period when Southwest is not operating because of its defective Skysolver program.

184.   As alleged herein, Defendant breached this duty.

185.   As a result of Defendant's breach of this duty, Plaintiffs and all other Class Members have been harmed as alleged herein.

186.   Indeed, Plaintiff Smith was without her luggage for nearly twelve hours, which included (among other important belongings) she did not have access to her medication in the luggage.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all putative Class members, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.   For an Order determining at the earliest possible time that this matter may proceed as a class action under Rule 23 and certifying this case as such;

B.   For Plaintiffs and each Class member their actual compensatory damages;

C.   For injunctive relief requiring Southwest to replace and/or update its antiquated crew scheduling technology and/or SkySolver technology; and refunding Plaintiff's and the Class Members ticket fees and add on fees automatically.

D.   For reasonable attorneys' fees and costs of suit;

E.   For pre-judgment interest and interest pursuant to redhibition; and

F.   Such further and other relief the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the Class of all others similarly situated, hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

**LAW OFFICE OF FRANCIS J. FLYNN, JR.**

Dated: June 21, 2024          By:   /s/ Francis J. "Casey" Flynn, Jr.
                                    Francis J. "Casey" Flynn, Jr., Esq.
                                    6057 Metropolitan Plz.
                                    Los Angeles, CA 90036
                                    (314) 662-2836
                                    Email:  casey@lawofficeflynn.com

                                    *Co-Lead Counsel for Plaintiffs*

                                    **AGUIRRE & SEVERSON, LLP**

                                    Maria C. Severson, Esq.
                                    501 West Broadway, Suite 1050
                                    San Diego, CA 92101
                                    (619) 876-5364
                                    Email:  mseverson@amslawyers.com

                                    *Co-Lead Counsel for Plaintiffs*

                                    **GLANCY PRONGAY & MURRAY LLP**

                                    Brian P. Murray, Esq.*
                                    122 East 42nd Street, Suite 2920
                                    New York, NY 10168
                                    (212) 682-5340
                                    Email: bmurray@glancylaw.com

                                    *Plaintiffs' Steering Committee*

                                    **JIM S. HALL & ASSOCIATES**

                                    Matthew B. Moreland, Esq.*
                                    800 N. Causeway Blvd., Suite 100
                                    Metairie, LA 70001
                                    (504) 832-3000
                                    Email: mmoreland@jimshall.com

                                    *Plaintiffs' Steering Committee*

                                    ***\* to seek admission Pro Hac Vice***

37

1
2
3
**CERTIFICATION**

4        I HEREBY CERTIFY that on June 21, 2024, a true and correct copy of the

5 foregoing was electronically filed with the ECF/CM Case Management System.

6 Copies of the foregoing document will be served upon interested counsel via

7 transmission of Notices of Electronic Filing generated by the system.

8
9 Date: <u>June 21, 2024</u>            By: <u>  /s/     Francis J. "Casey" Flynn, Jr.          </u>

10                                    **Francis J. "Casey" Flynn, Jr.**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
LEAD CASE NO. 3:23-CV-00306-AJB-SBC