

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

*In Re: Southwest Airlines Co. Flight Disruption Litigation*

Lead Case No.:  23-cv-00306-AJB-SBC
Consolidated with:
Case No. 23-cv-00313-AJB-SBC
Case No. 23-cv-00633-AJB-SBC

**ORDER GRANTING IN PART AND DENYING IN PART SOUTHWEST'S MOTION TO DISMISS**

**(Doc. No. 50)**

Defendant Southwest Airlines Co. ("Southwest") has filed a motion to dismiss Plaintiffs Mary Smith, Matt Grove, Paula Hill, Eva Piña, and Eric Capdeville's (collectively, "Plaintiffs") Consolidated Third Amended Class Action Complaint ("TAC"). (Doc. No. 50.) Plaintiffs filed an opposition (Doc. No. 54), to which Southwest replied, (Doc. No. 55). After thorough consideration of the papers, the Court **GRANTS IN PART AND DENIES IN PART** Southwest's motion for the reasons set forth below.

## I.     BACKGROUND

This consolidated putative class action arises from the cancellation of flights by Southwest during the winter holiday season of December 2022 to January 2023. (*See*

1

*generally* Consolidated Third Amended Class Action Complaint ("TAC"), Doc. No. 46.) After two rounds of successful motions to dismiss (*see* Doc. Nos. 36 (Order Granting Motion to Dismiss First Amended Complaint); 45 (Order Granting Motion to Dismiss Second Amended Complaint)), Plaintiffs filed the TAC on December 17, 2024, after which Southwest filed the instant motion to dismiss (Doc. No. 50).

### A.    Plaintiffs' Allegations

Between December 22, 2022, and January 2, 2023, Southwest cancelled nearly 16,000 flights due to an alleged combination of an outdated software system and winter storms. (TAC ¶¶ 4, 24, 106, 135, 155.) Each Plaintiff named herein had purchased tickets for flights that Southwest cancelled during the impacted time. (*Id.* ¶¶ 40–41, 53, 55, 58–59, 62–63, 69, 72, 184, 186, 190–92.)

For example, Plaintiff Mary Smith purchased a ticket for travel on December 29, 2022, from San Jose, California to Indianapolis, Indiana. (*Id.* ¶ 40.) This initial flight was cancelled after Plaintiff Smith had waited at the airport for ten hours. (*Id.* ¶ 41.) Southwest rebooked Plaintiff Smith for travel on December 30, 2022, which was subsequently cancelled as well. (*Id.* ¶¶ 42–43.) "Plaintiff Smith requested that Southwest transport her on the next flight(s) on which space is available to her intended destination," but when "Southwest was unable to do this within a reasonable period of time after cancelation," she "was forced to purchase a replacement flight through Delta Airlines." (*Id.* ¶¶ 45–46.)

Similarly, Plaintiff Matt Grove originally purchased a ticket for travel on December 23, 2022, after the cancellation of which he made the same request. (*Id.* ¶¶ 53–55.) When Southwest was unable to transport him within a reasonable period of time after cancelation, "Plaintiff Grove was forced to rent a car and then drive from Oakland to San Diego in a rental car[.]" (*Id.* ¶ 56.)  Much like Plaintiff Grove, when Plaintiff Eva Piña's flights were cancelled, she made the same request, Southwest failed to transport her, and she "was forced to find an alternative means of travel to get back to San Diego by booking a car through a rental service for an 8-hour drive from Sacramento to San Diego." (*Id.* ¶¶ 62–

2

64.) When Plaintiff Paula Hill's round trip travel was canceled and delayed, she made the same request, which Southwest did not fulfill within a reasonable period of time after cancellation. (*Id.* ¶¶ 58–59.)

Plaintiff Capdeville originally booked a flight from New Orleans, Louisiana to Portland, Oregon for travel on December 27, 2022, but it was cancelled. (*Id.* ¶¶ 69, 71.) Plaintiff Capdeville "requested that Southwest transport him on the next flight(s) on which space is available to his intended destination, but Southwest was unable to do this within a reasonable period of time after cancelation." (*Id.* ¶ 72.) He attempted to make other travel plans to Portland, but because he was "unable to find a viable ticket to go to Portland, he bought a plane ticket to instead have a vacation in Boston." (*Id.* ¶ 74.) Plaintiff Capdeville requested a refund for the cost of his ticket. (*Id.* ¶¶ 75, 209.)

After requesting refunds, Plaintiffs Smith, Hill, Piña, and Capdeville were not refunded for the cost of their airline tickets within seven days of cancellation. (*Id.* ¶¶ 48, 61, 65, 75.) In fact, Plaintiff Capdeville, to his knowledge, was never issued a refund/credit at all. (*Id.* ¶ 77.) Plaintiffs Smith, Grove, Piña, and Capdeville were not reimbursed for their out-of-pocket expenses caused by the ticket cancellations within hours of the flight during the holiday season. (*Id.* ¶¶ 49, 57, 66, 76.)

Plaintiffs bring claims for (1) breach of contract of carriage; (2) breach of contract of carriage as modified, (3) breach of contract to reimburse for out of pocket expenses, (4) promissory estoppel, and (5) judicial estoppel.[1] (*See generally* TAC.) Southwest moves to dismiss all five claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] (Doc. No. 50.)

///

///

///

---

[1] The fifth cause of action is misnumbered but referred to herein by the correct subsequent number.

[2] All future use of Rule or Rules refer to the Federal Rules of Civil Procedure unless otherwise stated.

3

**B.     Contract of Carriage[3]**

The TAC alleges each Southwest passenger's air travel ticket is governed by the Contract of Carriage ("CoC") drafted by Southwest. (TAC ¶¶ 81, 83.) Section 9 of the CoC provides in relevant part:

Failure to Operate as Scheduled

(1) Canceled Flights or Irregular Operations. In the event the Carrier cancels or fails to operate any flight according to Southwest Airlines published schedule, or significantly changes the schedule of any flight, or there is a significant delay, Carrier will, at the request of a Passenger with a confirmed Ticket on such flight, take one of the following actions:

(i) Transport the Passenger at no additional charge on Southwest Airlines next flight(s) on which space is available to the Passenger's intended destination, in accordance with Southwest Airlines established re-accommodation practices; or

(ii) Following a request by the Customer, refund the unused portion of the Customer's fare in accordance with Section 4.c.

(CoC § 9.a.) Regarding the application of the CoC and its limitations on damages, it states:

Unless specifically stated otherwise herein or where any limitation would expressly violate any applicable law, the Carrier shall not be liable for any consequential, compensatory, indirect, incidental, or punitive damages arising out of or in connection with the performance of its obligations under this Contract of Carriage.

(*Id.* § 1.a(8).)

Moreover, "Southwest Airlines reserves the right, in its sole discretion and to the extent not prohibited by law, to change, delete, or add to any of the terms of this Contract of Carriage without prior notice. All changes must be in writing and approved by an

---

[3]     Plaintiffs attached Southwest's Contract of Carriage, to which each passenger agrees to be bound when they make a reservation or accepts transportation on Southwest, to their TAC. (*See* CoC (Doc. No. 46-1, Southwest Airlines Co. Contract of Carriage – Passenger ("CoC").). Because the Contract of Carriage was attached to the TAC, the Court may appropriately consider it at the pleading stage.

authorized representative of Southwest Airlines." (*Id.* § 1.a(2).)

Finally, the CoC includes a choice-of-law provision setting Texas state law as the governing law. (*Id.* § 10.c(1).)

## II.   LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). Dismissal is proper "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (quoting *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also L.A. Lakers, Inc.*, 869 F.3d at 800 ("In conducting this review, we accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff.").

## III.   DISCUSSION

Plaintiffs plead five counts—breach of contract of carriage, breach of contract as modified, breach of unilateral contract to reimburse for out of pocket expenses, promissory estoppel and judicial estoppel—all of which Southwest seeks to dismiss.[4] The Court will

---

[4] Southwest asserts that Plaintiffs' TAC violates Rule 15 and the Court's prior order because the Court dismissed each claim with leave to amend. (Doc. No. 50-1 at 10–12.) To Southwest, this means that "the Court provided Plaintiffs with leave to amend their three dismissed claims: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) bailment." (*Id.* at 10–11.) Plaintiffs rely on the conclusion of the Court's order—wherein the Court granted Southwest's motion to dismiss with leave to amend—as providing leave to allege new allegations about Southwest['s] representations about its promise to reimburse for out of pocket expenses." (Doc. No. 54 at 24–25.) The Court is not persuaded by Plaintiffs' characterization of the new allegations as "newly identified statements" (*see* Doc. No. 54 at 24) because, as noted by Southwest, all the statements pre-date Plaintiffs' SAC (*see* Doc. No.

23-cv-00306-AJB-SBC

address each in turn.

### A. Breach of Express Contract

Southwest moves to dismiss Plaintiffs' first cause of action for breach of express contract. (Doc. No. 50-1 at 13, 16–17, 19–23.)[5]

"In Texas, the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (cleaned up).

The first cause of action alleges two different breaches of CoC: (1) Southwest failed transport Plaintiffs on the next flight to their intended destinations on which space was available and (2) refund the unused portion of Plaintiffs' fare. In comparing the allegations in the operative complaint with those of the previous complaint, Plaintiffs have added four paragraphs to amend the replacement flight claim and three paragraphs to amend the refund claim. First, Plaintiffs now allege that the CoC is "ambiguous" as to the time of performance making it susceptible to parole evidence demonstrating that "within a reasonable time" should be inferred. (TAC ¶¶ 193–96.) Second, Plaintiffs identify where the CoC references compliance with all applicable laws and allege Plaintiff Capdeville requested a refund, which Southwest did not process within seven days. (*Id.* ¶¶ 207–09.)

### 1. Failure to Provide a Replacement Flight

The first claim within the first cause of action alleges that, after Southwest cancelled flights for which they had purchased tickets, "Plaintiffs requested that Southwest transport them on the next flight(s) on which space is available to their intended destination, but

---

55 at 11.) However, considering the "extreme liberality" with which Rule 15 is to be applied, *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003), the Court will address all Plaintiffs' claims, including those pleaded for the first instance.

[5] For clarity and consistency, the Court cites to the page numbers in the header applied by the electronic case filing system.

23-cv-00306-AJB-SBC

Southwest was unable to do this within a reasonable period of time after cancelation," which based on Section 9 of the CoC as interpreted by the parties' beliefs, statements, and representations at the time, meant "later that day or the next few days.[.]" (*Id.* ¶¶ 188–96.) Plaintiffs assert that parole evidence is permissible to interpret Section 9 of the CoC because it is ambiguous as to when performance is to occur. (*Id.* ¶ 193.)

With regard to Plaintiffs' ambiguity argument, the relevant CoC provision states that, in the event of a canceled flight, Southwest will, at the request of a passenger with a confirmed ticket on such flight, "[t]ransport the Passenger at no additional charge on Southwest Airlines next flight(s) on which space is available to the Passenger's intended destination[.]" (CoC § 9.a(1)(i).)

When interpreting contract language, "[i]f the language lends itself to a clear and definite legal meaning, the contract is not ambiguous and will be construed as a matter of law." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). Although Plaintiffs allege the language is ambiguous (*see* TAC ¶ 193), "the Court is not required 'to accept as true a legal conclusion couched as a factual allegation,'" *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (quoting *Iqbal,* 556 U.S. at 678), and "[w]hether a contract is ambiguous is a matter of law for the court," *In re Davenport*, 522 S.W.3d 452, 456 (Tex. 2017). *See also Great Am. Ins. Co.*, 512 S.W.3d at 893 ("An ambiguity does not arise merely because a party offers an alternative conflicting interpretation[.]"). Because Plaintiffs' additional allegation is a legal conclusion, it does not receive the assumption of truth Plaintiffs' factual allegations warrant when considering a motion to dismiss.

Instead, the Court turns to the actual contractual language at issue. As previously interpreted, the provision has a clear and definite meaning of "specifically provid[ing] a fixed time to provide an alternative flight in the event a flight is cancelled: (1) on Southwest's *next* flight to the passenger's intended destination (2) on which space is available." (Doc. No. 45 at 8 (emphasis in original).) The language of the CoC has not changed between the SAC and the TAC, and as such the Court's interpretation of this language as unambiguous will not change either.

7

Having determined that Plaintiffs have alleged the existence of a valid contract and what the terms of that contract were, the Court turns to the next element of a breach of contract claim: that the plaintiff performed or tendered performance as contractually required. *See West Loop Hosp., LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 491 (Tex. App. 2022). Pursuant to Section 9 of the CoC, an impacted passenger, namely one who purchased a ticket on a subsequently cancelled flight, must request to be rebooked or refunded. (*See* CoC § 9.a(1).) All named Plaintiffs allege they purchased tickets for Southwest flights and, once Southwest cancelled their flights, requested Southwest transport them on the next flight(s) on which space is available to their intended destinations. (*See* TAC ¶¶ 40, 45, 53, 55, 59, 62–63, 69, 72, 184, 186, 190–92.) This element is sufficiently pled.

Next, Plaintiffs must allege "the defendant breached the contract by failing to perform or tender performance as contractually required." *See West Loop Hosp., LLC*, 649 S.W.3d at 491. All Plaintiffs allege that "Southwest was unable to do this *within a reasonable period of time after cancelation*." (TAC ¶¶ 45, 55, 59, 63, 72, 190 (emphasis added).) Plaintiffs do not allege that Southwest did not rebook them on the next flight to their intended destination on which space was available. Rather, it appears that none of the named Plaintiffs waited for there to be a breach before taking alternative action. Because Plaintiffs fail to allege Southwest breached the contract, they fail to state a claim for breach of contract. The first cause of action regarding replacement flights is **DISMISSED**.

### 2. Failure to Provide a Refund

The second claim within the first cause of action alleges that, after Southwest cancelled flights for which they had purchased tickets, Plaintiff "Capdeville requested a refund of the cost of his ticket[,] but Southwest did not refund his ticket within seven days," as required by Section 1 of the CoC, which incorporates the Airline Deregulation Act. (TAC ¶¶ 206–09.)

Southwest asserts that Plaintiffs' claim that "the CoC incorporates by reference a federal regulation requiring that airlines refund the cost of cancelled flights in seven

days . . . has already been rejected by this Court, and their new allegations fail to undermine that prior ruling." (Doc. No. 50-1 at 16.)

Plaintiffs fail to address this argument. (*See generally* Doc. No. 54.)

Although the TAC now identifies the specific provision upon which Plaintiffs' claim rests—section 1—the Court previously analyzed this provision and determined that "a mere reference to the U.S. Department of Transportation 'and laws, regulations, and rules imposed by U.S. or foreign governmental agencies . . . does not create a 'self-imposed obligation' . . . [and thus] Southwest was not required to provide a refund within seven days." (Doc. No. 45 at 12.) Considering that the TAC relies on the same provision of the CoC which the Court has previously interpreted and Plaintiffs fail to oppose Southwest's argument for dismissal, the Court reaffirms its prior analysis and conclusion: Southwest was not required to provide a refund within seven days. Thus, the applicable contract provision Plaintiffs allege Southwest breached states that, in the event of a canceled flight, Southwest will, "[f]ollowing a request by the Customer, refund the unused portion of the Customer's fare in accordance with Section 4.c." (CoC § 9.a(1).)

Having identified the applicable contractual language, the Court turns to the rest of the elements of a breach of contract claim. Southwest fails to address any other aspects of this claim beyond the inapplicability of the alleged seven-day limitation for refunds. (*See generally* Doc. No. 50-1.)

First, as discussed *supra*, all named Plaintiffs allege they purchased tickets for Southwest flights. (*See* TAC ¶¶ 40, 53, 55, 59, 62–63, 69, 72, 184, 186, 190–92.) However, only Plaintiff Capdeville alleges that he requested a refund for the cost of his ticket. (*Id.* ¶¶ 75, 209.) As such, Plaintiffs only sufficiently allege this element as to Plaintiff Capdeville. Next, Plaintiff Capdeville alleges Southwest breached the contract by failing to perform as contractually required.[6] *See West Loop Hosp., LLC*, 649 S.W.3d at 491. Specifically,

---

[6] In addition to failing to allege their own performance under the contract, Plaintiffs Smith, Grove, Hill, and Piña do not sufficiently allege Southwest failed to perform. Specifically, Plaintiffs Smith, Hill,

Plaintiff Capdeville alleges that Southwest "did not issue Plaintiff Capdeville a refund/credit at all and, as well, not within seven days of cancelation." (TAC ¶ 77.) Although the seven day limitation is not applicable, Plaintiff Capdeville alleges that Southwest failed to ever refund him, thus sufficiently pleading this element. Finally, because Plaintiff Capdeville's flight was cancelled by Southwest and he did not receive a refund, despite requesting one, he sustained damages as a result of Southwest's breach. *See Sacks v. Hall*, 481 S.W.3d 238, 246 (Tex. App. 2015) (quoting *Bowen v. Robinson,* 227 S.W.3d 86, 96 (Tex. App. 2006)) ("In a breach of contract action, the normal measure of damages 'is just compensation for the loss or damage actually sustained, commonly referred to as the benefit of the bargain.'"). Specifically, Plaintiff Capdeville neither used his ticket nor otherwise received the benefit of his bargain with Southwest. (*See* TAC ¶ 187.) Plaintiff Capdeville sufficiently alleged damages in the amount of the unused portion of his purchased fare.[7] *See Sacks*, 481 S.W.3d at 246 (quoting *Matheus v. Sasser,* 164 S.W.3d 453, 459 (Tex. App. 2005)) ("Benefit-of-the-bargain damages 'measure the difference between the value as represented and the value as received.'").

Accordingly, the first cause of action regarding refunds is **DISMISSED** as to Plaintiffs Smith, Grove, Hill, and Piña. However, Southwest's motion to dismiss the first cause of action is **DENIED** as to Plaintiff Capdeville's refund claim (and those of the putative class similarly situated).

### B.   Breach of Contract as Modified

Plaintiffs' second cause of action asserts that "Southwest modified the Contract of Carriage by making the 'self-imposed' promises to Plaintiffs and Class Members and Congress that it would reimburse Plaintiffs and class members for these out-of-pocket

---

and Piña allege Southwest did not issue a refund within seven days of cancellation, while Plaintiff Grove does not allege Southwest failed to reimburse him at all. (*See* TAC ¶¶ 48 (Smith), 61 (Hill), 65 (Piña); *see generally id.* ¶¶ 52–67 (Grove).)

[7]     Although the TAC includes allegations about other damages, such as "the cost of replacement tickets on other airlines, ground transportation, hotels, and other out-of-pocket expenses," (*see id.* ¶¶ 202–04, 210), those are not applicable to the refund claim based on the applicable contractual language.

23-cv-00306-AJB-SBC

expenses, including reimbursement of flights on alternative airlines, caused by its failure to transport them on Southwest['s] next plane with available space." (TAC ¶ 223.) Plaintiffs assert that such unilateral modification was permitted by Section 1 of the CoC, which reserves the right to Southwest "to change, delete, or add" to the CoC "without prior notice," so long as the changes are "in writing and approved by an authorized representative of Southwest Airlines." (*Id.* ¶¶ 16, 222.) Specifically, Plaintiffs allege that Southwest modified its CoC to include that they would honor reasonable reimbursement requests for out-of-pocket expenses based on a December 27, 2022 traveled disruption notice, a December 28, 2022 video message from Southwest's Chief Commercial Officer, and two written media releases. (*See id.* ¶¶ 95–100.)

In the instant motion, Southwest argues that Plaintiffs fail to sufficiently allege that the CoC was modified because elements required by Texas contract law and contractual requirements set by the CoC itself are not pled. (Doc. No. 50-1 at 13–16.)

### 1.    Requirements for Valid Modification

Applying Texas contract law, Southwest argues Plaintiffs fail to plead the elements of intent and consideration. (Doc. No. 50-1 at 14–15.) First, Southwest argues that Plaintiffs' allegations regarding "when (1) [Southwest's] representatives testified before the Senate, (2) when it made statements on its public website, or (3) or when it set up a page to allow passengers of cancelled flights to submit requests for reimbursement," do not "demonstrate that Southwest intended to modify the terms of the 37th version of the CoC," because none of Southwest's "statement[s] . . . even reference[] the CoC[.]" (*Id.* at 14.) Second, Southwest argues that even if Plaintiffs could establish Southwest intended to modify the CoC, the modification would fail because there was no new consideration supporting the modification. (*Id.* at 15.)

The general rules of contract dictate that "[p]arties have the power to modify their contracts[, but] modification must satisfy the elements of a contract: [namely] a meeting of the minds supported by consideration." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986); *see also Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 314 (Tex.

App. 2003) ("Texas courts have consistently adhered to the rule that a modification to a contract must itself be supported by consideration to be valid."). "Whether a contract is modified depends on the parties' intentions and is a question of fact." *Hathaway*, 711 S.W.2d at 228–29. "In determining whether the parties had a meeting of the minds concerning a modification of a contract, the focus is on what the parties did and said, not their subjective states of mind." *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App. 2008). "The burden of proving modification rests on the party asserting the modification." *Hathaway*, 711 S.W.2d at 229.

Despite the general rules, "Texas law recognizes and protects a broad freedom of contract." *Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95 (Tex. 2011). "As a rule, parties have the right to contract as they see fit as long as their agreement does not violate the law or public policy." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 129 (Tex. 2004). "This 'paramount public policy' mandates that courts 'are not lightly to interfere with this freedom of contract.'" *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 481 (Tex. 2017) (quoting *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007)); *see also Nafta Traders, Inc.*, 339 S.W.3d at 95–96 ("[I]f there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by Courts of justice."). "Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered[.]" *Shields Ltd. P'ship*, 526 S.W.3d at 481 (quoting *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 485 (Tex. 2016)).

The CoC that Southwest drafted expressly states that it "reserves the right, in its sole discretion and to the extent not prohibited by law, to change, delete, or add to any of the terms of this Contract of Carriage without prior notice," (CoC § 1.a(2); *see also* TAC ¶ 16), which reserves to Southwest the right to unilaterally modify the CoC. Southwest proffers no argument nor any case law addressing why such a provision should not be enforced against its drafter in light of Texas's strong public policy of upholding a broad

12

freedom to contract. *Cf. Shields Ltd. P'ship*, 526 S.W.3d at 483 n.39 ("[F]reedom of contract includes not only the power to make a contract, but also the freedom to waive, modify, or unmake the contract.").

Because the CoC provides for Southwest's unilateral modification, it is the terms of that provision, not the general contract provisions, that governs Plaintiffs' claim. Pursuant to the CoC, "[a]ll changes must be in writing and approved by an authorized representative of Southwest Airlines." (CoC § 1.a(2).) As such, Southwest's arguments that modification requires new consideration and a meeting-of-the-minds both fail as those requirements have been contracted around. *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) ("Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit.").

### 2.     Southwest's Alleged Modification

Next, the Court turns to whether Plaintiffs allege sufficient facts to state that Southwest's modification was contractually valid pursuant to CoC § 1(a)(2): namely whether Plaintiffs allege there was a change (1) made in writing and (2) approved by an authorized representative of Southwest.

In the second cause of action, Plaintiffs simply allege that, "during and after this disruption, Southwest modified the Contract of Carriage by making the 'self-imposed' promises to Plaintiffs and Class Members and Congress that it would reimburse Plaintiffs and class members for these out-of-pocket expenses, including reimbursement of flights on alternative airlines, caused by its failure to transport them on Southwest next plane with available space." (TAC ¶ 223.) Plaintiffs do not include other factual allegations specifically addressing the modification in the second count; however, they incorporate the preceding allegations (*see id.* ¶ 211), which include a subsection of the factual background addressing the promises Southwest allegedly made through Chief Operating Officer ("COO") Andrew Watterson's testimony to the Senate, Chief Commercial Officer Ryan Green's video message, Chief Executive Officer Bob Jordan's message, and statements on Southwest's website (*see id.* ¶¶ 95–104).

13

First, there is no document that Plaintiffs point to that expressly states it is modifying the CoC. As a result, the Court must assess whether Plaintiffs sufficiently "plead facts that 'allow[] the court to draw the reasonable inference'" that Southwest modified its CoC. *See Scheibe v. ProSupps USA, LLC*, 141 F.4th 1094, 1099 (9th Cir. 2025) (quoting *Iqbal*, 556 U.S. at 678). Southwest asserts in its motion that none of the relevant allegations attributed to Southwest in the TAC even reference the CoC. (Doc. No. 50-1 at 14.) In reply, however, Southwest concedes that Watterson testified to Congress regarding the CoC. (*Compare id. with* 55 at 6.) The Court agrees with Southwest that the statements on its website, those made by Green, and those made by Jordan as alleged in the TAC do not address the CoC or modification thereto. Thus, it would be unreasonable to infer on those factual allegations that Southwest modified its CoC. As Watterson's testimony to the Senate does reference the CoC, the Court will analyze his testimony further below.

Second, none of the oral statements cited by Plaintiffs—such as Watterson's testimony and Green's video message— themselves fulfill the "in writing" requirement for a valid modification. (*See* Doc. No. 50-1 at 14 ("Southwest's testimony to the Senate was not 'in writing.' Thus, Plaintiffs' alleged 'modification' to the CoC not only fails to satisfy the legal requirements for modification, but it also fails to meet the contractual requirements for it, too.") (citations omitted). Southwest's argument misses how Plaintiffs are relying on Watterson's testimony—not as the contract modification itself but as an admission by an authorized representative that Southwest already had changed the terms. (*See* Doc. No. 54 at 18 ("Said differently, Southwest admitted under oath that Southwest unilaterally changed its terms to be that Southwest would reimburse passengers for their alternative travel expenses incurred due to its operational failure.").)

In the TAC, Plaintiffs quote the following exchange between Watterson and Senator Kyrsten Sinema:

> Senator SINEMA. . . . On the topic of reimbursements, we heard that Southwest wasn't promising to reimburse expenses until multiple days after the cancellations began. So, a lot of customers in the early days didn't book alternative transportation, like they didn't book expensive alternative flights

because they didn't know whether or not Southwest would pay them back. So, my question is, why did it take so long to make this commitment? And for customers who are concerned about this for the future, I am asking that you update your contract of carriage to clearly state that reasonable expenses will be reimbursed in the event that a similar disruption occurs in the future.

Mr. WATTERSON. Thank you, Senator. The early part disruption was a weather event like everyone else experienced, and then it turned into a crew mix event that only we experienced. And when that happened, my recollection is that we then changed our language to be that we would reimburse. And then I believe we have held true to that word as well. And as far as the updates to our contract of carriage, I believe we are consistent with the DOT policy. We certainly want and endeavor to reimburse our customers, but I will commit you that we will go back and we look at that language and make sure it is up to date.

(TAC ¶ 106 (emphasis omitted).) To reasonably interpret Watterson's use of "our language" as meaning the CoC, the sentence must be read in isolation, as the TAC initially quotes it. (*See id.* ¶ 25.) When read in context, Senator Sinema asked Watterson two questions, only the second of which involved the CoC. Watterson addressed each point separately. The transition of "[a]nd as far as the updates to our contract of carriage" makes clear that "our language" was distinct from the CoC. *Cf. Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998) ("We must read all parts of the contract together, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.") (citations omitted). As such, the Court finds that, based on Watterson's testimony in the full context provided by the TAC, it would be unreasonable to infer that Watterson is asserting that Southwest modified its CoC.

Although the Court finds that Plaintiffs sufficiently pleaded that a unilateral modification to the CoC by Southwest is permitted, Plaintiffs have not provided sufficient factual allegations, taken as true, to state that Southwest did unilaterally change the CoC to provide that Southwest would reimburse for the disruption. Thus, Plaintiffs fail to state a claim for breach of contract as modified. The Court **DISMISSES** Plaintiffs' second cause of action.

///

15

23-cv-00306-AJB-SBC

### C.      Breach of Contract to Reimburse Out-of-Pocket Expenses

Plaintiffs' third cause of action alleges that Southwest's promise to reimburse constituted an offer for a unilateral contract which Plaintiffs are attempting to accept through bringing the lawsuit. (TAC ¶¶ 235–43.)

In its motion, Southwest asserts that (1) its post-disruption statements were general statements to Congress and the public-at-large, not an offer, (2) Plaintiffs failed to accept in compliance with the alleged offer because they filed a lawsuit instead of submitting an Expense Reimbursement Request, and (3) Plaintiffs do not allege that they provided any consideration for the alleged contract. (Doc. No. 50-1 at 18–19.)

"Unlike a bilateral contract, in which both parties make mutual promises, a unilateral contract is created when a promisor promises a benefit if a promisee performs." *City of Houston v. Williams*, 353 S.W.3d 128, 135 (Tex. 2011) (citations omitted). "The performance or forbearance constitutes both acceptance of a promisor's offer and consideration[;]" thus, "[t]he contract becomes enforceable when the promisee performs." *Vanegas v. Am. Energy Servs.*, 302 S.W.3d 299, 302, 304 (Tex. 2009) (citations omitted).

#### 1.      Southwest's Offer

First, the Court turns to whether the TAC alleges sufficient facts that Southwest promised a benefit if Plaintiffs performed. "To prove that an offer was made, a party must show (1) the offeror intended to make an offer, (2) the terms of the offer were clear and definite, and (3) the offeror communicated the essential terms of the offer to the offeree." *Matter of Texxon Petrochemicals, L.L.C.*, 67 F.4th 259, 263 (5th Cir. 2023) (quoting *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App. 2008)).

Plaintiffs point to Watterson's testimony to the Senate, Green's video message, Chief Executive Officer Bob Jordan's message, and statements on Southwest's website as "additional 'self-imposed' promise[s]" that "constitute[] a unilateral contract[.]" (*See* TAC ¶¶ 95–104 (factual background subsection setting forth allegations regarding Southwest's promises), 235–43 (Count III).)

///

16

None of Watterson's quoted testimony is itself an offer because it is not "sufficiently definite in its terms" to determine what obligations each party undertook. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("A contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook."). However, Watterson's testimony may be construed as referencing an offer. (*See* TAC ¶¶ 23 ("We will not pay them cash to be in another airline unless it is for reimbursement of a flight they took in the disruption."), 24 ("And when that happened, my recollection is that we then changed our language to be that we would reimburse."), 25 (responding affirmatively when asked if Southwest is still working to ensure customers are made whole), 26 (listing action steps that include "[m]aking the unilateral determination that every flight disruption between December 24th and January 2nd was treated as 'within the airline's control,' regardless of the actual cause, meaning that we would grant all reasonable reimbursement requests for our Customers' out-of-pocket expense").

On the other hand, the messages on Southwest's website state that for "additional expenses (e.g., hotel, rental car, food, etc.)," impacted travelers "may submit receipts for consideration via Email Us on Southwest.com" and that Southwest "will honor reasonable requests for reimbursement for meals, hotel, and alternate transportation." (*Id.* ¶¶ 96, 102, 104; *see also id.* ¶ 99 ("We've set up a page at Southwest.com/traveldisruption for Customers to submit refund and reimbursement requests for meals, hotel, and alternate transportation; as well as to connect Customers to their baggage.").) Considering Watterson's testimony referencing offering refunds (*id.* ¶¶ 23–26), Jordan's message referencing offering refunds (TAC ¶¶ 27, 100), and the messages on Southwest's website in the light most favorable to Plaintiffs, Southwest made an offer to reimburse reasonable meal, hotel and alternate transportation expenses for those "impacted by a flight cancellation or significant flight delay between December 24, 2022, and January 2, 2023," which Plaintiffs can accept by "submit[ting] receipts for consideration via Email Us on Southwest.com."

///

23-cv-00306-AJB-SBC

In their opposition, Plaintiffs assert that Southwest's offer did not set the method of performance. (Doc. No. 54 at 15–17 (analyzing Green's video message, Watterson's testimony, and Southwest's website).) With regard to Green's video message, Plaintiffs rely heavily on the use of "ways" in the video's caption as authorizing multiple methods of acceptance. (Doc. No. 54 at 15–16.) As alleged in the TAC, "Southwest represented that the message 'offers ways for travelers to submit receipts for travel expenses incurred in disrupted travel, to request a refund for canceled or significantly delayed flights, and to share information to help Southwest to deliver delayed bags free of charge.'" (TAC ¶ 28.) Plaintiffs argue that, "[b]ecause Southwest used the word 'ways', the inference here is that there is more than one way for a customer who acted on Southwest's offer to submit a request for reimbursement of out of pocket expenses." (Doc. No. 54 at 16.) However, based on sentence construction, the use of the plural is due to addressing three different actions impacted individuals can take.

Plaintiffs also assert that Watterson's testimony never referenced requiring impacted travelers to fill out a reimbursement request form in order to obtain reimbursement. (*Id.* at 16–17.) However, Watterson's testimony did in fact address how Southwest "create[d] a highly-visible, user-friendly webpage where Customers could easily find information and directions on how to request refunds and reimbursements[.]" (TAC ¶ 26.) Moreover, as discussed *supra*, Watterson's testimony cannot be interpreted to be an offer based on its language and timing.

Considering the allegations of the TAC in the light most favorable to Plaintiffs, Southwest's offer to reimburse reasonable expenses set the method of acceptance: performance by submitting receipts to Southwest by the Email Us link and completing the subsequent prompted steps. The Court finds that Plaintiffs allege sufficient facts to state that Southwest made an offer for a unilateral contract.

///

///

///

18

## 2.    Plaintiffs' Performance

Next, the Court turns to whether the TAC alleges sufficient facts that Plaintiffs accepted Southwest's offer through performance.[8] "Where . . . an offer prescribes the time and manner of acceptance, its terms in this respect must be complied with to create a contract." *Town of Lindsay v. Cooke Cnty. Elec. Co-op. Ass'n*, 502 S.W.2d 117, 118 (Tex. 1973); *see also Cantu v. Cent. Educ. Agency*, 884 S.W.2d 565, 566 (Tex. App. 1994) ("The aphorism 'the offeror is the master of his offer' reflects the power of the offeror to impose conditions on acceptance of an offer, specify the manner of acceptance, or withdraw the offer before the offeree has effectively exercised the power of acceptance."); *Domingo*, 257 S.W.3d at 39 ("An acceptance must be identical to the offer; otherwise, there is no binding contract.").

As discussed *supra*, Southwest promised the benefit of reimbursement if Plaintiffs performed by submitting receipts to Southwest by the Email Us link and completing the subsequent prompted steps. In contrast to the terms of the unilateral contract, the TAC alleges that "Plaintiff and putative class members through this lawsuit are attempting to accept that offer." (TAC ¶ 241.) Because Plaintiffs do not allege that they submitted receipts through the Email Us function on Southwest.com as required by the offer, Plaintiffs fail to allege performance in response to Southwest's promise. *See, e.g.*, *Hill v. Concho Res., Inc.*, 634 F. Supp. 3d 359, 364 (W.D. Tex. 2022) ("The Release Agreement gave the 'time and manner of acceptance.' Plaintiff did not perform as the Release Agreement required and did not accept the offer. And without Plaintiff's acceptance, be it a contract for benefits or an employment agreement, no contract was formed."); *Town of Lindsay*, 502 S.W.2d at 118 ("The use of a different method of acceptance by the offeree will not be effectual unless the original offeror thereafter manifests his assent to the other party."). Without Plaintiffs' performance, there is no unilateral contract to enforce. *See*

---

[8]    Because the consideration of a unilateral contract is performance, Southwest's second and third arguments collapse into each other. *See Vanegas*, 302, S.W.3d at 304.

*Vanegas*, 302 S.W.3d at 302.

Accordingly, Plaintiffs fail to state a claim for breach of a unilateral contract for reimbursement. The third cause of action is **DISMISSED**.

### D.    Promissory Estoppel

Plaintiffs bring a claim of promissory estoppel. (TAC ¶¶ 244–52.) Specifically, Plaintiffs allege:

> Southwest voluntarily and unequivocally promised to reimburse Plaintiffs and members of the proposed class for out-of-pocket expenses incurred to purchase air travel on an alternate airline to reach their designated locations. Southwest made this promise knowing and intending that Plaintiffs and class members would rely on it by purchasing tickets on alternate airlines. Reyling on Southwest's promise, Plaintiffs and class members incurred substantial out-of-pocket expenses to purchase tickets for air travel on alternate airlines to their designated destinations. This reliance was reasonable, foreseeable, and directly induced by Southwest's representations. Plaintiffs and class members made proper requests for reimbursement of these out-of-pocket expenses through this lawsuit. Despite its promise, Southwest refused to reimburse Plaintiffs and class members for their incurred expenses.

(*Id.* ¶¶ 244–49.)

"The requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment." *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.25 (Tex. 2002) (quoting *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)). "Although promissory estoppel is normally a defensive theory, it may serve as a substitute for an unsuccessful breach of contract claim." *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 673 (Tex. App. 2010). "Promissory estoppel is not applicable to a promise covered by a valid contract between the parties[] but can apply to a promise outside a contract." *Baylor Scott & White v. Project Rose MSO, LLC*, 633 S.W.3d 263, 292 (Tex. App. 2021).

Southwest asserts that "Plaintiffs did not incur out-of-pocket expenses because Southwest said it would reimburse them," but rather "[t]hey incurred those expenses before any promises by Southwest." (Doc. No. 50-1 at 25.)

Although it may be the case that some individuals purchased alternative flights or rental cars in reliance on Southwest's promise to reimburse such expenses, the TAC fails to set forth such allegations for the named Plaintiffs. Plaintiff Smith purchased a replacement flight; however, the TAC fails to allege when the replacement flight was purchased or that Plaintiff Smith made that purchase relying on Southwest's representations of reimbursement. (*See* TAC ¶¶ 45–46.) In their opposition, Plaintiffs state that "Plaintiff Smith relied on the promise because she purchased her ticket on December 29th, **after** Defendant Southwest voluntarily undertook to reimburse customers for out-of-pocket expenses related to alternative flights as alleged *supra*." (Doc. No. 54 at 20 (emphasis in original).) However, the date of purchase is not alleged in the TAC and, even if it were, the fact that Plaintiff Smith purchased an alternative ticket after Southwest's reimbursement representations is not sufficient to allege that her actions were *caused* by reliance on those representations. For Plaintiffs Grove and Piña, the TAC fails to allege when they rented cars, whether it was after representations made by Southwest, and whether either Plaintiff booked their rental cars relying on the representation that they would be reimbursed. (*See* TAC ¶¶ 52–57, 62–67.) The TAC does not allege that Plaintiff Capdeville bought a flight to a different locale based on Southwest's representations. (*See id.* ¶¶ 68–77.) Finally, there are no allegations that Plaintiff Hill took any action at all, let alone action in reliance on Southwest's representations. (*Id.* ¶¶ 58–61.)

Because Plaintiffs fail to sufficiently allege that any named Plaintiff substantially relied on Southwest's promise to reimburse, the TAC fails to state a claim for promissory estoppel. The fourth cause of action is **DISMISSED**.

### E.    Judicial Estoppel

Plaintiffs bring a claim of judicial estoppel (TAC ¶¶ 253–58), specifically alleging:

> Southwest is judicially estopped from claiming it has no obligation to reimburse out-of-pocket expenses under the Contract of Carriage because: (1) Southwest took the clearly inconsistent position before Congress that it would reimburse all reasonable expenses during the disruption period; (2) Congress relied on these sworn statements in its oversight function, with multiple

Senators expressing approval of Southwest's commitment to reimburse customers; and (3) Southwest gained an unfair advantage by using these promises to avoid more stringent Congressional oversight and regulation while later refusing to honor those same commitments to customers. Southwest's Chief Operating Officer Andrew Watterson testified under oath to Congress that Southwest would "grant all reasonable reimbursement requests for our Customers' out-of-pocket expenses (i.e., hotels, rental cars, meals, tickets on other airlines, etc.)" and characterized these payments as mere reimbursements rather than settlements that would waive customers' legal rights. Having benefited from this position before Congress, Southwest cannot now reverse course and claim no such obligation exists.

(*Id.* ¶ 255–57.)

"The doctrine of judicial estoppel 'precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding.'" *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008) (quoting 2 Roy W. McDonald & Elaine G. Carlson, Texas Civil Practice § 9.51 at 576 (2d ed. 2003)); *see also Perryman v. Spartan Texas Six Cap. Partners, Ltd.*, 546 S.W.3d 110, 117 (Tex. 2018) ("Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation."). "The primary purpose of the doctrine is not to protect litigants, but rather the integrity of the judiciary." *Andrews v. Diamond, Rash, Leslie & Smith*, 959 S.W.2d 646, 650 (Tex. App. 1997).

"[J]udicial estoppel is subject to several important limitations." *George Fleming & Fleming & Assocs., L.L.P. v. Wilson* ("*George Fleming*"), 694 S.W.3d 186, 191 (Tex. 2024). First, "a party cannot be judicially estopped if it did not prevail in the prior action." *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 643 (Tex. 2009). "A party has 'prevailed' if it persuaded the court to adopt the party's position and thus grant the relief that the party sought." *George Fleming*, 694 S.W.3d at 191–92. Second, "the prior 'statement must be deliberate, clear, and unequivocal.'" *Id.* at 192 (quoting *Am. Sav. & Loan Ass'n of Hous. v. Musick*, 531 S.W.2d 581, 589 (Tex. 1975)). Third, "judicial estoppel applies only if the successful representation arose in a different case or, at most, 'in another phase' of the same case." *Id.* at 192 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749

(2001)).

Southwest argues that Plaintiffs do not identify a "prior judicial proceeding" or that Southwest "successfully maintained the prior position" because the statements made to Congress were not made in a judicial proceeding for which Southwest could obtain success. (Doc. No. 50-1 at 25–26.)

Plaintiffs argue that "[b]ecause judicial estoppel is an equitable doctrine[,] the decision of whether to invoke it [is] within a court's discretion." (Doc. No. 54 at 23 (quoting *Siller v. LLP Mortg., LTD.*, No. 04-11-00496-CV, 2013 WL 1484506, at *5 (Tex. App. Apr. 10, 2013)).) Specifically, Plaintiffs assert that the doctrine of judicial estoppel applies because Southwest provided sworn testimony to Congress and "Congress relied on these sworn statements in its oversight function, with multiple Senators expressing approval of Southwest's commitment to reimburse customers," which then Southwest benefit from by avoiding more stringent Congressional oversight and regulation. (*Id.* at 22–23.) Essentially, Plaintiffs ask this Court to extent judicial estoppel to cover non-judicial proceedings on the basis of justice.

"But 'discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike.'" *George Fleming*, 694 S.W.3d at 193 (quoting *In re Rudolph Auto., LLC*, 674 S.W.3d 289, 308 (Tex. 2023)). "Consistent application of judicial estoppel follows from respect for the requirements and limitations [the Texas Supreme Court] ha[s] described. Specifically, the party to be estopped must have obtained a benefit by making a clear and unambiguous statement that convinced a prior court to adopt a position that contradicts the party's current position." *Id.*

The parties do not identify, nor is this Court independently aware, of any authority stating that congressional hearings are judicial proceedings within the context of judicial estoppel. Based on the limitations placed on the doctrine by both the U.S. Supreme Court and Texas Supreme Court, the purpose of the doctrine to protect the integrity of the *judiciary*, and language of opinions focusing on prior *litigation*, the Court declines to

23

extend the doctrine of judicial estoppel to this new context. *See Kane v. Nat'l Union Fire Ins.*, 535 F.3d 380, 385 (5th Cir. 2008) ("Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in *litigation*.") (emphasis added); *New Hampshire*, 532 U.S. at 750 ("[C]ourts regularly inquire whether the party has succeeded in persuading a *court* to accept that party's earlier position, so that *judicial* acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second *court* was misled[.]") (citation omitted) (emphasis added). Accordingly, because no prior proceeding has been alleged, Plaintiffs fail to state a claim for judicial estoppel. The Court **DISMISSES** Plaintiffs' fifth cause of action.[9]

## IV.   CONCLUSION

Based on the foregoing, the Court **GRANTS in part** and **DENIES in part** Southwest's motion to dismiss the TAC as follows:

1.     The first cause of action is **DISMISSED** in its entirety as to Plaintiffs Smith, Grove, Hill, and Piña. The replacement flight claim is also **DISMISSED** as to Plaintiff

---

[9]     In reply, Southwest retorts that "[i]f anything[,] judicial estoppel applies to Plaintiffs' allegations in the TAC" because Plaintiffs "previously took the position that the unmodified CoC was the contract that governed their claims; the Court adopted that position; and it is difficult to see the inadvertence in failing to disclose a contract modification or separate unilateral contract allegedly in existence at the time of the first complaint." (Doc. No. 55 at 9.) Southwest's response is not well taken for myriad reasons, not the least of which is that "[i]t is well-established in our circuit that an amended complaint supersedes the original, the latter being treated thereafter as non-existent." *See Ramirez v. Cnty. Of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015) (quotations omitted). In fact, considering that all Southwest's arguments are made within the framework of a Rule 12(b)(6) motion, "there is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations." *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007); *see also Shirley v. Univ. of Idaho, Coll. of L.*, 800 F.3d 1193, 1194 (9th Cir. 2015) (Kozinski, J., concurring) ("Inconsistency—even direct contradiction—between a current complaint and an earlier one is not a basis for dismissal. The fact that the earlier complaint is inconsistent may have collateral consequences in the litigation, including possible sanctions under Rule 11 or undermining the plaintiff's credibility, but it does not render the current complaint legally insufficient under Rule 12(b).") (citations omitted). Moreover, considering Southwest's remark substantively, the Texas Supreme Court has opined, in addressing the doctrine of judicial estoppel, that "[s]ame-case inconsistencies are often wholly unproblematic[, particularly because p]arties may maintain alternative positions as a case unfolds." *See George Fleming*, 694 S.W.3d at 192 n.*.

Capdeville. Southwest's motion to dismiss the first cause of action is **DENIED** with regard to Plaintiff Capdeville's refund claim.

    2.    The second, third, fourth, and fifth causes of action are **DISMISSED** in their entirety.

    3.    Southwest must file an answer to the remaining claims of the TAC **no later than <u>March 16, 2026</u>**.

    **IT IS SO ORDERED.**

Dated:  March 2, 2026

Hon. Anthony J. Battaglia
United States District Judge

23-cv-00306-AJB-SBC